UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

```
-------------------------------x
WINSTON & STRAWN, LLP, et al., :
                                :
        Plaintiffs,             :
                                :
    v.                          : No. 06-01120 (EGS)
                                :     06-01227 (EGS)
FEDERAL DEPOSIT INSURANCE        :     06-01273 (EGS)
CORPORATION,                    :
                                :
        Defendant.              :
-------------------------------x
```

Washington, D.C.

Wednesday, January 17, 2007

Deposition of

RICHARD GILL

a witness, called for examination by counsel for

Plaintiffs, pursuant to notice and agreement of

counsel, beginning at approximately 2:30 p.m., at

the law offices of Winston & Strawn, 1700 K Street,

NW., Washington, D.C., before Mary Ann Payonk of

Beta Court Reporting, notary public in and for the

District of Columbia, when were present on behalf

of the respective parties:

58

1         MR. WILLNER:  I have no further

2    questions.

3         MR. PLUTA:  I have some questions.

4    Off the record.

5              (Discussion off the record.)

6         EXAMINATION BY COUNSEL FOR WINSTON

7         & STRAWN

8         BY MR. PLUTA:

9    Q    Mr. Gill, my name is Scott Pluta.

10   I'm counsel for Winston & Strawn in this

11   matter.  I just have a couple questions for

12   you.

13        We'll start generally.  In regards

14   to the issue at stake, the -- the matter

15   brought by the IRS, as far as the 1.2 billion

16   dollar claim they had against the

17   receivership, would you describe the issue

18   that was brought as being one that was novel?

19   A    There were lots of -- it was the

20   determination of the tax liability so there

21   were -- there were probably some unusual

22   issues in it.  But it wasn't just one issue.

59

1    There was a whole series of issues to arrive

2    at what the appropriate tax rate for the

3    Benj. Franklin receivership was supposed to

4    be.

5        Q    It's fair to say it was very

6    complex issue?

7        A    It was complex.  It certainly was.

8        Q    And there were multiple issues,

9    each of which was unique and novel in its own

10   right?

11       A    Well, they were complex.  I can't

12   tell you truthfully whether they were unique

13   and novel, but they were very complex.  From

14   my perspective, they were unique and novel,

15   but I hadn't had a lot of experience on tax

16   cases before this one.

17       Q    Okay.  Are you aware -- the issues

18   presented by the IRS tax issue, were they --

19   did they present an issue of first

20   impression, meaning have you had similar

21   issues like that in the past, or was this a

22   brand new analysis that had to be

60

1    accomplished?

2        A    I think we had the -- and again,

3    I'm -- I'm talking from people that have

4    talked to me.  I think one of the issues in

5    the case was the tax treatment of federal

6    financial assistance.

7        Q    Right.

8        A    And I think that this was the first

9    one where it actually became real, because

10   this was a surplus receivership and all the

11   other receiverships, it didn't really matter

12   because they were so deep in the hole.

13            But as I understand it, the FDIC

14   had discussions with the IRS before about

15   what the appropriate tax treatment of federal

16   financial assistance should be, and -- and so

17   -- but this was the first case that I'm aware

18   of that the issue became actually ripe.

19       Q    In the event there actually was a

20   surplus in the receivership, what -- how the

21   tax would be treated at that point, you had

22   had preliminary discussions with the IRS?

1      A    I did not, but my colleagues before

2    me evidently -- when FIRREA was enacted in --

3    the federal -- federal insurance -- Financial

4    Institution Reform Recovery and Enforcement

5    Act of 1989, which we call FIRREA, when that

6    was enacted, I think the IRS shortly after

7    issued an IRS Notice 89102.  I think the FDIC

8    folks had discussions with the IRS regarding

9    whether that notice, you know, was correct or

10    incorrect.  And I think over the years, they

11    had discussions, but this was the first case

12    where it became real because, as I said

13    before, the other institutions were deep in

14    the hole, so --

15      Q    When you first approached the case

16    was it your opinion that the best outcome for

17    the shareholders was a settlement or a trial?

18      A    My -- when I came into the case,

19    what had actually happened is -- and the -- I

20    mean, victory has a thousand fathers and

21    defeat is an orphan.  The attorney for the

22    DOJ had told me that in the process of

63

1    get nothing.  So my internal calculus was

2    that this was a case that was crying out for

3    settlement, so I firmly believe trial would

4    not have been good for this case.

5        Q    Did you share with that anyone,

6    that you thought settlement would be the

7    preferred avenue?

