00001

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

United States of America
Plaintiff

vs.

Federal Deposit Insurance Corporation
Defendant

Docket No. CA 02-1427 EGS
Washington, D.C.
Tuesday, May 2, 2006
2:00 p.m.

Transcript of Fairness Haring
Before the Honorable Emmitt G. Sullivan
United States District Judge

APPEARANCES:

For the Plaintiff: Henry C. Darmstader, Esq.
For the Defendant: Richard S. Gill, Esq.
Other Counsel: Thomas M. Buchanan, Esq.
Rosemary Stewart, Esq.

Reporter: WILLIAM D. MC ALLISTER, CVR CM
Official Court Reporter
Room 4806 B
333 Constitution Avenue, N.W.
Washington, D.C. 20001 8306
(202) 371 6446

Reported by Voice Writing and transcribed using SpeechCAT
Pages 1 through 58

00002

P R O C E E D I N G S

THE CLERK: This is the case in the matter of Civil Action 02-1427. United States Versus Federal Deposit Insurance Corporation, et al.

Will counsel please state your name of the record?

MR. GILL: Richard Gill, representing the Federal Deposit Insurance Corporation and we filed the motion for the fairness hearing.

MR. DARMSTADTER: Good afternoon, Your Honor. Henry Darmstadter for the plaintiff, United States of America.

THE COURT: Who else is sitting at counsel table? It is good to know who is sitting in the well of the court.

MR. WILLNER: Your Honor, I am Don Willner from Portland. I represent shareholders.

THE COURT: Good afternoon. Welcome to court.

MS. STEWART: Rosemary Stewart. I also represent shareholders.

MR. BUCHANAN: Thomas Buchanan of the first Winston and Strawn. I represent shareholders, Your Honor.

THE COURT: We have some guests on the telephone, do we not?

MR. WILLNER: Your Honor, the court will recall in the court's order you allowed a hook up to the courtroom in Portland, Oregon.

THE COURT: Yes.

00003

MR. WILLNER: On the screen are many shareholders from Portland, Oregon, and the surrounding area participating through the magic of video camera

several distributions that have been requested by the shareholders and the shareholders' counsel that are going through the FDIC's claim process. In particular those relate to there was a litigation trust fund created that has approximately $3 million. The FDIC has tentatively agreed and will issue a formal determination to pay that particular distribution to the shareholders that contributed that money,

00010

and in the next phase we have three sets of petitions. I truthfully wish that was before the court, but it's before the FDIC so it's not on your plate which is on the attorney's fees relating to this particular tax case.

So what I'm trying to say is the only thing that is specifically before this court is the approval of the $50 million tax settlement.

THE COURT: All right. And approval of that sentiment has nothing to do with the request for attorney's fees, is that correct?

MR. GILL: Yes, Your Honor. It has nothing to do with it. That is coming through the FDIC's claim process. But I will say that in the event that the shareholders' counsel contest the attorneys' fee determination, they can pick a district court to go to but that's totally separate and it's basically the appeals process from the FDIC claims determination.

THE COURT: That's fine.

MR. GILL: What might be helpful, just obviously -- I don't want to go through the nuances of the settlement --

THE COURT: I don't want to belabor the point. I have received, as you can well imagine, scores of comments pro and against the settlement, and there have been a fair number of comments regarding the attorney's fees.

I just want the folks in Portland to know that this

00011

court has no jurisdiction at this time to address any issues that impact attorney's fees because that is an issue of some concern to shareholders. I just want the record clear. That is still in the administrative proceeding. It may well find its way to a judicial tribunal at some point but it may well be resolved at the administrative level, correct?

MR. GILL: Yes, Your Honor.

THE COURT: I just want the folks in Oregon to know that.

MR. GILL: It might be helpful and I'll try to be brief, but just a brief walk through of the settlement process so that you can feel comfortable.

THE COURT: Oh, go right ahead. Take your time.

MR. GILL: I think that parties fought hard and long and it's one of those kinds of things that I have learned that maybe this is why we have a settlement. It is the old adage that when agencies with a reputation for excellence probably take on a case with a reputation for mediocrity, I think we've all learned that it's the reputation of the case that survives. And so I think in this particular case it's why everybody, I think, sat down and tried to be reasonable.