8        A    I believe I shared it with Don and

9    Tom Buchanan.  I can't remember.  I'm not

10   sure whether I shared it with Ernie or not,

11   but at that time, I thought Ernie was a

12   consultant to Don.

13       Q    Did you share that view with the

14   Court at any point?

15       A    No, because the -- the -- well,

16   yes, in the sense -- and not directly.  What

17   we had to file every six months was status --

18   status updates or status updates on the case.

19   And, you know, what we -- each status

20   conference we'd file is we're making progress

21   towards settlement.  So I didn't say that,

22   you know, we wanted -- we didn't want to

64

1    litigate, but certainly, you know, if you

2    read the status conference reports, it

3    certainly -- and then I think Judge Sullivan

4    mentioned that in the fairness hearing that

5    each status report, he could tell that we

6    were making progress towards settlement.

7        Q    Earlier you referenced the money,

8    that the IRS either way felt that they were

9    going to get the money.  When you refer to

10   the money, is that the -- the balance of the

11   surplus in the receivership?

12       A    Yes.  It was the surplus that

13   turned out to be around $94 million.

14       Q    So their general feeling was that

15   no matter how things ran, they were going to

16   end up getting the balance of the surplus?

17       A    Yes.  When they sued for a

18   million-2 or a billion 2, they felt that, you

19   know, no matter, it just would be gradations,

20   but no matter which scenario was run, it

21   would never push it down to a level where

22   you'd generate a surplus.

65

1     Q    Uh-huh.  Now, you referred to 11 or

2  12 scenarios that were to be run.  Do you

3  know who authored those?  Was that the IRS?

4     A    I believe, yes, yes, it was Susan

5  -- was it Susan?  It was -- it was -- and

6  this was before my time on the case, but the

7  -- the attorney for the DOJ, Henry

8  Darnstadter, D-A-R-N-S-T-A-D-T-E-R, but he

9  stated to me that somebody had suggested

10  that, and he went along with it.  And I guess

11  through discussions -- and I wasn't there --

12  they basically ran the tax scenarios

13  depending on a number of assumptions which

14  way federal financial assistance was taxed,

15  and there were a bunch of other assumptions

16  that kind of escaped me, whether penalties

17  were excluded.  And I think they produced 11

18  scenarios, and I believe two of which

19  produced actually a surplus.

20     Q    Do you happen to recall the amounts

21  of surpluses those two scenarios resulted in?

22  Approximate amount is fine.

66

1          A     I think -- I think that -- and the

2     documents will probably prove how accurate,

3     but one produced a tax liability of around 12

4     and a half million, which we believe I think

5     was scenario 10, which we believe was the --

6     or at least I believed was the amount on

7     which the IRS, you know, acceded to the

8     settlement.  There was another scenario that

9     produced a tax -- a tax amount of less.  It

10    was the nontaxability of FFA entirely.  And I

11    think that number was 10-something.  Then to

12    make the thing complete, the one amount I

13    think got up into the high 20s, might have

14    been mid 30s, with it, which was the

15    nontaxability of federal financial

16    assistance.  And the other number, which was

17    scenario 10, which was spreading the

18    financial assistance over a number of years

19    which, in effect, had the effect of not

20    taxing financial assistance.  But because of

21    the timing flows, I think that produced a tax

22    liability of around 12 and a half million and

67

1    37 and a half million in interest, somewhere

2    in that ballpark.

3         Q    Okay.  Is your understanding that

4    the -- the IRS tax claim of $1.2 billion

5    would have eliminated the -- any damages

6    award received through the Court of Federal

7    Claims case?

8         A    I believe that to be the case.

9    Subsequent to the -- in other words, it

10   wouldn't have been the case potentially if

11   the -- if the number -- if the original trial

12   had produced a number well over a billion

13   dollars.  But when I stepped into the case, I

14   think the Court of Claims had awarded like 35

15   million derivatively to the shareholders.

16   And there was petition for reconsideration,

17   but I don't think even under those petitions

18   the number would have gotten up above

19   anywhere near a billion dollars, so -- so

20   yes.

21        Q    Okay.  In your opinion, the

22   settlement that was reached, would you

68

1    consider that a success?

2        A    I would consider that a successful

3    resolution of the -- of the tax litigation,

4    yes.

5        Q    Okay.  Did you review personally

6    the Winston & Strawn bill submitted to you as

7    part of the proof of claim?