But initially when the government filed its complaint in July of 2002, they were alleging IRS damages in excess of a

billion dollars. That was composed of approximately 94 million in taxes, an excess of 200 million in penalties and an excess

00012

of $770 million in interest. That was in July of 2002.

Several months later, the Portland, Oregon case was stayed and we all sat down, the Internal Revenue Service which was ably represented by Mr. Darmstadter and others and at the FDIC's request we invite shareholders' counsel because we wanted their good wisdom on this particular matter, to sit down and see if we could try to reach resolution.

And what we've got in this particular instance which is pretty rare in the FDIC's scheme of things is a surplus receivership. We found, up until recently, that they're more like Halley's comet. They come by once in a generation so we don't see these cases very often.

But what we have now is approximately $94 million in surplus; and if the IRS were to prevail in litigation for the billion dollars, obviously there will be no money to pour out to the shareholders.

So we all sat down to see, because from the FDIC's perspective what we were really trying to do was find the correct tax. So the principal issue that was in dispute, but there was a bunch of others, was this vehicle called federal financial assistance and what happened when this particular institution was taken down in February of 1990, Bank of America took over the deposits and assets of the institution. But they put back to the FDIC, or it was the Resolution Trust Corporation, approximately a billion seven and certain types of

00013

mortgages that they didn't want.

Well, that under the IRS, this particular interim regulation called 89(102) produced immediate tax consequences because it was determined to be income in that particular year.

Now, the FDIC disagreed with that determination and we fought hard with the shareholders' counsel; and what the IRS has done for purposes of this settlement is actually allowed the more lenient treatment of federal financial assistance which basically allows it to, in effect, not to be taxable because it is only taxable when it is put up against years in which they have expenses that offset the income. The net effect of that was the IRS allowed us to use section 597.

The IRS also, just for purposes of the settlement, obviously if we're back in the litigation arena, all bets are bets are off and the IRS and the Department of Justice will certainly pursue the maximum tax case possible. They waived, for these purpose the penalties which were in excess of $200 million dollars. There was another deduction that the FDIC did not take because it occurred in later years and the IRS allowed us to actually roll it back into the year of failure which was 1990 which was 258 million dollars for something called subrogated interest which was frankly interest paid on the deposits that the FDIC picked up.

The bottom line on all of this is that we pushed a tax liability that was in excess of a billion dollars with all

00014

the interest and penalties down to approximate 12 million in tax and around 38 million in interest. From the FDIC's

perspective we believe that that actually is the appropriate tax consequences in this particular case.

Sort of the next thing I'd like to talk briefly about, I know that lawyers never should do math in public, but since the FDIC is the party that actually, you know, pushed for the proxies, I just wanted -- you are getting the originals obviously of the proxies, but just from, we've done an Excel spreadsheet and what we have come up with but they are still coming in, I mean, in other words hopefully we can stop counting. But we have actually received approximately two million 900,000 in shareholder proxies representing -- there were seven million, 705,000 shares at the time of failure. So we received two million nine of the shares voting which is approximately 39 percent of the outstanding shares. And of those, we've got two million 668,000 that were affirmative voting in favor of the settlement and we have 22,000 shares, a little over 22,000 shares disagreeing with the settlement.

Just to push the percentages a little bit, if my math is correct, we have approximately 99.3 percent of the shares that voted, represented voting in favor of the settlement and we have 0.7 percent of the shares disagreeing with the settlement.

For all of these reasons we believe that, you know,

that this settlement should be approved. We believe that it's a fair and reasonable settlement and it will result in distributions back to the shareholders, the total surplus that would be left after the IRS received the 50 million would be $44 million dollars

Your Honor, that's all that I have to say, but I would like, obviously with your permission, to turn it over to Don Willner who is the lead counsel for the shareholders at least in the good will litigation case.

THE COURT: Let me ask a question. I'm just curious as to whether or not there was any criminal responsibility assigned to anyone for what happened in this case?

MR. GILL: Not that I'm aware of, Your Honor,

THE COURT: That in and of itself is fairly amazing in this day and age. No one was prosecuted for what happened? It was just flagrant disregard of the tax laws.

MR. GILL: I think that --

THE COURT: This wasn't just simple negligence. It was gross negligence.