8        A    Yes.

9        Q    Did you review them line item by

10   line item?

11       A    I tried to.  I mean, I -- it was

12   tedious, but I went through them.

13       Q    What are some of the factors that

14   you used in evaluating granting Winston &

15   Strawn the standard hourly billing rate?

16       A    I accepted -- I looked to see that

17   the work that was done was legal and related

18   to the tax case.  And I accepted your

19   representations about your hourly rates,

20   which, you know, as law firms do, they

21   increased over time.  And so that -- that's

22   -- and I guess, you know, maybe it's

1    answering your question indirectly, but I

2    think it was 15.5 hours that I disallowed.    I

3    believed that those hours were spent -- you

4    know, in a big bill like that it's not

5    surprising those hours were spent on the

6    goodwill case, the related but unrelated

7    case.    So I thought that wasn't directly

8    related to the tax case.

9        Q    In evaluating Winston & Strawn's

10    claim for a success fee, which factors did

11    you use to evaluate that part of the proof of

12    claim?

13        A    Well, I guess -- backing up, I -- I

14    think we were not going to pay a success fee.

15    In other words, our understanding -- and

16    maybe Tom Buchanan and Winston got pulled in

17    -- is that according to our letter with Don

18    Willner, we believed that reasonable hourly

19    rates was the standard rate.    And I know that

20    Tom wasn't, you know, directly involved in

21    that letter, but I think the FDIC's feeling

22    was what was good for the goose is good for

70

1    the gander and that we were going to pay the

2    standard hourly rates.

3                (Discussion off the record.)

4            BY MR. PLUTA:

5        Q    How familiar are you with the

6    involvement of various firms working on the

7    tax issue?  And by that I mean the amount of

8    work done by the various firms, the presence

9    of the various firms, the lawyers involved,

10    the resources allocated.

11        A    I mean, reasonably familiar, but I

12    don't want to say intimately familiar.  I

13    mean, I -- I learned a lot, I think, by

14    reviewing the bills, but --

15        Q    Okay.  And based on your

16    familiarity and reviewing the bills, I think

17    you used the term earlier "heavy lifting."

18    In your opinion, of the law firms that worked

19    on the tax settlement, who in your opinion or

20    what firm in your opinion did the most heavy

21    lifting?

22        A    I think with respect to the tax

71

1    matters, the -- I think Winston & Strawn --

2    at least there was a memo written on the

3    federal financial assistance that -- that I

4    thought was very helpful in, you know,

5    advancing certain of the issues in the tax

6    settlement.  I mean, that -- that's what I

7    remember in particular.

8        Q    Was there anything else besides the

9    memo?

10       A    Well, in -- I -- I thought that

11   Mitchell Moetel, which I don't remember how

12   -- of the Winston & Strawn firm did, you

13   know, very effective jobs at the settlement

14   conference on advancing, you know, certain of

15   the tax positions.

16       Q    Are you familiar with the various

17   tasks that were performed by the different

18   law firms in regards to the IRS settlement

19   issue?

20       A    In general.  I -- I don't want to

21   say that I -- I -- I mean, it was more by

22   watching the people at the settlement that I

72

1    was gleaning what tasks were allocated, but I

2    truthfully don't think I knew in advance --

3    and maybe my perceptions were wrong -- as to

4    who was doing what.

5        Q    Okay.  Given that, given your

6    perceptions, do you have knowledge of which

7    firm, in your opinion, reviewed the majority

8    of the tax returns?

9        A    Judging by the billing, it was

10    clear that the Winston & Strawn firm reviewed

11    most of the tax firms -- I mean, the tax

12    forms.  Certainly, Ernie Fleischer's firm did

13    some work, but it looked like in particular

14    Mitchell Moetel was assigned because there

15    were lots of hours reviewing the various tax

16    returns and -- and tax matters.

17        Q    Which firm performed the most legal

18    analysis and research?

19        A    Just given -- given what -- given

20    what I saw, I'd say that on the -- that --

21    that the Mitch -- Winston & Strawn performed

22    at least a significant part of the legal

73

1    research.  And I think Rosemary Stewart

2    provided some.  But I don't think that was --

3    I think that was not necessarily the tax

4    strategy.  And I -- Ernie, I would assume,

5    provided some, but I just don't remember.

6        Q    Which law firm did the -- the most

7    work associated with the presentations that

8    were given?