MR. GILL: Actually, Your Honor, it's far more complicated than that. What actually happened is is that Congress passed, probably during the height of the thrift crisis, they passed legislation that because during the 1980s federal financial assistance was abused and people were not only getting -- they were getting kind of a doubled tax benefit

for it. Congress sort of swung the other way and said that federal financial assistance was to be taxed. The IRS issued 89(102) which if that particular tax regulation which actually applies in this case were to be applied, the tax liability would be approximately $94 million dollars. Then the penalties and interest would flow.

THE COURT: So there would be nothing to turn over

the shareholders at all then.

MR. GILL: Exactly. But what happened is the IRS, upon rethinking and recogitating, determined that 597 was the more appropriate regulation, but that was not enacted until 1992 and it was not applied to this particular receivership because this receivership failed in 1990.

So in fairness to the IRS, in other words, a literal application of 89(102) actually produces the tax liability; but for purposes of this compromise, the IRS has agreed that we will be allowed to apply on section 597.

THE COURT: All right. Thank you, counsel.

MR. WILLNER: May it please the court, I am Don Willner from Portland, Oregon.

THE COURT: Good afternoon, counsel. Welcome to the court.

MR. WILLNER: Thank you. I would like to welcome all the people from Oregon and Washington who are sitting in the courtroom out there listening to us. I should also tell the

00017

court that I became a member of the bar of this court in 1951. The court may remember the Jonah Crowelly Bar Review court.

THE COURT: Absolutely. Absolutely.

MR. WILLNER: I'm a happy graduate of that.

THE COURT: Absolutely. That's the mark of a true Washingtonian that you remember the Jonah Crowelly Bar Review.

MR. WILLNER: If I may take 30 more seconds of random comment that you and I remember, sir. Jonah Crowelly for $30 in my day, at least that is what I paid for the bar review and I paid for three things.

One, for the course. Two, he spotted about 50 percent of the questions.

THE COURT: That's right. He was an amazing spotter, wasn't he?

MR. WILLNER: Yes. And the third was he moved our admission to the United States Court of Appeals for the District of Columbia Circuit.

He would stand there with about 50 of us there, and the court may remember this, and read off our names, and one at a time say, I vouch for his character. I always wondered what would happen if the judge would have asked him what does he know about the character of each of these.

THE COURT: And of course, he was never asked.

MR. WILLNER: He was never asked. All he knew was our $30 check had not bounce. He knew that.

00018

Your Honor, previously the court introduced, asked the people to introduce themselves at home in Portland but let me also introduced in this courtroom some people.

THE COURT: By all means.

MR. WILLNER: First, I'm going to ask two of them, when I'm done, very briefly to comment.

First of all, I would like to introduce Dr. Dale Weight, the chairman of the board, CEO and president of Benj. Franklin at the time of seizure.

THE COURT: All right. Good afternoon.

MR. WEIGHT: Good afternoon, Your Honor.

MR. WILLNER: Sitting next to him is Richard Green, a

shareholder and a plaintiff in this case. Mr. Green works for and has worked for NIH in this area.

Next to him is Donald McIntyre who was the executive vice president of Benj. Franklin at the time of seizure.

THE COURT: Good afternoon.

MR. McINTYRE: Good afternoon, Your Honor.

MR. WILLNER: Next to him is Peter Baker who represents presents the group who were the larger shareholders of Benj. Franklin at the time of seizure.

THE COURT: Good afternoon.

MR. BAKER: Good afternoon, Your Honor.

MR. WILLNER: Next to him is Bob Suess, who started this lawsuit and is a plaintiff.

00019

THE COURT: Good afternoon, welcome.

MR. SUESS: Good afternoon, Your Honor.

MR. WILLNER: As the court possibly knows from the papers that have been filed, I have been working on this case for 16 years and I have a thousand hours and I am lead counsel in all of the three cases. The three cases being first the Claims Court case where I represent the shareholders derivative action pending there which is I represented in that way all of the shareholders.

Then in the case in Portland, Oregon, the breach of fiduciary duty case. And when this tax claim was filed on behalf of shareholders, I filed a motion to intervene and transferred to Oregon, to the District of Oregon.

The result of this, I believe, this may have had some impact on getting some of the discussions going and FDIC graciously allowed us to participate and the government thought that was all right. The government strongly opposing our right to interview, but allowing us to participate in the matter.