9        A    As far as the substantive

10   responses, I would say Winston & Strawn.  I

11   think, you know, Don Willner considers

12   himself the master of ceremonies and the

13   maestro, but I think the heavy substantive

14   work, at least as far as the -- was done by

15   Winston & Strawn.  And I remember Ernie did

16   some work on a -- on a goodwill issue that --

17   but I think that the main substantive work

18   was Winston & Strawn.

19       Q    Can you tell me which firm did the

20   majority of the substantive work in the

21   negotiations with the IRS directly?

22       A    You know, that -- in other words,

1    the negotiation was a combination of the FDIC

2    and the law firms and the IRS.  I mean,

3    certainly -- trying to remember.  I know that

4    Winston & Strawn did a lot of the

5    substantive, you know, presentations at the

6    negotiations.  I think there was a lot of --

7    lot -- I would say at the actual settlement

8    discussions where the -- the IRS and all the

9    people were present, the Winston & Strawn

10   firm -- subsequently, there were a lot of

11   like telephonic conversations.  So I think

12   Don Willner played a part, I played a part

13   and --

14        Q    Okay.  In your opinion, if you

15   could single out one single attorney who did

16   the most to bring about a successful

17   settlement of the IRS claim, who would that

18   be?

19        A    Excluding me?

20        Q    Excluding -- excluding you.

21        A    You know, that -- in all honesty,

22   it's hard to answer that question because I

75

1    think the combined group performed the magic

2    of the settlement.  I mean, I -- certainly, I

3    mean, if -- you know, issue by issue, I think

4    Mitchell Moetel did -- well, I think Mike

5    Duhl, who was an FDIC consultant, and Richard

6    Peyster, who was at FDIC, had discussions

7    with IRS on the way FFA should be taxed.

8    Mitchell Moetel did a memo that was very

9    useful and I think very helpful in

10   facilitating settlement.

11           But there were a bunch of other tax

12   issues that I think lots -- I mean, it wasn't

13   -- my predecessors, Hugo and Catherine, there

14   was a big issue that would have pulled away

15   all the surplus.  There was approximately 260

16   million of the subrogated interests that the

17   FDIC wanted to deduct in 1990, and the IRS

18   said that it didn't meet the all events test

19   because it was accrued later and paid later.

20   The FDIC, my predecessors, carried the ball

21   on that.

22           So I don't mean not to answer the

76

1    question, but I think that it probably is

2    more issue by issue that --

3        Q    I think that's fair.  Talking

4    specifically about the claim, the procedures

5    that you went about to review the claim, I

6    think you said earlier that there were two

7    other individuals that reviewed the claim as

8    well, Mr. Aboussie.  Is that one of them?

9        A    Yes.

10        Q    And the other was?

11        A    Bill Kroener was the general

12    counsel.

13        Q    Okay.  Those are the only other two

14    people that reviewed the claim besides

15    yourself?

16        A    Yeah, that -- see, what I can't

17    remember, and -- and in the interest of

18    completeness, I think that the -- it -- you

19    know, it -- when Mr. Aboussie -- I'm sorry,

20    Mr. Kroener reviewed it, but I believe this

21    claim was actually paid in May of this year.

22    So I'm virtually certain that while Mr.

77

1    Kroener had approved it before he left, it

2    was also reviewed by the acting general

3    counsel after Mr. Kroener left, which was

4    Doug Jones.

5         Q    Okay.  And what were each of those

6    roles in reviewing the claim?

7         A    I think they were -- they were

8    performing like a high-level conceptual -- in

9    other words, was it appropriate to pay

10   reasonable hourly rates?  Was it appropriate,

11   not appropriate, let's say, to give any type

12   of success award that you were requesting?

13   They didn't perform a review of the bills.  I

14   mean, they -- they relied on me to do that.

15   Their role was mainly to make the

16   determination as to whether or not, you know,

17   a success fee should be awarded and whether

18   or not, you know, standard hourly rates was

19   appropriate.  And they also reviewed and, you

20   know, approved the -- the -- the way that we

21   calculated Don Willner's 250 hourly rate.

22        Q    Okay.  Focusing specifically on the

78

1    conversations that revolved around award of

2    any success fee, who were specifically

3    involved in those discussions?  The same

4    three people that you've already mentioned?

5        A    Yes.  And the other person that I

6    -- that left the agency and I think I

7    mentioned before was Bob Clark.  I mean, that

8    was, you know, his -- but he left the agency

9    I think in mid 2005.

10       Q    The decision not to -- or to deny a

11   success fee, what were the factual -- what

12   was the factual basis for denying the success

13   fee?