We had many many many discussions and negotiations. One of the issues before this court was was this arms length, were the parties well represented, and were issues raised and discussed; and the answer is very much so. This went on for three and a half years. There were many meetings that I recall coming to Washington and being lead counsel for the shareholders. One we had, I think over 20 people present

00020

including IRS folks, Department of Justice people.

THE COURT: You do this without the benefit of a third party, of neutral evaluator or arbitrator or mediator, didn't you?

MR. WILLNER: Of course, we had no neutral there. I thought we did very well.

THE COURT: I did, I applaud your efforts, I mean when I say you, I applaud the efforts of everyone who participated in this, but it just struck me as quite unusual that this was accomplished without the assistance of a mediator or a retired judge or an arbitrator. The parties literally rolled their sleeves up and made this thing happen. It took a lot of time.

MR. WILLNER: In retrospect that might have been a good idea but I thought we worked well together.

THE COURT: I'm sure, because of that working relationship, no one thought about upsetting the apple cart at

that point and asking for the involvement of a third party mediator which sometimes will alter the chemistry that exists among the participants. I applaud your efforts. It is quite unusual that a settlement of this magnitude is achievable without the intervention or the assistance of someone who is completely detached from the proceedings. I really applaud the efforts of everyone who worked so hard over the years.

I recognize this case was on a docket for quite a

00021

while, but the parties were quiet. You weren't bothering me so I didn't bother you. I kept track of it every six months. I had to report open which is fine. The parties were negotiating. Periodic progress reports. I've learned that when the parties are actively working and trying to resolve their differences, let them work. If they need me, they'll ask me.

MR. WILLNER: Your Honor, I too have read all of the comments that have been coming in.

Let me briefly state from my point of view what the tax issue was.

THE COURT: Sure.

MR. WILLNER: The question was raised in many comments why was anything paid.

THE COURT: That's right. That has been a recurring question.

MR. WILLNER: Most of the assets and liabilities of Benj were sold to Bank of America as counsel has mentioned. What they were really interested in was the deposit base. Bank of America being a California corporation primarily they wanted an entry into Oregon. Benj. Franklin was the largest savings and loan in Oregon and a very clean and honorable well thought of savings and loan formed in 1925.

Bank of America also purchased on all of the loan portfolio. And they decided -- and they had a put option in,

00022

and they decided they would put it back and it was worth a billion seven and all of a sudden the FDI, then the RTC it's predecessor, had to come up the money.

There was another part of RTC called RTC Corporate, not RTC receiver which had money, and paid the money to Bank of America. And charging interest. The receiver got back the loans and did very well with them. That is part of the reason why there is a big balance in the receivership now.

After paying the money and getting back the loans, the receiver repaid all of the money that was loaned by RTC Corporate with $258 million dollars worth of interest in addition paid to RTC Corporate.

We, on behalf of the shareholders, thought that was a classic loan situation which should not be taxed. The government took the position that this was a taxable transaction and there was a good deal of congressional legislative history from which they could draw some support. We went into these discussions taking the position which is there was no federal financial assistance tax owed because we thought under the 16th Amendment it was a loan. The government had some, I ultimately realized, some arguments that I didn't have here when I started.

will be more than happy to fax a copy of this out so they can take a few minutes to look at this and I'll invite any comments they may have about this order.

MR. GILL: Thank you, Your Honor, that sounds like very good wisdom.

00045

THE COURT: See if we can get a fax number.

MR. BULLES: Your Honor, our fax number here is (xxxx).

THE COURT: All right. It's on the way. We'll give you a few minutes to look at it.

MR. GILL: Thank you.

THE COURT: Sure.

(Pause.).

THE COURT: It will take a few minutes. It's only fair to give the folks out there a copy of it and let them make any comments they would like to make.

To the folks in Oregon, it's on the way. It will be there in a few minutes and we'll talk again in about 15 minutes or so and maybe the deputy clerk who is assisting can make a few copies so that you can read it and I'll be happy to answer any questions, I can answer. I have not approved it, I have not signed it. I'm just seeing it for the first time now, but I'm going to take a very short recess and read it. If you have questions about it, I would be more than happy to answer the questions or if I can't I'll refer the questions to the attorneys for an appropriate comment.