14       A    As best as I can remember, it was

15   the letter that was the November letter that

16   was sent to Don Willner.  I'm sorry, Don

17   drafted it and the FDIC concurred in it.

18            The concept that the FDIC always

19   had was that we were going to either approve

20   in court or it subsequently turned out that

21   they were run up for us to approve through

22   the administrative claims process reasonable

79

1    attorneys' fees.  And the FDIC always thought

2    that that was going to be the standard hourly

3    rates.

4        Q    You said that the FDIC always

5    thought that would be the standard rate?

6        A    Yes.

7        Q    Is that based on some policy at the

8    FDIC, either written or oral?

9        A    I think it was -- I -- that's a

10   good question.  I don't know the full answer

11   to that.  I think it's the idea that as the

12   receiver, we have duties to the various

13   creditors and shareholders and that -- that

14   reasonable hourly rates, we -- we should be

15   probably conservative and not, you know,

16   overly aggressive.

17       Q    Is one of the duties that you have

18   to the shareholders to sufficiently

19   compensate attorneys working on their case?

20       A    I think that -- I don't know if

21   it's a duty to the shareholders but I think

22   as the receiver, we think that it is

82

1      Q      In your assessment of the situation

2    do you believe that Winston & Strawn assumed

3    a measure of risk in prosecuting the

4    shareholders' case?

5      A      Now that requires facts that I'm

6    not fully aware of.  I don't know what

7    Winston & Strawn's total wall was, but -- but

8    certainly if a firm takes a case on

9    contingency, you obviously do assume some

10   risk.  I guess the -- to mitigate that risk a

11   little bit, you at least were getting paid

12   something.  It wasn't a pure contingency, but

13   -- but there obviously is risk when you take

14   on a case if you're not being compensated

15   straight up at your normal hourly rate.

16     Q      If Winston & Strawn -- strike that.

17   If the case had been lost, would the FDIC

18   have approved Winston & Strawn's standard

19   billing rates?

20     A      Oh, absolutely not, because I think

21   in the letter to Don Willner it was made

22   clear that this was contingent on the

83

1    successful settlement.

2        Q    So if Winston & Strawn would not be

3    compensated if the case was lost, if the case

4    was won, they would merely be compensated to

5    the level of their standard billing rates?

6        A    Well, that's a question I don't

7    know the answer to is if this case had

8    actually been litigated to judgment. And,

9    one, I think the FDIC wouldn't be directly

10   involved in it. You would be going to the

11   Court to get, you know, some type of -- but

12   this was part of a -- of a settlement

13   process. And the specific deal was if the

14   settlement was effectuated, the attorneys

15   that, you know, added to the settlement would

16   be compensated.

17       Q    In the discussions you had

18   regarding the awarding or not to award the

19   success fee to Winston & Strawn, do you

20   recall any legal basis that was discussed or

21   that you relied on to deny the success fee?

22       A    We -- we believed that it was -- it

84

1    was based -- I mean, it wasn't as much a

2    legal basis as what the -- the letter

3    agreement said.

4        Q    So the letter agreement was both a

5    factual and a legal basis to deny the awards?

6        A    Well, it was clearly the factual

7    basis.  I don't think we ever -- I don't

8    think we ever got into -- I mean, we

9    certainly -- we certainly looked at the cases

10   and, you know, we didn't believe that -- I

11   mean, obviously, you're having a de novo

12   proceeding in district court.  And Judge

13   Sullivan will be the final arbiter, but just

14   on our read of the cases, if one law firm had

15   taken on a case and provided through trial

16   and successfully run it, then a success fee

17   in many cases was appropriate.

18           This was a novel animal.  It was

19   effectuating a settlement, and so I think the

20   primary basis was the fact that the FDIC

21   believed it had -- its position was we were

22   going to pay the normal hourly rates.

85

1        Q      Do you happen to know if Winston &

2   Strawn was a party to the agreement that you

3   refer to?

4        A      No.   Winston & Strawn wasn't at

5   that time.   Should I say it diplomatically?

6   I think Bob Seuss, who was Winston & Strawn

7   client, and Don Willner, was on the outs, so

8   to speak.   So Winston & Strawn was not a

9   direct party to that agreement.

10       Q      Do you know if that letter or

11  agreement were referenced in any way in the

12  disallowance letter you sent Winston & Strawn

13  regarding that claim?