We'll take a very short recess and make sure you get a copy in a few minutes. There is no need to stand.

(Recess from 3:33 p.m. to 3:55 p.m.)

THE COURT: Any comment folks, regarding the proposed

00046

order?

(No response.)

Does anyone have any comments regarding the proposed order that's been submitted?

All right. I take it from your silence the answer is no.

I've had a chance to review the order and I'm going to sign the order and put the court's approval on this order. I am going to read into the record so there is a record of this in case anyone who's not present wishes to obtain a copy of the transcript with the order, and I'll just read it verbatim as it appears.

On May 2nd, 2006, the court presided at a fairness hearing to consider a proposed settlement of the tax claim made against the Federal Deposit Insurance Corporation as the receiver for the Benj. Franklin Federal Savings and Loan Association Portland, Oregon. Because the amount of any tax settlement payment will directly affect the amount of money remaining in the Benj. Franklin receivership to be distributed to approximately 6500 shareholders of Benj. Franklin, the court previously approved a notice to shareholders and directed that it be sent by the FDIC to all known shareholders to advise them of the hearing about the fairness of the proposed tax settlement and to invite such shareholders to advise the court of their views on the proposed settlement.

00047

Both parties to this action, United States represented by the United States Department of Justice tax division and the FDIC, have agreed to a proposed settlement that would require the FDIC receiver to pay $50 million dollars for the federal income taxes allegedly due for calendar years 1990 through 2002 which will resolve and close each of those disputed tax years.

The remaining terms of the settlement are set out in the attached letter agreement between the Department of Justice and the FDIC which is made a part of this order. That agreement was conditioned on the approval of this court after the conduct of a fairness hearing.

At the May 2nd, 2006 fairness hearing, the court heard from counsel for the plaintiff, the United States and for the defendant, FDIC and also heard statements by several Benj. Franklin shareholders and by counsel from other Benj. Franklin shareholders all of whom except one, spoken in favor of the proposed settlement.

Prior to the hearing, the court also received the votes of approximately 446 shareholders representing the ownership of approximately 3 million shares of Benj. Franklin's stock. Most of the shareholders who sent written views to the court expressed agreement with the proposed settlement.

Of the total number of shares owned by these responding share owners, 99.3 percent of the shares agreed with

00048

the settlement and 0.7 percent of the shares disagreed with the proposed settlement.

Most of the shareholders who voted and disagreed, do not believe that any taxes should be paid by the Benj. Franklin receivership because of the way in which the institution was seized back in 1990.

In a notice previously approved by this court and sent Benj. Franklin shareholders, they were advised that if they did not send their response form back to the court, the court would assume that such non-responding shareholders did not object to the proposed settlement described in the notice.

Accordingly, 7,682,958 of the 7,705,000, shares of common stock of Benj. Franklin voted in favor of the settlement.

Based on all of the views expressed at the hearing as set out in the form submitted by Benj. Franklin shareholders, the court finds that the settlement reached between the United States and the FDIC with various counsel for Benj. Franklin shareholders also participating actively in the settlement discussions was the product of arms-length negotiations.

The court further finds that the settlement is a fair adequate reasonable way to resolve the tax controversy between the parties particularly considering the early stage of litigation proceeding and the opinions expressed by the experienced counsel to the parties and to the shareholders.

00049

And I will add, and based on this court's own experience.

More over the issues related to the bank's seizure in 1990 are not before this court and thus would not have been resolved in this forum even if this tax case had been litigated

to conclusion.

Accordingly, the terms of settlement set out in the attached letter agreement between the Department of Justice and the FDIC -- and that's the letter dated November the 16th, 2005 -- are approved by this court and the parties are directed to carry out the settlement in the manner set out in that agreement.

And let me just say and I'll depart from the order. Let me say that there's no such thing as a perfect settlement. I've not seen a perfect settlement in the 22 years I've been a judge in the more than 30 years I've been an attorney and it just strikes me as eminently reasonable that this settlement has been reached as a result of significant arms-length negotiations and, as counsel readily admit and concede, a give and take process. It is not the perfect settlement. I've not seen anyone leaping with joy to their feet, but it's a settlement that the parties can live with and often times that's the best settlement and it's going to bring about some finality.