14       A      I don't think it was.   I don't

15  think it was.

16       Q      Did you cite any or rely on any

17  case law in deciding whether or not to grant

18  a success fee?

19       A      Not in the disallowance letter, no.

20       Q      When you were going through the

21  process of deciding whether or not to grant

22  the success fee did you cite or rely on any

86

1    case law?

2          MR. TAYLOR:   I'm going to object to

3    the extent the question seeks information

4    that is protected by the attorney work

5    product privilege and instruct the witness

6    not to answer.   The witness can answer to the

7    extent the question seeks information that

8    leads to the legal conclusion for the

9    disallowance or that was the basis for the

10   legal conclusion for the disallowance but not

11   for the analyses or mental impressions of the

12   attorneys that may have been involved in that

13   decision.

14   A     We looked -- we looked at -- at

15   case law and -- and determined under these --

16   these circumstances it was not appropriate to

17   pay a success fee.

18          BY MR. PLUTA:

19   Q     Can you tell me how much time you

20   spent, approximately, evaluating that Winston

21   & Strawn claim?

22   A     I would say somewhere between 50

87

1    and a hundred hours, probably, because there

2    was --

3        Q    Do you know which cases you looked

4    at?

5        A    Not offhand.  I -- I --

6        Q    Would it be possible for you to

7    figure out which cases you looked at and

8    supply those to Winston at a later time,

9    after this deposition?

10        MR. TAYLOR:  Subject to my prior

11    objection.

12        THE WITNESS:  Yeah, that's okay.  I

13    think so.

14        MR. PLUTA:  Okay.

15        MR. WILLNER:  I'd like a copy too.

16        BY MR. PLUTA:

17        Q    After reviewing Winston & Strawn's

18    fees and expenses, did you determine them to

19    be reasonable and appropriate except for the

20    15.5 hours that you excluded?

21        A    Yes.

22        Q    When deciding whether or not to

88

```
 1    allow the success fee for Winston & Strawn as

 2    part of their claim, did you consult any of

 3    the shareholders?

 4        A    What -- what I tried to do, which

 5    was unsuccessful, is I was actually trying to

 6    pitch the decision back to Mr. Buchanan and

 7    Don Willner, saying that if they could reach

 8    unanimity as far as the success fee or the

 9    various fees, that we would love the

10    shareholders in unison to make that

11    determination.  But that didn't happen.

12        Q    So you didn't directly contact any

13    of the shareholders?

14        A    No.

15        Q    Were you aware at any time during

16    the decision-making process related to

17    Winston & Strawn's claim the positions of the

18    various individual shareholders?

19        A    There were affidavits submitted I

20    know in the Winston & Strawn case by I

21    believe Abe Siemens and Gary Hines and Bob

22    Seuss.
```

113

1    were not in on conferences between our

2    shareholder group, and you were asked by Mr.

3    Borthwick and you agreed you didn't know what

4    may have been said on those conferences.

5            Do you know the extent to which Mr.

6    Moetel and Mr. Fleischer collaborated on

7    documents and the extent to which either

8    edits of the documents prepared by the other?

9        A    No.

10       Q    Do you know that almost all the

11   phone calls between -- on behalf of the

12   shareholders were made by -- between the

13   shareholders and IRS were made between me and

14   Henry Darmstadter?

15       A    I don't know that.  I'm not -- I'm

16   not going to disagree with it, but I don't

17   know.

18            MR. WILLNER:  No further questions.

19            MR. PLUTA:  I have one question.

20            FURTHER EXAMINATION BY COUNSEL FOR

21       WINSTON & STRAWN

22            BY MR. PLUTA:

114

1      Q      Would you agree that Winston &

2    Strawn was not compensated for the time value

3    of money on fees dating back from 1998

4    through the present?

5            MR. TAYLOR:  Objection, calls for a

6    legal conclusion, but the witness may answer.

7      A      Yeah, I mean, to the extent that

8    Winston & Strawn didn't receive interest on

9    its legal fees because they were incurred

10   earlier, I would agree that they did not.

11           MR. PLUTA:  Okay, that's all.

12           MR. BORTHWICK:  No questions.

13           MR. WILLNER:  Nothing further.  I

14   assume you want the witness to read and sign

15   the deposition.

16           MR. TAYLOR:  Yes.

17                (Whereupon, at 4:50 p.m., the

18                deposition of RICHARD GILL was

19                adjourned.)

20                *   *   *   *   *

21

22