And I felt the emotion of the woman who testified and her husband who testified. I feel your pain. I've seen this

00050

all too often in these cases in which litigation and the prospect of litigation and the prospect of future litigation has been spread out over years and the prospect for continued litigation exists and undoubtedly this case would have dragged on for years and years. There is no doubt in my mind about it. There would not have been a speedy resolution of this issue.

Even if there was a speedy resolution of the issues before this court, in this court, without a doubt there would've been an appeal. It would have been an expensive appeal. It would have been an protracted appeal and it would not have brought about finality in the foreseeable future, I can assure you, based on my experiences over the past 30 plus years.

So I think that the settlement is a fair one. It's a reasonable one, and of utmost importance, that the settlement that's been reached is a result of arms-length negotiations, and I have nothing but applause for the attorneys in this case and the shareholders who participated in this agreement.

Indeed, it's a very historic agreement for many reasons. Many of the reasons have been alluded to by counsel for the parties. But it is also an important settlement because it came about as a result of the hard work and efforts of the attorneys and shareholders without the participation by disinterested third parties, and we don't see that too often especially in cases that are either class actions or analogous

00051

to class actions.

Normally it takes the experience and hard work of a disinterested third party to achieve finality. The parties were able to achieve finality themselves. It took a lot of time. It took a lot of effort, but it does show that the process can work. So the parties have something to be thankful. The shareholders have something to be thankful for.

You're not getting 100 percent return on your investment, but you know, there's an old expression, half of a

loaf is better than none and you're getting some return on your investment and hopefully this court's approval of this settlement today and bringing about finality to this one chapter of the proceeding will encourage the parties to attempt to speedily resolve the remaining litigation in the two other forums.

So, I will sign this order. We will give Xerox copies of this order to the attorneys in the well of the court and it will be scanned into our electronic case filing system this evening and be a part of the electronic records of the court, but I will approve it today and will be dated today's date.

I didn't inquire whether counsel for the government had anything else to say in response to any of these statements made by the other attorneys for or the shareholders. It was just an oversight on my part.

00052

Counsel.

MR. DARMSTADTER: Thank you, Your Honor. I really don't have anything to add.

I do appreciate that the shareholders who have come down and I didn't feel that it was the government's role to justify whether it was in the interest of the shareholders to accept the settlement or not. I felt that was a process they had go through with their attorneys.

But I would be remiss as well in not thanking the court for permitting us to go through a very lengthy and drawn out settlement process. I think the court has had some flavor of complicated tax issues were involved, some of which were very novel.

But even under the best case scenario I believe for the shareholders, there were still millions of dollars that would have been owed in tax from basic interest income. So I share the court in that I hope that this matter puts out this issue to rest.

Thank you.

THE COURT: Let me just inquire. The court will sign this order and approve this settlement today. What's next? You are expecting a payment of $50 million dollars soon?

MR. DARMSTADTER: That's correct, Your Honor, and I've already had discussions with the FDIC in the hopes that the court would approve the settlement in transferring those

00053

funds.

THE COURT: The check is in the mail, right?

MR. DARMSTADTER: Hopefully.

THE COURT: Then what?

MR. DARMSTADTER: Then, Your Honor, we can dismiss this case with prejudice and hopefully the court can take it off of its docket.

THE COURT: What about the issue of attorneys' fees? Now, let me just inquire about the shareholders first. When will they receive the benefit of their investment?

MR. DARMSTADTER: Well, Your Honor, I don't want to speak out of school, so I may have to defer to the attorney for the FDIC for that. They will be handling the remainder, as I understand it, the remainder of the receivership process and

any remaining claims I guess need to be paid out and then they would pay the shareholders the final amounts.

THE COURT: I'm sure the next question that the shareholders have out in Oregon, what's next?

MR. GILL: Your Honor, do you want me to address that?

THE COURT: Yes. And for the record I have just signed the order and we can make some Xerox copies for those attorneys in the well of the court.

MR. GILL: Your Honor, just before I get into that. Mr. Suess reminded me that I'm certainly going to buy a book

00054

but evidently there is being about written on, called, "Remember the Benj." and I think he said the first edition will have 5000 copies. So I certainly plan to get one since, you know, this has been part of my life for the last three years.

In direct answer to your question what the FDIC plans to do is to figure out how much of the attorneys' fees need to be paid. We have to do that in the next couple of weeks. Then if there is a challenge, what we are going to do is pay the distribution to the shareholders with a hold back for any amount that's been challenged, if they say, we didn't give them enough. But I would say a distribution probably somewhere between 30 and $39 million will be coming, you know, to the shareholders hopefully in the next couple of months and then we anticipate --

THE COURT: Be careful of what you say now, because people are listening very carefully and they're going to be expecting those receive those checks.

MR. GILL: Well, I'm hoping. I mean, the only thing that may mess us up is that we are trying to locate a lot of the shareholders and anything that the shareholders can do, because a lot of the letters that we sent out to the shareholders, I mean, there were I think there were 6500 at the time of the takedown. We sent out 8500 letters. I said to the folks that I would rather be over-inclusive than under-inclusive and what I'm hoping is that the shareholders can

00055

spread the word among their friends and people that may have bought shares so that we can try to get to as many shareholders as we can because what we are going to do is divide through by the number of shares and make that a per share distribution. So I don't see any major reason why we can't get checks out in the next couple of months.

THE COURT: I see no reason either. You know there's a finite number of shares of stock that's outstanding.

MR. GILL: Yes.

THE COURT: We know that a certain number people have responded to notices. So it would seem to me that it shouldn't be a problem whatsoever to get checks in the hands of those shareholders who have responded and maybe even just escrow the remaining balances or the remaining sums of money for those shareholders who have not responded or for those shares of stock.

MR. GILL: The good news is we're in essence doing that. I know that's of no comfort to the shareholders, but the receivership is earning interest, so they're getting paid while

they wait even though the interest rate --

THE COURT: Well, they've got to have the money in hand, I'm sure.

MR. GILL: I'm sure. But at least the last month it was 4.52 percent per month so that's not too bad.

THE COURT: Right. Tell that to someone who has been

00056

waited 16 years, so they would rather have that money in hand to do as they please, I'm sure.

MR. GILL: Yes, I agree with you, Your Honor.

THE COURT: Yes, counsel.

MR. WILLNER: I don't want to add anything further to the technical questions. On behalf of the shareholders, I want to thank Your Honor very much for taking the time, for giving us the opportunity for participating on behalf of, I guess I speak for all of them when I say we appreciate it.

THE COURT: The question came up every six months. You know, we have to report to the world about pending cases every six months or so which is fine. I think judges should have an obligation to resolve cases in a timely manner and that's not an issue with me. The question came up every four or five months or so, I wonder what's going on that case? Is it time to bring them in and -- nah, nah, I haven't heard them, so no news is good news. Let's just let them wait a while. I'm sure they're working hard and they get periodic progress reports and I accepted in the good faith attached to those progress reports.

We kept reporting the case is open and will remain open until it's either settled or will resolved by further proceedings. That's fine and I got the sense that the parties were hard at work and I accepted the representation that everyone was working hard. I had no reason to doubt that and

00057

it's truly amazing though that you were able to accomplish this without the intervention of the third party because that's really atypical these days. The cases are so complex. It's very difficult to get the parties to sit down at the table without a third party knocking heads and bring people together, but, you know, you have something to be proud of. Everyone worked very hard.

MR. WILLNER: Thank you for signing the order.

THE COURT: Sure, it's my pleasure.

Anything else?

To the folks in Oregon, you were able to participate because we're in the electronic age and it's been a pleasure to have you here in my court and I wish you well.

All right. Thank you, counsel.

We'll give you copies. We have some copies of the signed order. There's no need to stand. We have some copies of the signed order and we'll scan in the original order today, but it's a done deal.

Do want this case dismissed with prejudice now?

MR. DARMSTADTER: Well, Your Honor, I --

THE COURT: You want to get your money first. How long is it going to take to write a check for $50 million dollars, unh?

MR. GILL: I think we're actually going to wire

transfer it.

00058

THE COURT: You're going to wire transfer it, all right.

It's good to see everyone. Good luck.

(Proceedings concluded at 4:12 p.m.)

CERTIFICATE OF REPORTER

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

WILLIAM D. MCALLISTER

OFFICIAL COURT REPORTER