Westlaw.

39 Fed.Cl. 753                                                    Page 1
39 Fed.Cl. 753
(Cite as: 39 Fed.Cl. 753)

▷
Briefs and Other Related Documents
California Federal Bank v. U.S.Fed.Cl.,1997.
United States Court of Federal Claims.
CALIFORNIA FEDERAL BANK, a Federal Savings
Bank, Plaintiff,
v.
The UNITED STATES, Defendant.
LANDMARK LAND COMPANY, INC., Plaintiff,
andFederal Deposit Insurance Corporation, as
Successor to the Rights of Oak Tree Savings Bank, a
State Savings Bank, Plaintiff Intervenor,
v.
The UNITED STATES, Defendant.
LaSALLE TALMAN BANK, F.S.B., Plaintiff,
v.
The UNITED STATES, Defendant.
C. Robert SUESS, et al., Plaintiffs,
v.
The UNITED STATES, Defendant.
**Nos. 92-138 C, 95-502 C, 92-652 C, 90-981 C.**

Dec. 22, 1997.

Financial institutions brought separate actions against
the United States, asserting breach of contract arising
from Congress' enactment of Financial Institutions
Reform, Recovery, and Enforcement Act (FIRREA),
which caused federal banking agencies to limit
financial institutions' application of special
accounting treatment to their acquisitions of failing
thrift institutions, which was purportedly inconsistent
with government's contractual obligation to treat
supervisory goodwill as regulatory capital for
contractually prescribed amortization period.    On
cross motions for summary judgment, the Court of
Federal Claims, Smith, Chief Judge, held that:    (1)
United States had contractual obligation to permit
financial institutions to apply special accounting
methods to acquisitions of failing thrift institutions;
(2) capital contract with United States, guaranteeing
that acquiring financial institution could record
supervisory goodwill as asset on its books and
amortize it over lengthy period, 25 or more years,
also meant that institution could include amount of
that goodwill in its calculation of regulatory capital;
(3) doctrine of unmistakability did not bar
enforcement of contract;  and (4) regional officials of
Federal Home Loan Bank Board (FHLBB), the
Principal Supervisory Agents (PSAs), had authority
to make contract with acquiring financial institutions.

Motions granted for plaintiffs.
West Headnotes
**[1] United States 393 ⟶53(8)**

393 United States
    393I Government in General
        393k53 Corporations and Special
Instrumentalities Controlled by United States
            393k53(6) Powers, Liabilities and Activities
                393k53(8) k. Financial Instrumentalities
in General. Most Cited Cases
Contract between United States and financial
institutions, concerning amortization of regulatory
goodwill over lengthy period, 25 or more years, in
connection with acquisition of failing thrift
institutions, was not affected by separate net worth
forbearances over shorter period, or by earlier
termination of assistance agreement providing for
cash payments.

**[2] United States 393 ⟶68**

393 United States
    393III Contracts
        393k68 k. Unauthorized or Illegal Contracts.
Most Cited Cases
Doctrine of unmistakability, limiting surrender by
government of its power to enforce changes in laws
and regulations, did not bar enforcement of contracts
under which United States agreed to permit financial
institutions to apply special accounting methods to
acquisitions of failing thrift institutions, which in
effect obliged government to hold thrifts harmless
from effects of future regulation.

**[3] United States 393 ⟶53(8)**

393 United States
    393I Government in General
        393k53 Corporations and Special
Instrumentalities Controlled by United States
            393k53(6) Powers, Liabilities and Activities
                393k53(8) k. Financial Instrumentalities
in General. Most Cited Cases
Capital contract with United States, guaranteeing that
acquiring financial institution could record
supervisory goodwill as asset on its books and
amortize it over lengthy period, 25 or more years,
also meant that institution could include amount of
that goodwill in its calculation of regulatory capital.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

39 Fed.Cl. 753
39 Fed.Cl. 753
(Cite as: 39 Fed.Cl. 753)

[4] **United States 393 ☜53(8)**

393 United States
   393I Government in General
      393k53 Corporations and Special Instrumentalities Controlled by United States
         393k53(6) Powers, Liabilities and Activities
         393k53(8) k. Financial Instrumentalities in General. Most Cited Cases
Capital contract with United States, guaranteeing that acquiring financial institution could record supervisory goodwill as asset on its books and amortize it over lengthy period, 25 or more years, constituted government promise that institution could actually amortize goodwill on that schedule for full period provided by contract.

[5] **United States 393 ☜53(8)**

393 United States
   393I Government in General
      393k53 Corporations and Special Instrumentalities Controlled by United States
         393k53(6) Powers, Liabilities and Activities
         393k53(8) k. Financial Instrumentalities in General. Most Cited Cases
United States had contractual obligation to permit financial institutions to apply special accounting methods to acquisitions of failing thrift institutions, notwithstanding that acquiring institutions would not have been immediately insolvent absent the capital contract, that they might have been willing to bear risk that capital contract was illusory, that accountant's opinion on intangible assets was missing from records, or that in some transactions there was no written assistance agreement with government.

[6] **Building and Loan Associations 66 ☜42(6)**

66 Building and Loan Associations
   66k42 Insolvency and Receivers
      66k42(6) k. Rights, Powers, Duties, and Liabilities of Receiver in General. Most Cited Cases
Regional officials of Federal Home Loan Bank Board (FHLBB), the Principal Supervisory Agents (PSAs), had authority to make contract with acquiring financial institutions, allowing them to apply special accounting methods to acquisitions of failing thrift institutions; FHLBB expressly delegated to its PSAs in the field the authority to approve unassisted mergers in which goodwill was included in net assets and regulatory capital.

*754 Steven S. Rosenthal, Morrison & Foerster, Washington, DC, for plaintiff in No. 92-138C.
Paul M. Fish, Modrall, Sperling, Roehl Harris & Sisk, Albuquerque, NM, for plaintiff in No. 95-502C.
Richard S. Gill, Federal Deposit Insurance Corporation, Washington, DC, for plaintiff intervenor in No. 95-502C.
Wilber H. Boies, McDermott, Will & Emery, Chicago, IL, for plaintiff in No. 92-652C.
Don S. Willner, Don S. Willner & Associates, Portland, OR, for plaintiffs in No. 90-981C.
Charles J. Cooper, Cooper & Carvin, Washington, DC, Steven S. Rosenthal, and Melvin C. Garbow, Arnold & Porter, Washington, DC, filed supplemental briefing on common issues on behalf of Plaintiffs Coordinating Committee.
John V. Thomas, Associate General Counsel, Federal Deposit Insurance Corporation, Washington, DC, filed supplemental briefing on common issues on behalf of plaintiff FDIC.
Lee M. Straus, Department of Justice, Washington DC, for defendant in No. 92-138C.
Thomas O. Mason, Department of Justice, Washington, DC, for defendant in No. 95-502C.
Charles R. Gross, Department of Justice, Washington, DC, for defendant in No. 92-652C.
Robert E. Leidenheimer, Jr., Department of Justice, Washington, DC, for defendant in No. 90-981C.
David M. Cohen, Director, Jeanne E. Davidson, Assistant Director, Commercial Litigation Branch, Civil Division, and Frank W. Hunger, Assistant Attorney General, Department of Justice, Washington, DC, filed supplemental briefing on common issues on behalf of defendant.

### *OPINION*

SMITH, Chief Judge.
It is the obligation of the United States to do right. Every free government can be judged by the degree to which it respects the life, liberty and property of its citizens. The United States stands tall among the Nations because it is a just Nation. In the instant cases the United States has not acted in a manner worthy of the great just Nation it is. Because the dollars at stake appear to be so large the government has raised legal and factual arguments that have little or no basis in law, fact or logic.

While the court can appreciate the concerns of the government's attorneys to protect the public treasury, and they are honorable people, it must severely criticize the tactics and approach of the government in these motions for summary judgment.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

39 Fed.Cl. 753                                                                    Page 3
39 Fed.Cl. 753
**(Cite as: 39 Fed.Cl. 753)**

When the plaintiffs asked the court to hear oral argument on issues applicable to many cases the government opposed the idea, arguing that each case was unique and that the cases did not present common issues conducive to resolution in such a fashion. The *755 recent hearing and briefing in these cases abundantly demonstrate that the government's assertions were and are wrong. They also demonstrate that the fear of the plaintiffs-that the government wants to relitigate the core *Winstar* liability issues in every case-seems quite justified. This does no credit to the United States.

If the arguments put forth here are the strongest the United States can muster against liability then the government has a moral obligation to seek a fair and equitable settlement from the parties whose contracts were breached. If this cannot be achieved then the court is here to resolve these cases. However, the court is a tool of last resort. Where the government has violated rights it should first attempt to do justice without judicial prompting.

Maybe these ideas are old-fashioned, but they strike the court as particularly applicable to a department that bears the sacred name of Justice. It takes courage to make decisions that may require the government to pay huge sums of money to injured parties. The Civil Division is led by attorneys who have both courage and honor. The history of our law is written in the heroic actions of attorneys who cared more for justice than advantage. It is the court's hope that following this decision the *Winstar* cases are either settled or litigated on a serious level.

The cases at bar are four of more than 120 cases which have been identified by the court as raising issues similar[FN1] to those raised in *Winstar Corporation v. United States* (90-8C), *Glendale Federal Bank v. United States* (No. 90-772C) and *Statesman Savings Holding Corp., et al. v. United States* (90-773C), which were the subject of the United States Supreme Court's decision in <u>United States v. Winstar,</u> <u>518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996)</u>, *aff'g* <u>64 F.3d 1531 (Fed.Cir.1995)</u>, *aff'g* <u>21 Cl.Ct. 112 (1990)</u>. The Court in *Winstar* affirmed the decision of the Federal Circuit and this court that the government had entered into binding contracts to treat supervisory goodwill as regulatory capital for the contractually prescribed amortization period and that it breached those contracts. *Id.* at ----, ----, ----, <u>116 S.Ct. at 2452, 2453, 2472</u>.

FN1. Rule 77 of the Rules of the United States Court of Federal Claims (RCFC) requires that counsel shall file, at the time a complaint is filed, a Notice of Related Case(s), stating whether there is any pending or previous action in any court or board of contract appeals and whether that action and the instant action: (A) "arise from the same or substantially identical transactions happenings or events"; (B) "call for determination of the same or substantially identical questions"; or (C) are "likely for other reasons to entail substantial duplication of labor if heard by different judges." <u>RCFC 77(f)</u>. The cases were identified as related by the parties under this Rule.

Even before the Supreme Court handed down its decision in *Winstar,* this court was aware of significant and unique case management problems these cases would pose irrespective of what the Supreme Court decided on liability in the lead cases. Action in those cases identified as "*Winstar*-related" had been stayed pending appellate resolution of the core liability issues. Many of these cases were quite old, and some had been filed more than six years earlier. In addition, the "*Winstar*-related" cases were not identical, and resolution of all the cases would probably not turn on a single issue of law the determination of which would dispose of all the stayed cases. Rather, the cases involved individually negotiated contracts with unique fact patterns. Further, the pending Supreme Court decision on liability would not resolve the issue of damages if liability were found. Thus, there would possibly need to be additional, and presumably fact intensive, litigation to resolve damages issues.

As a final group of factors indicating the management challenges, these cases were being handled by a large number of law firms and several hundred attorneys on the plaintiffs' side. Collectively plaintiffs in these cases were seeking contract damages in the range of tens of billions of dollars. The 120-plus cases involve several hundred mergers and hundreds of institutions. The parties include functioning banks and thrifts, holding companies, a large number of former stockholders of failed and seized thrifts, and individuals who allege that they directly contracted with the government. A number of the cases had prior litigation histories in United States district courts across the country. Lastly, following the Supreme Court *756 affirmance the Federal Deposit Insurance Corporation (FDIC)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

moved to intervene as a party plaintiff in about 50 of the cases.

All these factors argued for adopting some form of coordinated case management procedure to deal with these cases, at least initially, as a common group. *See, e.g.,* 35 Fed.Cl. 707 (May 31, 1996 Order); July 8, 1996 Order; August 20, 1996 Order; August 28, 1996 Order. The goal of this common management was two-fold. One goal was to insure that the *Winstar*-related cases could be managed as efficiently as possible with a fair opportunity for all plaintiffs to present their cases while minimizing the onerous litigation and discovery burdens facing the government. A second goal was to insure that the *Winstar*-related cases received an appropriate share of the court's resources, but did not unduly burden the court's ability to manage the other cases on the docket. The Justice Department, which defends the United States in all cases before this court, also recognized the potential problem and prior to the Supreme Court decision had requested that the court adopt special case management procedures in the *Winstar*-related cases.

The court held an initial status conference on the government's motion for special case management procedures to which all plaintiffs' counsel were invited. A couple of hundred counsel appeared. There was a general consensus that some special procedures were needed, though there were wide differences among counsel and between plaintiffs and the defendant on what procedures to adopt. From the start, one area where the court particularly believed and still believes that real benefits in efficiency, fairness and uniformity could be achieved is through the use of special procedures to identify and resolve issues common to many cases.

This group of four cases presents such a significant opportunity. That is why the court used break time in August, between the plaintiff's and the defendant's cases in the *Glendale* trial, to hear two days of oral argument in these four cases. This argument was accompanied by extensive briefing. It was also the understanding of the court that these four cases raise issues that are potentially relevant in a large number of the pending *Winstar*-related cases. This was a point of contention between the plaintiffs and the defendant, with the government objecting to the format on the grounds that there were essentially no common issues that could be resolved in such a fashion. The court resolved the dispute in favor of the effort. If it did not succeed in resolving any common issues that had applicability to other *Winstar*

cases, at worst it would resolve the issues in these four cases. At best it had the potential to resolve multiple issues and conserve considerable resources for the court and the parties. This is the reason for the hearing and this opinion. As noted in the introduction of this section the plaintiffs' proposal was quite justified.

Before proceeding to the merits of the specific motions at issue here it is relevant to set out the rest of the case management system from which this hearing and opinion originate. The court understands that any system of complex case management depends upon the willingness of the parties to work toward the common goal of rationalizing the process, which requires a recognition of the common and divergent interests of the various plaintiffs and defendant. Here both sides clearly had a common interest: reducing litigation and discovery costs. Plaintiffs had the additional strong interest in obtaining judgments as quickly as possible. Defendant had the additional interest in having to allocate common litigation resources and personnel over all these cases, while still defending the government in the remaining approximately 2000 cases on the court's docket.

Central to the success of these case management procedures is the participation of the three coordinating committees, representing the private plaintiffs, the FDIC, and the defendant, which meet with the court monthly or as needed, to give the court the committees' views on case management issues. The court appreciates the efforts of the counsel who make up the three coordinating committees. The court particularly appreciates the effort of Mr. Stephen D. Susman, who on a *pro bono* basis served as Special Counsel to the court in the months that immediately followed the Supreme *757 Court's decision in *Winstar,* and who undertook the task of organizing the plaintiffs into a coordinating committee that could then work with the government to help the court manage this litigation efficiently. This complex organizational task was completed very successfully and to everyone's benefit. The coordinating committee meetings have been open to all parties, on the record, and highly useful to date. When individual plaintiffs feel that their interests diverge from those of the collective plaintiffs they have come to the coordinating committee meetings to make their specific views known. To date the management system has resulted in the following actions:
1) Entry of the Omnibus Case Management Order (September 18, 1996).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

39 Fed.Cl. 753
39 Fed.Cl. 753
(Cite as: 39 Fed.Cl. 753)

2) Entry of the Master Protective Order (November 22, 1996).

3) Disposition of Statute of Limitations common issue identified in the Omnibus Case Management Order. *See Plaintiffs in Winstar-Related Cases v. United States*, 37 Fed.Cl. 174 (Jan. 7, 1997)(Judge John P. Wiese).

4) Disposition of the Motions to Intervene by the Federal Deposit Insurance Corporation common issue identified in the Omnibus Case Management Order. *See* Order Addressing FDIC's Motion to Intervene, Case No. 90-8C *et al.* (March 14, 1997) (Judge James T. Turner).

5) Appointment of Judge Christine O.C. Miller to serve as Discovery Judge (May 15, 1997).

6) Entry of Procedural Order No. 1: Master Litigation Plan (August 11, 1997).

7) Entry of Procedural Order No. 2: Master Discovery Plan (August 11, 1997).

On September 18, 1996 the court entered an Omnibus Case Management Order (CMO), which established several initial procedures and which was designed to guide the first stages of the litigation process in the *Winstar*-related cases. One of the most important features of the CMO was the creation of a streamlined summary judgment process. Under the process, plaintiffs could file a "short-form" motion for summary judgment as to two liability issues: (1) Was there a contract and (2) Did the government act inconsistently with the contract. The CMO also provided for plaintiffs a suggested short-form format for presenting this information. In light of the additional burdens that defendant might face as a result of responding to a multitude of these summary judgment motions, defendant was given additional time to respond to these motions. Defendant was required to file an initial response to the motion within 60 days, and a second response within 120 days asserting any defenses relating to liability.

This procedure, which was first negotiated by the parties and then recommended to and implemented by the court, was in the court's view designed to streamline the process for identifying cases where liability was effectively determined by the Supreme Court's decision in *Winstar*. It was the court's hope that the process would work as follows: plaintiffs who believed that the *Winstar* decision controlled would file the short-form motions which provided the relevant documentation and cited the appropriate authority. Defendant would have ample time to review this documentation and the law to determine whether defendant was liable. If defendant

determined that *Winstar* governed and that liability was established, then those cases could leave the liability track and move to the damages track and ultimate resolution. The court could then work with the parties to develop procedures to resolve other issues not resolved by the *Winstar* liability decisions.

Since implementation of the CMO, more than thirty plaintiffs have filed motions for summary judgment pursuant to its terms. While the court was hopeful that the procedures in place would expedite resolution of at least the liability issues in a large number of cases, in only one of the cases (*Coast Federal Bank v. United States*, No. 92-466C) where plaintiffs have filed motions for summary judgment has defendant conceded that plaintiff had a contract with the government and the government acted inconsistently with that contract. In all other cases, the government has raised a variety of contract defenses. As a result, the court was faced with a multitude of summary judgment motions which were opposed by defendant. Although **758** defendant believed that these summary judgment motions should be dealt with individually, the court believes that, consistent with the goals of the case management process, the court should attempt to economize the resources of both the court and parties and use special procedures for resolving the summary judgment motions efficiently and expeditiously.

This opinion is the result of that attempt. During the late spring of 1997, Plaintiffs Coordinating Committee (PCC) and the FDIC identified a group of contract defenses raised by defendant in more than one of the *Winstar*-related case summary judgment motions. The court then selected the four cases at bar for consideration because they would ventilate the broadest cross-section of the contract defenses raised by defendant.[FN2] While the court was unsure whether this would resolve all issues in all pending summary judgment motions, the court believed it merited the effort consistent with the goals of the CMO and subsequent management orders. As noted earlier, this belief was well founded.

> FN2. Plaintiffs Coordinating Committee identified 13 common issues it believed were raised in the government's summary judgment briefing. The four cases at bar involve 11 of the 13 common issues identified by PCC.

These four cases are before the court on the following motions: plaintiff's and defendant's cross-motions for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

summary judgment as to liability in *California Federal Bank v. United States;* plaintiff's and plaintiff intervenor's motions for summary judgment and defendant's cross-motions for summary judgment as to liability in *Landmark Land Company v. United States;* plaintiff's motion for summary judgment as to liability in *LaSalle Talman Bank v. United States;* and plaintiff's and defendant's cross-motions for summary judgment as to liability in *Suess v. United States.*

The court will briefly discuss the underlying facts in each case, and then will address the relevant issues raised in each case on an issue-by-issue basis.

## FACTS

### *CALIFORNIA FEDERAL BANK v. UNITED STATES* (No. 92-138C)

California Federal Bank, FSB, (CalFed) seeks summary judgment that the defendant breached its contractual obligations to CalFed regarding the treatment of supervisory goodwill with respect to three transactions in 1982 and 1983: 1) CalFed's 1982 acquisition of three Georgia thrifts and a Florida thrift (the Southeastern transaction); 2) CalFed's 1982 acquisition of Brentwood Savings and Loan Association, a California thrift; and 3) CalFed's 1983 acquisition of Family Savings and Loan Association. Defendant makes three arguments supporting its claim for summary judgment: 1) no contract existed between the government and CalFed regarding the Brentwood and Family transactions; 2) although a contract existed with respect to the Southeastern deals, no cause of action lies because CalFed failed to satisfy a "condition precedent" (submission of an accountant's opinion to the Federal Home Loan Bank Board); and 3) because each of the transactions was governed by a "net worth forbearance" letter that expired after five years, and which in all three sets of transactions expired before the passage of the Financial Institutions Reform and Recovery Act (FIRREA) and its implementing regulations, FIRREA and its regulations did not breach any contracts with plaintiff.[FN3]

> FN3. CalFed argues in its brief that defendant should be barred from raising the "net worth forbearance" issue because it failed to raise the issue in its initial 60-day response to plaintiff's motion for summary

judgment, in which defendant was required pursuant to the CMO to answer "whether the Government acted inconsistently with [the] contract." Defendant initially raised the issue in its 120-day response. Regardless of the merits of plaintiff's procedural argument, the court will consider the issue for two reasons: it was voluminously briefed in supplemental briefing in *CalFed* and in the supplemental briefing provided by Plaintiffs Coordinating Committee, and, as PCC points out, it is an issue that has been raised in more than 10 cases, including another case at bar, *Suess v. United States.*

### *LANDMARK LAND COMPANY, INC. v. UNITED STATES* (No. 95-502C)

Landmark seeks summary judgment as to liability for defendant's breach of its contractual**759** obligations regarding the treatment of supervisory goodwill regarding two transactions entered into by Landmark in 1982 and 1986.[FN4] In September 1982 the government approved the merger of Dixie Savings and Loan Association and Heritage Savings and Loan Association (Heritage), and the conversion of both from federal mutual to federal stock form, with Landmark to be the owner of the resultant thrift's (Dixie) newly issued stock. As part of the Assistance Agreement, signed by Landmark, Dixie, and the Federal Savings and Loan Insurance Corporation (FSLIC), the FSLIC made a cash contribution of $21 million in the form of a five-year note. Plaintiff was to contribute $20 million to Dixie's net worth in the form of cash and/or real estate. Section 9 of the Assistance Agreement contained a termination clause, and Section 10 provided for the amortization of supervisory goodwill on a 40-year basis. Defendant contends that it is entitled to summary judgment as to this transaction for several reasons: 1) that the termination clause that governed these transactions expired prior to FIRREA, hence terminating any government obligations that might have existed; 2) that there was no requirement for the government to permit Dixie to amortize goodwill over forty years, or to count FSLIC and Landmark capital contributions towards net worth beyond the expiration of the Assistance Agreement; and 3) that Landmark failed to satisfy conditions precedent relating to real estate appraisals which are set forth in the Assistance Agreement and in Bank Board Resolution 82-657.

> FN4. The FDIC has filed a motion for

39 Fed.Cl. 753
39 Fed.Cl. 753
(Cite as: 39 Fed.Cl. 753)

summary judgment as successor in interest to Oak Tree Savings Bank, which became the name of the affected thrifts in December 1989, and which was ultimately seized in October 1991. Since the FDIC's motion and plaintiff's motion, and the government's responses, are in all major respects identical, the court will for analytical purposes treat them as one argument.

The second transaction involves the acquisition by Dixie of St. Bernard Savings and Loan Association in 1986. St. Bernard was converted into a stock association and acquired by Landmark Land Development Company, a wholly-owned subsidiary of Dixie. Landmark contributed assets totaling $715 million in exchange for the stock, and were granted in a series of Federal Home Loan Bank Board (FHLBB) Resolutions several regulatory forbearances. The government argues in regard to the St. Bernard transaction that no contract with the government was formed.

## *LASALLE TALMAN BANK, F.S.B. v. UNITED STATES* (No. 92-652C)

In 1982, LaSalle Talman Bank, at the behest of and with the express agreement of the Federal Savings and Loan Insurance Corporation (FSLIC) and FHLBB: 1) merged with Alliance Savings and Loan Association and Northwest Savings and Loan; 2) acquired Unity Savings and Loan, which was in receivership, from the FSLIC; and 3) merged with First Federal Savings and Loan. All relevant documents provided for the amortization of supervisory goodwill over 40 years. In 1986, LaSalle Talman executed a Financing Agreement, including an "Agreement Regarding Goodwill," with the FSLIC. The goodwill agreement provided for a $100 million reduction in total goodwill on plaintiff's books, recognized the remaining goodwill as reflected in plaintiff's financial statements and expressly provided for amortization of that goodwill over a 30-year period. The government argues that the 1982 contracts were superseded by the 1986 agreement, and that, as a result, the enactment of FIRREA could not have breached the 1982 contract, and that none of the 1986 documents can be read to permit plaintiff the right to use unamortized goodwill to meet regulatory capital requirements.

## *SUESS v. UNITED STATES* (No. 90-981C)

This case involves two acquisitions by Benj. Franklin Savings and Loan Association (BF) of ailing thrifts. In September 1982, BF merged with Equitable Savings and Loan. In July 1985, BF acquired another failing savings and loan, Western Heritage. Additionally, BF converted from a federal mutual to a federal stock association in December 1986, and the amortization period for the goodwill recognized on its books from the Equitable merger was changed from 40 to 25 years. Defendant challenges the existence of *760 a contract relating to the Equitable merger, and also challenges plaintiffs' reliance on affidavits as part of its motion to establish contractual intent. Regarding the Western Heritage acquisition, the government contends that BF failed to meet a condition precedent (requiring BF to submit an independent accountant's opinion letter to the Bank Board); that the five-year net worth forbearance trumps any contractual language suggesting that goodwill could be amortized for a period longer than five years; and that the capital credit attributable to net worth expired at the same time as the five-year assistance agreement.

## DISCUSSION

Following the format set forth in the Plaintiffs Coordinating Committee's brief and Defendant's response, the court will address each common issue in turn.

## ISSUE No. 1

Relevant to: *CalFed, Suess*
*Statement of issue:* The existence of a five year agreement protecting against the seizure of the thrift for any reason related to a supervisory acquisition establishes that the government's agreement to a 25-or-more year capital contract was, in fact, only a five year agreement, and the government is bound to honor the capital contract for only five years.
* * *

Plaintiffs make three basic arguments in response to this general assertion by the government. First, "[t]wo of the three *Winstar* test cases, *Statesman* and *Glendale,* involved forbearance letters issued by the FHLBB that contained net worth forbearances similar, if not identical, to those now at issue." Pls. Cmte Brief, CI # 1, at 6 (citing *Statesman Savings Holding Corp. v. U.S.,* 26 Cl.Ct. 904, 910 (1992)). The Supreme Court affirmed the findings by this

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

court and the Federal Circuit that contracts allowing amortization of goodwill over the longer (20-40 year) periods existed and were breached by FIRREA and its regulations. Second, "[t]he government has provided no basis for reinterpreting those promises to render the promise regarding supervisory goodwill largely insignificant and useless." *Id.* at 8. The proposition that a contract must be interpreted to give meaning to all of its provisions is a fundamental rule of contract interpretation; thus, the government's reinterpretation must be rejected. *Id.* at 7 (citations omitted). Third, the various parties' course of conduct prior to FIRREA establishes that the government ratified the plaintiffs' recording of supervisory goodwill and "amortizing it according to the promises that the government now says did not exist." *Id.* at 13. Only in several of its 120-day responses, filed this year, has the government ever suggested that net worth forbearances trumped the supervisory goodwill commitments.

The evidence presented by the *CalFed* and *Suess* plaintiffs strongly support Plaintiffs' argument. CalFed would not have sought a separate net worth forbearance one year after its acquisition of the Southeastern thrifts and the goodwill forbearance issued in connection therewith unless the commitments were complementary. CalFed Reply at 11 & n. 7. It would have been irrational to bargain away a 35 year amortization of goodwill that CalFed had bargained for in return for a 5 year period. CalFed has also submitted the testimony of Dr. D. James Croft, who served as Director of FHLBB's Office of Examinations and Supervision, stating that net worth forbearances "were frequently granted in supervisory mergers and were intended to deal with different issues and to provide distinct inducements separate from the agreements regarding purchase accounting and regulatory treatment of goodwill." CalFed Reply, Croft Decl. at ¶ 21. CalFed regularly submitted quarterly financial reports to the FHLBB, after the expiration of the five year net worth forbearances, that recorded supervisory goodwill as regulatory capital. CalFed Reply at 12-13. The government did not assert, prior to 1997, that the inclusion of such supervisory goodwill was barred by the expiration of the net worth forbearances.

The government's arguments in *Suess*[FN5] fare no better than those in *CalFed.* First, a *761 May 6, 1985 letter from the Seattle FHLBB to Mr. G. Dale Weight (CEO of Benj. Franklin S & L, of which *Suess* plaintiffs are shareholders), "offering a written synopsis of our agreement as we see it," states that "[t]he Accounting Forbearances are allowable and,

therefore, accepted." Suess Pl.App. at 230. The forbearances referred to were contained in an April 17, 1985 proposal letter from Benj. Franklin to the Seattle FHLBB. Under the heading "Forbearances," upon which the transaction was made "contingent," the letter stated that "[a]ssets acquired by Benj. Franklin from Western Heritage will be deemed to have been acquired in a 'merger instituted for supervisory reasons.' " *Id.* at 220. In the next paragraph under the same heading, the five year forbearances were listed and discussed. *Id.* A separate heading, "Accounting Forbearances," appears several pages later (following a brief section on tax implications). Under this heading, Benj. Franklin "respectfully requests that the following accounting forbearances be granted it for regulatory accounting purposes, subsequent to the merger with Western Heritage." *Id.* at 223. These forbearances are listed:

> FN5. The government makes its Common Issue # 1 argument with respect to Benj. Franklin's acquisition of Western Heritage S & L in 1985. The government does not make this argument with respect to BF's 1982 merger with another failing bank, Equitable S & L.

1. That the FSLIC assistance received be credited directly to net worth rather than being treated as an adjustment of the purchase price as required by G.A.A.P. [Generally Accepted Accounting Principles]
2. Discounts on loans to be amortized over 15 years by the level-yield method rather than over the contractual loan life adjusted for expected prepayments as required by G.A.A.P.
3. The entire value of intangible assets created by applying the purchase method of accounting be amortized over 40 years by the straight-line method.

Suess Pl.App. at 223. The Seattle FHLBB accepted these accounting forbearances in its May 6, 1985 letter. These accounting forbearances were entirely separate and not contingent upon the forbearances concerning the FSLIC insurance regulations that were to expire after five years.

Second, a July 15, 1985 interoffice memo from Mr. James R. Faulstich, FHLBB Principal Supervisory Agent to the FHLBB not only recognized that Benj. Franklin had amortized $329 million of goodwill up to December, 1984, but confirmed that:

[T]he following accounting treatment has been requested for regulatory reporting purposes:
(B) The value of intangible assets resulting from application of the purchase method of accounting will be amortized to expense by the straight-line method over a period not to exceed 40 years.... Benj. Franklin has indicated that without the authorization of such accounting treatment, it would be disinclined to proceed with the transaction. Accordingly, the Supervisory Agent has no objection to such accounting treatment for purposes of regulatory reporting only.

Suess Pl.App. at 238. In the same memo, under a separate section labeled "Requested Forbearances," Faulstich discusses the five year forbearances to be granted under the FSLIC insurance regulations. This memo constitutes further evidence that the forbearances granted concerning the latter regulations were independent of the accounting treatment of goodwill that the FHLBB understood to be a *sine qua non* of the Western Heritage acquisition.

Finally, the Assistance Agreement between the FHLBB and BF, at Section 10, states:
Except as otherwise provided, any computations made for purposes of this Agreement shall be governed by [GAAP] as applied in the savings and loan industry, except that where such principles conflict with the terms of the Agreement, applicable regulations of the Bank Board or the CORPORATION, or any resolution or action of the Bank Board approving or relating to the Merger or to this Agreement, then this Agreement, such regulations, or such resolution or action shall govern.

*Id.* at 279. The Agreement's integration clause, at Section 16, states that the Agreement**762** "supersedes all prior agreements and understandings of the parties in connection with it, excepting only the Merger Agreement and any resolutions or letters concerning the Merger or this Agreement issued by the Bank Board...." *Id.* at 283. The Merger Agreement, *see id.* at 292, affirms the 40 year amortization of regulatory goodwill, and in so doing corroborates the understandings of the parties as manifested in the letters referenced above.

[1] Under such contractual circumstances, the remainder of Defendant's arguments concerning the net worth forbearances and whether they were breached are completely irrelevant. *See* Def. Cross-Mot. & Opp'n (Suess) at 81-85. A contract did exist concerning the amortization of regulatory goodwill, and its existence did not depend in any way upon the

separate net worth forbearances granted amongst the same contractual documents. FHLBB Resolution 85-618, Suess Pl.App. at 292 ("the value of any intangible assets acquired as a result of the Merger may by amortized by [BF] over a period of forty (40) years by the straight line method"). *Accord, Winstar,* 518 U.S. at ---- - ----, 116 S.Ct. at 2442-43. Consistent with the initial assertions of the PCC, the government's position on this issue seems a clear attempt to relitigate the Supreme Court, the Federal Circuit, and this court's decisions in the original *Winstar* cases.

ISSUE No. 2

Relevant to: *Landmark, Suess*
*Statement of Issue:* Where the government has provided a 25-or-more year capital contract, but where the assistance agreement [AA] providing for cash payments terminates in five years, the five year termination provision pretermits the 25-or-more year capital contract such that the government is bound to obey the capital contract for only five years.
* * *

Plaintiffs argue generally that "this exact issue was raised, and disposed of, in the Winstar test cases." Pls. Cmte. Brief, CI # 2, at 2. The "termination clauses" at issue employ similar or identical language.[FN6] In fact, Section 9 of the AA was the agreement's termination clause, identical in all respects to those contained in the *Statesman, Winstar,* and *Suess* (Western Heritage) assistance agreements. *See* Plaintiffs Coordinating Committee Brief, CI # 2, Apps. A, B.

> FN6. In Landmark, the relevant clause in the Assistance Agreement executed in connection with Landmark's 1982 acquisition Dixie S & L reads (in part):
> Except as otherwise specifically provided, this Agreement shall terminate five years following the Acquisition Date or on such other date to which the parties or their successors agree in writing....
> Pls. Cmte Brief, CI # 2, at App. A. [Landmark 1982 Assistance Agreement, § 9].

With respect to Landmark, the government argues that "any contractual obligation to permit the FSLIC assistance to be counted as a contribution to Dixie's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

net worth, or to permit any particular treatment of real estate contributions from Landmark, clearly expired with the Assistance Agreement." Def. Cross-Mot. & Opp'n (Landmark) at 11. Further, based on AA § 9, Defendant reads the "contract" to have permitted Dixie to "continue to count [supervisory goodwill] as regulatory capital, and to use a 40 year amortization schedule [ ], during the term of the agreement [five years]." *Id.* at 14. The plaintiffs respond that: "[T]here is no dispute that the government vigorously asserted this termination argument in the *Winstar* test cases, alleging that the validity of any promises that might have been made lapsed when the relevant [AA] terminated." Pls. Cmte. Brief, CI # 2, at 4-5 (citing Landmark Pl. Reply at 5-7 (quoting government briefs and oral argument in the Federal Circuit and Supreme Court)). Indeed, the Federal Circuit found the government's termination clause arguments "unpersuasive," stating that the expiration provisions applied only to the "executory provisions set out in the SAA...." *Winstar,* 64 F.3d at 1544, 1542.[FN7] Landmark points out correctly that the Supreme*763 Court could not have affirmed the existence of contracts with respect to amortization of goodwill or the counting of capital credits towards net worth without rejecting Defendant's termination clause arguments. Landmark Pl. Reply at 7 & n. 5 (quoting *Winstar,* 518 U.S. at ----, 116 S.Ct. at 2451). Also, Landmark points out that "[g]iven the fundamental goals and basic intentions of the parties to the Assistance Agreement, it would have been no more possible for Landmark to withdraw its real estate contributions after five years than for Defendant to back out of its commitments concerning accounting methodology and to promote real estate development opportunities."[FN8] Landmark Pl. Reply at 18.

FN7. "We view the expiration provisions as only relating to executory provisions set out in the SAA ... [t]his provision of the SAA does not negate other obligations under the merger plan, including the specific time periods for the amortization of goodwill." *Winstar,* 64 F.3d at 1542

FN8. *See* Landmark AA § 17: "It is the purpose of this Agreement to provide a means by which the failures of the MERGING ASSOCIATION and the RESULTING ASSOCIATION may be prevented ... and the RESULTING ASSOCIATION [ ] may be provided with property development and loan portfolio opportunities. [ ]. [I]t is intended that the purposes of this Agreement be accomplished without imposing an unreasonable financial burden on the RESULTING ASSOCIATION." Landmark Pl. Mot. Summ. J. at Ex. A. "Likewise, it would have been 'madness' for Landmark to contribute all real estate assets-with projected development over a 20 year period-only to have that value cancelled after a few years." Landmark Pl. Reply at 20.

The government attempts the same argument in *Suess* to rebut Plaintiffs' assertion that Defendant breached its obligation to treat the $8.8 million cash contribution from FSLIC to BF as a credit to BF's net worth. Def's Cross-Mot. & Opp'n (Suess) at 86. Here, the termination clause is set forth at Section 13 of the Western Heritage Assistance Agreement.[FN9] Plaintiffs common issue brief attaches copies of the relevant sections of the *Winstar* and *Statesman* Assistance Agreement termination clauses. *Id.,* Pls. Cmte. Brief CI # 2, at Appx. A, B. These are identical, except for the term of years (two years in *Winstar,* five in *Statesman,* three here). As the Western Heritage documents demonstrate, there is no reason to treat the Western Heritage termination clause differently from those considered by the Federal Circuit and the Supreme Court.

FN9. Section 13 states that "[e]xcept as otherwise specifically provided in this Agreement, this Agreement shall terminate three (3) years following the Effective Date [July 31, 1985]."

In *Suess,* the government's agreement to provide a cash contribution to BF to facilitate the Western Heritage acquisition dates from the Seattle FHLBB letter of May 6, 1985, offering an $8.8 million figure instead of the $9.5 million BF suggested in its proposal of April 17, 1985. Suess Pl.App. at 225, 230. As in *Statesman,* the Assistance Agreement in this case "contained express terms that allowed capital credits to be used to satisfy regulatory capital." 64 F.3d at 1542. In *Statesman, 26 Cl.Ct. at 916,* this court could not "find any reason for treating capital credits differently than supervisory goodwill" and concluded that "the government is liable to Statesman for its decision not to honor either of these promises." The government's position is that the $8.8 million capital credit could only be treated as such for three years. Thus, by the time BF was

"placed into conservatorship in February 1990, Franklin had no contractual entitlement to count the FSLIC's $8.8 million cash contribution as a credit to its net worth." Def. Cross-Mot. & Opp'n (Suess) at 87. The government's argument must fail as it is inconsistent with the law set forth in the previous considerations of this very same issue by the Supreme Court and the Federal Circuit.

Benj. Franklin, in its April 17, 1985 proposal letter, submitted "Bid No. 1," which stated that "[i]n order to make this merger possible and affordable, The Benj. Franklin seeks from the FSLIC a cash contribution in an amount of $9,500,000 to be paid in full promptly after closing." Suess Pl.App. at 225. In its May 6, 1985 acceptance and amendment of BF's proposal, the FHLBB stipulated that "the amount of cash assistance requested as part of 'Bid No. 1' has been lowered to $8.8 million." *Id.* at 230. In other words, the terms of the proposal that set forth the requirement of "paid in fill promptly after closing" remained unvaried by FHLBB's acceptance of the proposal. BF's proposal also made clear to the FHLBB that the cash contribution was essential to the transaction. FHLBB-Seattle President Faulstich's July 15, 1985 memo, under the **764** section entitled "Accounting Issues," further states that "[t]he FSLIC cash contribution will be a direct credit to net worth." There is no indication that the FHLBB placed an expiration date on this credit. Further, Section 16 of the Assistance Agreement (the integration clause), which takes into account collateral understandings and documents, would allow the prior understanding of the parties concerning the capital credit to modify the termination clause. Not only is the latter clause non-specific, but the Supreme Court affirmed the Federal Circuit's construction of identical language in the documents examined in those decisions. *See* Pls. Cmte. Brief, CI # 2, at 5-6 ("[A]ny non-executory aspects of the transaction were not affected by the termination clause. Those non-executory aspects included, of course, the promise that allowed Glendale to include in regulatory capital the supervisory goodwill generated by the acquisition."); FDIC Brief, CI # 2, at 4-5 ("If a thrift obtained a right (here, to count goodwill or a capital credit) at the inception of the contract, the fact that different rights (e.g., the right to put bad assets back to FSLIC) terminate after five years is of no moment, since the thrift's rights were already vested.")

Considering the documentary evidence in *Landmark* and *Suess*, and the Supreme Court's necessary rejection of the same government arguments in *Winstar*, Defendant's argument on Common Issue # 2

is meritless and should be rejected.

## ISSUE No. 3

Relevant to: *Landmark, Suess*
*Statement of Issue:* Capital contract fails to satisfy the unmistakability doctrine.
* * *

In *Landmark* and *Suess*, the unmistakability argument plays a minor role among the government's arguments. In *Landmark,* the government asserts this defense in its 120-day filing as part of a general, five item "defense regarding the existence of a contract" list unsupported by any citations to the record. *See* Def. Supp. Filing (Landmark) at 2-3. In *Suess,* the defense is asserted in a footnote to the government's argument that the net worth forbearance afforded as part of BF's acquisition of Western Heritage trumped any provision allowing amortization of goodwill over 40 years. Def. Cross-Mot. & Opp'n. (Suess) at 84 n. 15; *see supra* (rejecting the government's arguments on Common Issue No. 1). Essentially, the government contends that agreements that would allow thrifts to amortize supervisory goodwill over 40 years are voided by the principle that a surrender of the government's power to enforce changes in laws and regulations must be "clear and unmistakable," and the fact that no documents memorializing the *Winstar*-type transactions satisfy that test. [FN10] Def.'s Cross-Mot. & Opp'n (Suess) at 84 n. 15; Pls. Cmte Brief, CI # 3, at 6.

> FN10. In its Reply brief in *Landmark,* at 6-10, Defendant proffers another version of the unmistakability argument, namely, that "if an acquiring thrift had other business reasons for acquiring a failing thrift, Defendant's (otherwise binding) promise to permit supervisory goodwill to be counted in computing capital was not binding...." FDIC Brief, CI # 3, at 4. This argument ignores the Supreme Court's finding that the primary motivation to consummate the relevant transactions came from the Bank Board's "plan to avoid the insurance liability." *Winstar,* 518 U.S. at ----, 116 S.Ct. at 2442. The argument also ignores the undisputed fact with respect to the Landmark-Dixie transaction in 1982 that Dixie's negative net worth was over $100

39 Fed.Cl. 753                                                                                      Page 12
39 Fed.Cl. 753
**(Cite as: 39 Fed.Cl. 753)**

million on the day it was acquired by Landmark. Business considerations notwithstanding, absent an agreement to amortize that amount of supervisory goodwill, Dixie would immediately have been subject to seizure and subsequent liquidation at FSLIC's cost. *See* Landmark Pl. Reply at 9-10.

[2] What the Supreme Court plurality opinion actually stated in *Winstar* is this: "[T]he government agreed to do something that did not implicate its sovereign powers at all, that is, to indemnify its contracting partners against financial losses arising from regulatory change. We accordingly hold that the Federal Circuit correctly refused to apply the unmistakability doctrine here." *Winstar,* 518 U.S. at ----, 116 S.Ct. at 2461.[FN11] The three justice concurrence recognized*765 a relevance to the doctrine in these cases but found that the identical contracts in *Winstar,* et al., clearly satisfied the doctrine. *Id.* at ---- - ----, 116 S.Ct. at 2477-78. Either way, a strong Court majority provides no support for the government's position. Plaintiffs' extensive arguments on this issue (most of which relate to distinctions the government attempts to make in other cases) serve to emphasize the point clearly expressed by the Supreme Court. Pls. Cmte. Brief, CI # 3, at 11-14 (rebutting the government's claims that (1) implied contracts must fail under the unmistakability doctrine; (2) successor regulations shift the risk under goodwill contracts to plaintiffs). In *Landmark* and *Suess,* the government provides absolutely no factual or legal grounds upon which to base its reassertion of the discredited unmistakability argument.

FN11. "To be sure, it might seem unlikely, in the abstract, that the Government would have intended to make a binding promise that would oblige it to hold the thrifts harmless from the effects of future regulation (or legislation) in such a high-risk, highly regulated context as the accounting practices of failing savings and loans. But, as the plurality's careful examination of the circumstances reveals, that is exactly what the Government did." *Winstar,* 518 U.S. at ----, 116 S.Ct. at 2476 (Breyer, J., concurring).

ISSUE No. 4

Relevant to: *LaSalle Talman*

*Statement of Issue:* Fact that capital contract guarantees that thrift may record supervisory goodwill as an asset on its books and amortize it over 25-or-more years does not mean that thrift may include the amount of that goodwill in its calculation of regulatory capital.
* * *

The Federal Circuit, discussing the Glendale transaction, "found that guidelines on the purchase method of accounting set out in an internal Bank Board memorandum, to which reference was made in the Resolution, evidenced Defendant's approval of regulatory accounting principles." FDIC Brief, CI # 4, at 3. It thus concluded that there existed "an express contractual obligation to permit Glendale to count the supervisory goodwill generated as a result of its merger with Broward as a capital asset for regulatory capital purposes." *Id.* (citing *Winstar,* 64 F.3d at 1540-41). In its Response to LaSalle Talman's Short Form motion, Defendant "does not concede that the 1986 agreement between the FSLIC and Talman Home created a contractual obligation to permit Talman Home to use unamortized goodwill to satisfy capital reserve requirements for the life of the agreed upon amortization schedule, or for any period of time." Def. Resp. (LaSalle Talman) at 4. FHLBB Resolution 82-110, issued in connection with LaSalle Talman's 1982 transactions, stated that "[i]f Talman Home desires to use the purchase method of accounting in regard to its acquisition of Unity, and its mergers with North West and Alliance, Talman Home shall submit a stipulation that any goodwill arising from the transactions shall be determined and amortized in accordance with Bank Board Memorandum R-31b." LaSalle Talman Pl. Exh. D, at 3. Bank Board Memorandum R-31b is the same document referred to throughout the *Winstar* litigation as providing for "the use of the purchase method of accounting under which 'supervisory goodwill' resulting from the merger would be treated as satisfying part of the merged thrift's regulatory capital requirements." *Winstar,* 64 F.3d at 1535 (citing the Memorandum). On October 22, 1986, LaSalle Talman executed an "Agreement Regarding Goodwill" with FSLIC providing that "all remaining goodwill of Talman Home shall be amortized over a thirty year period," and that "[n]o change shall be made to the manner in which such goodwill was amortized prior to the Closing Date and each separate component of goodwill shall be amortized after the Closing Date on a straight line basis over the then remaining term of such component's thirty year period." LaSalle Talman Pl. Ex. J., at 1-2.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[3] To summarize: LaSalle Talman was specifically allowed to amortize goodwill from its 1982 transactions and use it in accordance with Bank Board Resolution 82-110 and Memorandum R-31b to satisfy capital asset requirements. The Supreme Court and Federal Circuit affirmed that such agreements were express contractual obligations that permitted thrifts to amortize goodwill and count that supervisory goodwill as capital assets to satisfy regulatory requirements. *See Winstar,* 64 F.3d at 1540, 518 U.S. at ----, 116 S.Ct. at 2449. In 1986, LaSalle *766 Talman executed an agreement with the government confirming the treatment of goodwill that had been agreed upon in 1982. Thus, Defendant's argument on this issue also ignores the core decisions reached by this court, the Federal Circuit, and the Supreme Court in *Winstar. See* Pls. Cmte Brief, CI # 4, at 7 ("[A]lthough the Supreme Court only specifically addressed three transactions in Winstar, its interpretation of the Bank Board's common plan for dealing with the thrift crisis by inducing healthy institutions to take on failing ones in exchange for help in meeting federal capital reserve regulations should be applied to all transactions that were part of the Bank Board's efforts").

ISSUE No. 5

Relevant to: *Landmark*
*Statement of Issue:* Capital contract guaranteeing that acquiror may amortize supervisory goodwill on a 25-or-more year schedule does not constitute a government promise that acquiror may actually amortize goodwill on that schedule for the full 25-or-more years.
* * *

In *Landmark,* Defendant argues that "[t]he provision in the assistance agreement upon which plaintiff relies established only that a 40 year schedule could be used to amortize supervisory goodwill, not that the amortization itself would necessarily occur over 40 years." Def. Cross-Mot. & Opp'n (Landmark) at 13. Section 10 of the 1982 Assistance Agreement in *Landmark* states that purchase accounting will govern the computations, accountings, and transactions contemplated by the agreement, including the "amortization of goodwill on a straight-line basis over a period of forty (40) years." Landmark Pl.'s Mot. Summ. J. at Exh. A.[FN12] The FDIC points out that the similar (if not identical) provisions in the *Winstar* agreements were construed

by the Federal Circuit to permit "the recording of supervisory goodwill as a capital asset for regulatory capital purposes to be amortized over [in Winstar's case] 35 years." *Winstar,* 64 F.3d at 1544; *see* FDIC Brief, CI # 5, at 4 (citing the language of the Glendale, *Statesman,* and *Winstar* agreements and their similar disposition by all *Winstar* courts).

FN12. Defendant actually argues that, because the forbearance letter (10/1/82) does not mention a specific amortization period, and in a separate paragraph states that net worth forbearances will expire after five years, the plain language of Section 10 of the AA does not grant Landmark the contractual rights it claims. Def. Cross-Mot. & Opp'n (Landmark) at 14. For the reasons discussed under Issue I, supra, and here, this argument is without merit.

Defendant's argument has, again, been litigated and rejected. "[T]he Supreme Court made clear that the specific 'help' it was referring to [the understanding that acquisitions and mergers be subject to purchase accounting] was a commitment to recognize as regulatory capital the supervisory goodwill resulting from purchase accounting of such transactions." Pls. Cmte Brief, CI # 5, at 5-6 (quoting *Winstar,* 518 U.S. at ----, 116 S.Ct. at 2442). The Supreme Court undisputedly concluded that "we do not doubt the soundness of the Federal Circuit's finding that the overall 'documentation in the Winstar transaction establishes an express agreement allowing Winstar to proceed with the merger plan approved by the Bank Board, including the recording of supervisory goodwill as a capital asset for regulatory capital purposes to be amortized over 35 years.' " 518 U.S. at ----, 116 S.Ct. at 2450 (quoting 64 F.3d at 1544). Defendant has not distinguished Landmark's case from *Winstar* in any way. Regulatory "help" that expired with the AA would have made no sense; the goodwill promises must have been durable for the terms set out in Section 10 of the AA, as the plain language therein indicates. *See* Pls. Cmte. Brief, CI # 5, at 7 ("It simply would not have made sense for healthy institutions to have gone to the trouble of negotiating a particular regulatory treatment if that treatment was not guaranteed to last for the specified period of time.").

[4] FIRREA breached Landmark's contract with the government. Defendant should be held liable in all cases in which similar language defined the government's contractual obligation to permit

39 Fed.Cl. 753                                                      Page 14
39 Fed.Cl. 753
**(Cite as: 39 Fed.Cl. 753)**

amortization of goodwill over a 25-or-more year time period. In these cases the language is virtually*767 identical or identical to the 3 lead cases. The court is disturbed by the fact that the government makes no serious attempt to distinguish this language. If this is not logically possible, as seems the case, then the defendant is acting unprofessionally in using this argument. It is not a responsible posture to reargue points lost overwhelmingly before all three levels of our federal judicial system.

ISSUE No. 6

*Relevant to: CalFed, Suess*
*Statement of Issue:* Fact that a thrift would have been in capital compliance on the date of acquisition without the capital contract *per se* evidences that no contract regarding capital could have existed.

* * *

With respect to *Suess*, Defendant contends that "the Supreme Court's reasoning [in *Winstar*] does not apply to [BF's acquisition of Western Heritage]." Def. Cross-Mot. & Opp'n (Suess) at 83. This is so, according to the government, because "the dollar amount of the Heritage goodwill was insufficient to render Franklin either in or out of compliance with regulatory capital requirements." *Id.* at 84. Defendant provides no citations to the *Suess* record to support this claim factually.[FN13] Legally, the government's argument reduces to the equally unsupportable proposition that, absent immediate insolvency, the healthy thrifts would have proceeded with the relevant transactions regardless of the existence of contractual provisions allowing for amortization of supervisory goodwill. *See* Pls. Cmte. Brief, CI # 6, at 6. The Supreme Court recognized that the "realities of the transaction" meant that "it would have been irrational" for the healthy thrifts to agree to acquire failing thrifts absent the contractual guarantee of favorable treatment of the liabilities assumed. *Winstar*, 518 U.S. at ----, 116 S.Ct. at 2449. The Court also recognized that the incentives offered by the Bank Board to the healthy thrifts to proceed with the transactions "consisted principally of promises with respect to the use of supervisory goodwill to satisfy capital requirements." Pls. Cmte. Brief, CI # 6, at 2 (citing *Winstar*, 518 U.S. at ----, 116 S.Ct. at 2443). These findings by the Supreme Court affirmed the first *Winstar* decision's finding that "without a contractual guarantee of supervisory goodwill, 'no purchaser would have engaged in th[e] transaction.' " *Id.* at 4

(quoting *Winstar,* 21 Cl.Ct. at 115). The government's position can be summed up as arguing that if a deal was not insane absent a contractual commitment, then there is no contract. Seldom has a court heard such a bizarre method of determining contractual intent. When this proposition is put forth by the United States of America one is almost tempted to wonder if insanity is indeed a prerequisite for contracting with the government.

> FN13. Plaintiffs in *Suess*, on the other hand, support their contrary contention. They cite to a FHLBB memorandum (dated July 15, 1985) stating clearly that "BF has indicated that without the authorization of such accounting treatment, it would be disinclined to proceed with the transaction. Accordingly, the Supervisory Agent has no objection to such accounting treatment for purposes of regulatory reporting only." Suess Pl.App. at 238. The accounting treatment referred to is set forth directly above that statement: "The value of intangible assets resulting from application of the purchase method of accounting will be amortized to expense by the straight line method over a period not to exceed 40 years." *Id.* Thus the government's argument is factually untrue as well as illogical.

[5] Given these findings, Defendant cannot credibly assert that the specter of insolvency was critical to the Supreme Court's holding that contracts allowing supervisory goodwill existed. "The financial condition of the resulting thrifts was only one of the circumstances noted by the Supreme Court in analyzing the 'relevant documents and circumstances' as a whole." FDIC Brief, CI # 6, at 5 (citing *Winstar,* 518 U.S. at ----, 116 S.Ct. at 2453). To assert "no immediate insolvency, therefore no contracts" ignores the wealth of other evidence that demonstrates that contracts existed. *See* Pls. Cmte. Brief, CI # 6, at 5; *see supra* note 10; *infra* citations to *CalFed* documents. As Plaintiffs suggest, "[a]ll acquirors were happy to accept such promises as part of the Government's *quid pro quo*-both those who needed such terms in order to protect against insolvency, and those who did not face the same extreme risks." Pls. Cmte. *768 Brief, CI # 6, at 7. The fact that some healthy thrifts might have been healthy enough to weather a government breach of its contract obligations is relevant perhaps to the quantum of damages suffered. It is not relevant to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

whether a contract existed. The government takes one piece of the evidence of contractual intent found by the Supreme Court, the Federal Circuit, and this court, and turns that one piece of evidence of intent into a litmus test for when a contract exists in all cases. This is a rendering of the courts' decisions that literally turns them on their heads.

The *CalFed* case makes the above crystal clear. Defendant asserts in *CalFed* that, with respect to the Brentwood and Family transactions, "CalFed would have remained solvent after absorbing [both failing S & Ls] even without being able to record any goodwill." Def. Resp. (CalFed) at 16. As Plaintiff Cal Fed points out, whether or not insolvency would have resulted from the acquisitions is irrelevant to the issue of whether there was a contract. CalFed Pl. Reply at 43.[FN14] Though in the *Glendale* case it was found to have been "irrational" to proceed with the transaction absent a contractual commitment, *see Winstar*, 518 U.S. at ----, 116 S.Ct. at 2449, "the absence of immediate insolvency without supervisory goodwill does not mean that the thrift *would* have entered into the transaction." CalFed Pl. Reply at 45 (emphasis in original). With respect to CalFed's acquisition of Family S & L, William L. Callender, Assistant General Counsel and later General Counsel to CalFed, who personally participated in negotiating that acquisition, states that "CalFed insisted that purchase accounting could be used; that the goodwill arising from the transaction could be included in calculating capital for regulatory purposes ... [ ]. CalFed certainly would not have acquired Family without the goodwill treatment provided under the regulatory accounting rules at the time of the acquisition." Callender Decl. ¶ 7. Plaintiff argues persuasively that the question should be whether each party would have engaged in the transaction absent the existence of a binding contract-insolvency is not the determinative factor. Both the desire to avoid huge financial loss, as well as a valid concern with the danger of insolvency, provided strong supporting evidence for the contractual nature of the promise in the *Winstar* cases as it does in these cases.

value." CalFed Pl. Reply at 48. Under purchase accounting, CalFed's acquisition of Brentwood would have rendered it immediately insolvent absent supervisory goodwill. *Id.* at 48-49, 49 n. 40 ("[I]f CalFed had acquired Brentwood without recording the goodwill thereby created as capital for regulatory accounting purposes, the resulting institution would have had a negative net worth of approximately $53,118,974.") (citing James R. Wegge [Cal Fed Senior V.P.] CalFed Reply Decl. ¶ 16).

ISSUE No. 7

Relevant to: *Suess, CalFed*
*Statement of Issue:* Fact that thrift would have been out of capital compliance on date of acquisition, but for capital contract, does not evidence existence of a capital contract, if either (1) the acquiror might have been willing to bear risk that the capital contract was illusory, or (2) the transaction also includes a government promise not to seize thrift for any failure to meet net worth requirements within five years after the date of the transaction.
* * *

According to the government, Benj. Franklin (the acquiring institution in *Suess* ) "knowingly undertook risks when it proposed to purchase Equitable." Def. Cross-Mot. & Opp. (Suess) at 57. BF undertook these risks ostensibly because "[i]t had but two choices: face insolvency [itself] or purchase Equitable and hope to return to profitability." *Id.* at 58. Defendant asserts that BF's gamble did not pay off, because the thrift recorded operating losses in seven of eight years following the 1982 acquisition. *Id.* Moreover, "like the risk that it would fail to return to profitability," BF "assumed the risk that the regulatory treatment of goodwill**769 would change in a manner unfavorable to it;" BF "also lost that gamble." *Id.* at 59. *Suess* Plaintiffs dispute the government's facts[FN15] and, justifiably, consider this spin on the law as ridiculous.

---

FN14. Plaintiff disputes the government's figures that purport to show CalFed's solvency after the Brentwood acquisition. "The figures the Government cites are derived from an internal Bank Board analysis that does not employ purchase accounting-and that therefore does not reduce the book value of Brentwood's loan assets to their considerably lower market

FN15. In their Supplemental Appendix A (attached to Plaintiffs' Reply brief), Suess Plaintiffs contend that "[BF] grew in size while making a profit for 16 consecutive calendar quarters from July 1, 1985 through June 30, 1989, just before the passage of FIRREA." Suess Pls. Supp.App. at 3 (citing deposition and affidavit testimony of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

39 Fed.Cl. 753                                                                                                   Page 16
39 Fed.Cl. 753
(Cite as: 39 Fed.Cl. 753)

G. Dale Weight, Chairman/CEO of BF from 1983 to 1990). Any contemporaneous reports of losses (Defendant cites to no documents, reports, or otherwise) can be explained by regulations governing financial statement reporting, rather than "economic reality." *Id.* In its Reply brief, filed July 21, 1997, Defendant continues to argue that, in 1982, BF was on the brink of insolvency. Def. Reply (Suess) at 5. According to Defendant's figures, BF reported a net loss of over $11 million on June 30, 1982, and its regulatory net worth was 3.4% of its assets. Def. Supp.App. (Suess) at 110-11. From this data, Defendant argues that "[BF]'s extremely weak financial condition made it less likely that the regulators would agree to such a promise, particularly given the moral hazard created by using goodwill as capital." Def. Reply (Suess) at 5. Plaintiffs point out, though, that "[BF's] solvency is not material or relevant to the issue of whether this was a contract...." *Id.* at 4. Further, Defendant's hindsight judgment of "moral hazard" on the government's nationwide plan to relieve itself of FSLIC's insurance liability by asking healthy banks to acquire failing banks is irrelevant at best, transparently hypocritical at worst. It is much like the classic story of the person who has killed his parents and then pleads for mercy because he is an orphan!

First, the merger application submitted by BF and Equitable stated clearly that "the obligations of [BF] to complete the Acquisition are conditioned upon receipt of the regulatory forbearances regarding compliance with applicable net worth requirements and the other matters set forth in the form of supervisory forbearance letter...." Pl.App. at 149. Having completed the acquisition of Equitable in September, 1982, BF would not have assumed that, by April, 1983 (when BF furnished the Bank Board with an independent accountant's opinion describing the treatment of goodwill and the amortization period), the regulatory treatment of goodwill was in doubt. Also, the Peat Marwick letters of June 24, 1982, August 5, 1982, and August 17, 1982 and the Kaplan-Smith "summary of revisions from initial pro-forma financial simulations" of the merger (July 21, 1982) reference the purchase accounting method and 40 year amortization of goodwill. Suess Pl.App. at 159, 167, 195, 196. Even if, as the government argues,[FN16] the affidavit testimony of the principal negotiators on both sides of the transaction is ignored, it is inconceivable that the government was not on notice that the 40 year amortization of goodwill was an essential part of the Equitable acquisition. James Faulstich, former President of the Seattle FHLBB, testified that the Seattle Bank "would not and could not have approved the acquisition without the long-term amortization of goodwill, because otherwise, the resulting institution would have been unsound." Pl. Reply at 6 (citing Deposition of James Faulstich, Suess Pl.App. at 65-66).

FN16. *See* Def. Cross-Mot. & Opp'n (Suess) at 66-75.

Second, the Supreme Court observed that it would have been irrational for acquiring thrifts to stake their existence upon anything less than a contractual promise to count goodwill as regulatory capital. *Winstar,* 518 U.S. at ----, 116 S.Ct. at 2449. The fact that a hypothetical super-healthy thrift might willingly undertake the risk that the government would change the accounting rules has little to do with the real world actual transaction. BF was not such a hypothetical thrift. The government might with equal relevance suggest that a wealthy philanthropist would have been willing to make up the capital deficit.[FN17] Not surprisingly, "the Government has pointed to no persuasive evidence that any particular acquiror made such a choice...." Pls. Cmte. Brief, CI # 7, at 2. *770 FDIC is also correct that Defendant provides neither the factual nor legal basis "for concluding that a party's willingness to take risks justifies a court rewriting a contract to delete an agreed upon term." FDIC Brief, CI # 7, at 8.

FN17. Defendant contends that "[BF] was not in a position to negotiate for a guarantee with respect to future changes in regulatory policy. [BF] was desperate. At the time of the Equitable acquisition, [BF] had absolutely nothing to lose." Def. Reply [Suess] at 18. Defendant's cited support for these contentions, however, are the declarations of two individuals (Mr. Frankel & Mr. Hamm) who lack any personal knowledge of the negotiations that took place. See Def. Supp.App. (Suess) at 76-78. Mr. Frankel is a well-educated economics consultant with no connection to the BF-Equitable merger; Mr. Hamm was a legislative analyst reviewing California

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Department of Savings & Loans budgets while the BF-Equitable merger occurred.

The second part of the government's argument on this issue is simply a rehashing of Common Issue # 1. *See* Def. Supp. Resp. (CalFed) at 11 (five year net worth forbearances gave the acquiring thrift sufficient incentive to make the acquisition even absent any Government promises related to goodwill); Def. Cross-Mot. & Opp'n (Suess) at 82-83 (five year net worth forbearances would have no meaning if documents were interpreted to allow BF to amortize goodwill over 40 years; the five year forbearance afforded BF the opportunity to make up almost all of any net worth deficiency). As discussed earlier, the five year net worth forbearances were separate from and complementary to any provisions for amortization of supervisory goodwill. Had such five year forbearances been sufficient to induce healthy thrifts to acquire failing ones, separate treatment of goodwill would not have been the subject of negotiation and agreement. *See* Pls. Cmte. Brief, CI # 7, at 4; *Winstar,* 518 U.S. at ---- - ----, 116 S.Ct. at 2443-44 (recognizing that the net worth forbearances issued under 12 C.F.R. § 563.13 (1981) were different from the "more complicated incentive" arising from regulators' decision "to let acquiring institutions amortize the goodwill asset over long periods, up to the forty-year maximum").[FN18]

> FN18. Plaintiffs note that both Statesman and Glendale "had successfully obtained Net Worth Provisions from the Bank Board. [ ]. Yet those plaintiffs were held not to have been willing to enter into the transactions in question without a binding Government promise concerning supervisory goodwill and capital compliance." Pls. Cmte. Brief, CI # 7, at 5 (citing *Winstar,* 64 F.3d at 1542).

Both the facts of *Suess* and *CalFed* and the law stated by the *Winstar* courts support Plaintiffs' argument on this common issue. Defendant's contentions rest on no evidence and hypothetical constructs which seem based on a willful ignorance of the Supreme Court's language in *Winstar.*

### ISSUE No. 8

Relevant to: *CalFed, Suess*
*Statement of Issue:* No contract arose with respect to certain transactions either because no letter of an

independent certified public accountant was submitted or because it was submitted late or was deficient, *or* because a plaintiff has not been able to produce a copy of the letter that was submitted, even though prior to the litigation the agencies never expressed concern over either the substance of or the absence of such a letter.

* * *

If this set of cases were not for such an enormous amount of money the government would never have raised this argument. It would be too embarrassed. The court finds this argument totally incredible. With respect to the Southeastern transactions in *CalFed* (where the government admits a contract existed), the government argues that Bank Board Resolution 82-72 required an independent accountant's opinion on "any intangible assets" as a precondition of the supervisory goodwill contract. Def. Resp. (CalFed) at 3. The pertinent section of Resolution 82-72 states that, if CalFed wanted to use purchase method accounting, it "shall" furnish such an opinion. CalFed avers that its independent auditors on repeated occasions did submit the required information concerning relevant supervisory goodwill, and "[f]or almost 15 years, the Government acted in a manner 180 degrees removed from any indication that the provision was not satisfied or that CalFed's use of purchase accounting was in any respect questionable." CalFed Pl. Reply at 15-16. The point is that "the better reading of the 'accountant's opinion' provision is that it imposed an independent duty on CalFed to supply such an opinion-not that the opinion was a condition of the Government's own contractual obligation to permit purchase accounting." *Id.* at 19-20. It is quite odd to imagine that this letter was a precondition to contractual liability since this information was a part of the government's regular and continuous regulatory oversight. Further, all the evidence points **\*771** to the government's complete satisfaction with the information actually obtained.

On the matter of the existence of the required accountant's letter, CalFed offers affidavits of its independent accountant and Senior VP averring that such a letter was prepared, but was destroyed in the normal course of business after 10 years. Pl. Reply at 20. Plaintiff further argues that "the Government has recently destroyed records concerning the Southeastern transaction that potentially included the letter in question." *Id.* at 21. Without the actual evidence, Plaintiff states that Fed.R.Evid. 1004 allows it to rely on secondary evidence of a lost

39 Fed.Cl. 753                                                    Page 18
39 Fed.Cl. 753
**(Cite as: 39 Fed.Cl. 753)**

original absent its own bad faith destruction.

Defendant's *only counter* to Plaintiff on this point is stated within its argument concerning contract interpretation: "[The Goodwill Forbearances] ... simply said that CalFed could use purchase accounting if it furnished an opinion from its independent accountants to the satisfaction of the Bank Board, which it apparently never did." Def. Supp. Resp. (Cal Fed) at 12.[FN19] Defendant offers *no evidence* to support this assertion, nor to refute the logic that "the Bank Board examiners who reviewed CalFed's financial condition following the Southeastern transaction would have noted the absence of the letter if it had not been sent." CalFed Pl. Reply at 21 n. 13.    Finally, CalFed presents additional unrefuted evidence that the information required to be contained in the missing accountant's letter was in fact provided to the government on many occasions following the 1982 deal.    *See* CalFed Pl. Reply at 22-23. "Since the purpose of the 'accountant's opinion' requirement was simply to ensure that the Bank Board had access to reliable information concerning the relevant supervisory goodwill," the various financial statements and auditor's reports provided to the government substantially complied with the requirement.    *Id.* at 22-23, 25.[FN20]

FN19. Defendant has provided an affidavit of a former Office of Examinations and Supervision, FHLBB official (Mr. Smuzynski), stating that the FHLBB often required independent accounting opinions during 1982 and 1983 for thrift acquisitions. "FHLBB required these opinions in order to establish an accurate accounting of goodwill as of the effective date of an acquisition." Smuzynski Decl. at 3 ¶ 8 (attached to Def. Resp. (CalFed)).    Further, "amortization periods could vary according to whether the goodwill was an 'unidentifiable intangible,' such as supervisory goodwill, or an 'identifiable intangible,' such as the value of an acquired thrift's depositor base."    *Id.* at ¶ 9.    Plaintiff characterizes the latter statement as a "red herring;    neither Resolution 82-72 nor any other aspect of CalFed's contract with the Government required CalFed to provide that information [distinguishing amortization of an acquired thrift's depositor base]." CalFed Pl. Reply at 26 n. 20.    Smuzynski's affidavit does not suggest either the importance of information

about an acquired thrift's depositor base, or that the information called for by the Brentwood and Family resolutions was not obtained from CalFed.    Smuzynski does not recall participating in the Southeastern transactions.    What this affidavit is supposed to show remains obscure.

FN20. CalFed also argues persuasively that, even if the condition existed and was not substantially complied with, the government waived it as a matter of law through its course of conduct in allowing the bargained-for regulatory treatment of goodwill up through the passage of FIRREA.    CalFed Pl. Reply at 27-33;  Pls. Cmte. Brief, CI # 8, at 12-14 ("By sitting on its hands while institutions performed, the government waived any objection to the institutions' compliance with the accountant letter provision.") (citing *Gresham & Co. v. United States,* 200 Ct.Cl. 97, 470 F.2d 542, 554 (1972)).    While this argument is quite credible, the court doesn't reach it in light of the total failure of the government's arguments and evidence on the general issue of the audit letter.

In *Suess,* the government raises the condition precedent argument as part of its contention that no contract existed between BF and the government concerning BF's 1985 acquisition of Western Heritage.    Defendant contends that BF failed to satisfy conditions precedent to the Government's "alleged obligation" to allow BF to amortize goodwill over 40 years for regulatory purposes.    The relevant document that contradicts the Government's argument is FHLBB Resolution 85-618 (Suess Pl.App. at 291-92).    The key language states:
[BF] shall submit to the Supervisory Agent an independent certified public accountant's opinion that [BF] has accounted for the Merger in accordance with [GAAP] except that for purposes of reporting to the Bank Board such principles may be modified in that ... (b) the value of any intangible assets acquired as a result of *772 the Merger may be amortized by the straight line method....

Resolution 85-618 at 5; Suess Pl.App. at 292.    This requirement is not set up as a precondition.    The common sense point is (as in *CalFed* ) that the "accountant's opinion" provision imposed an independent duty on Plaintiffs to supply such an opinion-not that the opinion was a condition of the Government's own contractual obligation to permit

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

39 Fed.Cl. 753                                                                        Page 19
39 Fed.Cl. 753
**(Cite as: 39 Fed.Cl. 753)**

purchase accounting. Because the accountant's opinion requirement was quite clearly not a condition of the Government's performance, Defendant's citation to FHLBB Resolution No. 85-620, to the effect that the merger was approved "subject to any conditions that may be imposed by the Bank Board in any concurrent resolution," is unavailing. *See* Def. Cross-Mot. & Opp'n (Suess) at 79 & n. 13.

Defendant also accuses Plaintiffs of failing to even mention the existence of an accountant's opinion concerning the Western Heritage acquisition in their Motion for Partial Summary Judgment. However, such an opinion is referenced as Exhibit S-9 to the FHLBB Memo of July 15, 1985, written by Mr. Faulstich sixteen days prior to the execution of the Resolutions and the Assistance Agreement. Pl.App. at 241. Neither Exhibit S-9 nor the other listed exhibits to this Memo are reproduced in Plaintiffs' Appendix. The FDIC's Brief on Common Issue # 8, at 3-4, points out that "Defendant has provided, as part of its core document production [in *Suess* ], a memorandum from the Bank Board's outside counsel ... stating that [BF] had complied with the conditions of the Assistance Agreement." *See* Suess Pl. Supp.App. at 109 (memorandum from Hopkins & Sutter stating that BF "has satisfactorily complied with the conditions set forth in § 2(b)(1)-(4) of the Assistance Agreement," which conditions included any documents required by the Agreement and "by any action of the Bank Board in approving the merger"); Suess Pl. Reply at 48. Thus, even if the government's obligations had been conditional upon an accountant's opinion, the documentary evidence available suggests that such a condition was in fact met.

As Plaintiffs suggest, there is no reason, at least in either *CalFed* or *Suess,* to find that "the absence of the accountant letter, its submission after the time specified by the FHLBB, or its variance from the specified terminology [ ] invalidates any contract between the government and the acquiring institution...." Pls. Cmte. Brief, CI # 8, at 3 (footnote omitted). The FDIC points out that "if [a] letter cannot be found, we do not see how that argument [that the opinion itself was deficient] can possibly prevail absent a contemporaneous record that the opinion was deemed deficient." FDIC Brief, CI # 8, at 5 n. 7. Defendant offered no evidence to demonstrate the deficiency of the accounting opinions submitted on behalf of either BF or CalFed. If the government had made the argument that plaintiff bank had been kidnapped by a UFO it would have been no more incredible, and a better one

because at least it would be entertaining. The government's position on this issue is neither entertaining nor respectable.


ISSUE No. 9

Relevant to: *CalFed, Landmark, Suess*
*Statement of Issue:* Absence of a written Assistance Agreement *per se* eliminates any possibility that an acquiring thrift and the government executed a capital contract, because without such an assistance agreement, the FHLBB/FSLIC resolutions, letters, and other documents and evidence cannot be given contractual effect.
* * *


Plaintiffs contend that this government position is unsupportable for the following general reasons: (1) "[A] high-priority objective of the Government's program to dispose of troubled thrifts was to effectuate dispositions which did not involve direct FSLIC financial assistance," and thus assisted transactions and agreements were executed only when necessary; (2) All *Winstar* courts based their findings that contracts existed on all of the relevant circumstances and documents of the transaction, not because of the presence of assistance agreements; (3) The common operative fact in all *Winstar*-type transactions is that "the Government sought to induce the acquisition of a troubled thrift through promises regarding supervisory goodwill and capital compliance and was successful;" the absence*773 of a single document is irrelevant. Pls. Cmte. Brief, CI # 9, at 2-4. The facts of these cases and the law set forth by the *Winstar* courts support Plaintiffs' position.

The first *Winstar* decision concluded that "an implied-in-fact contract existed between *Winstar* and the United States" without referencing the Supervisory Action Agreements [SAAs] or Assistance Agreements [AAs] involved in those transactions. *Winstar,* 21 Cl.Ct. at 114-15. This court held that "the undisputed evidence" that confirmed plaintiffs' position that contracts existed included correspondence between FHLBB and the banks and FHLBB inter-office memoranda "illustrat[ing] the reality that the promise of continued treatment of goodwill as a capital asset that could be amortized over 35 years was a negotiated and critical term of this particular transaction." 21 Cl.Ct. at 115. The Federal Circuit affirmed this conclusion and the reliance on "all of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

39 Fed.Cl. 753
39 Fed.Cl. 753
(Cite as: 39 Fed.Cl. 753)

contemporaneous documents." *Winstar*, 64 F.3d at 1541-42. The Supreme Court stated:

[I]n other words, the SAA characterizes the Board's resolutions and letters not as statements of background rules, but as part of the "agreements and understandings" between the parties.

To the extent that the integration clause [of the SAA] leaves any ambiguity, the other courts that construed the documents found that the realities of the transaction favored reading those documents as contractual commitments, not mere statements of policy, [ ] and we see no reason to disagree.

518 U.S. at ----, 116 S.Ct. at 2449 (citing Restatement (Second) of Contracts § 202(1) (1981)). The existence of an AA or SAA has not driven the courts' findings of enforceable contracts in the *Winstar* cases. If the factual records of individual cases show intent to contract with the government for specified treatment of goodwill, and documents such as correspondence, memoranda, and Bank Board resolutions confirm that intent, the absence of an AA or SAA should be irrelevant to the finding that a contract existed. Contracts are not technical documents requiring certain forms. Rather, they are legal relationships imposed by the law on parties when certain functional prerequisites like intent, offer, acceptance, and consideration occur in logical sequence. The contracts at issue here are no different. If the government seeks to show that in these cases, in order for a contract to occur, special requirements like an AA or SAA are mandatory it must provide some support for such a special rule. It has presented none.

CalFed concedes that there is no single, integrating SAA (as in *Winstar* ) in either the Brentwood or Family transactions, but argues that this fact neither precludes reliance on *Winstar* nor rebuts the contention that a contract existed. According to the government, an "integration clause that incorporated documents relating to supervisory goodwill into the contract" was "[c]entral to the Supreme Court's determination that there was an agreement between the government and each of the thrifts." Def. Resp. (CalFed) at 14. By contrast, "[t]he resolutions and letters relied upon by CalFed are not incorporated into any agreement signed by the FSLIC," thus no "*Winstar*-like contractual obligations" were imposed on the government. *Id.* at 15. Plaintiff responds with the general observation that the integration language cited in *Winstar* was but "one basis" upon which all of the deciding courts (from this court to the Supreme Court) found that the thrifts and the government intended to enter contracts. Equally

important, according to Plaintiff, was the intent manifested from the sources other than the SAA: the agreements, negotiations, and motivations surrounding the transactions. [FN21] CalFed Pl. Reply at 37 (quoting *Winstar*, 518 U.S. at ----, 116 S.Ct. at 2449). Plaintiff correctly notes that integration does not create a contract but it often makes clear precisely what documents constitute the contract (and to prevent variance from the terms of *774 those documents through parol testimony). CalFed Pl. Reply at 40-41.

> FN21. Plaintiff also argues that, if no express contract is found, an implied-in-fact contract existed based on conduct that indicated assent (intent, offer, acceptance, and consideration) to the proposed bargain. CalFed Pl. Reply at 42 (citing *Winstar*, 64 F.3d at 1542 (inference of a contract from the documents is supported by the circumstances surrounding the transaction)). The court need not reach this argument since there was an express contract in this case.

Mutuality of intent, even in the context of written contracts, may be established by several contractual instruments as opposed to one superseding document. *Id.* at 38-39 (citations omitted). Contracts are frequently found to exist despite the absence of an integrating document. *Id.* at 39 n. 35. In the *Winstar* and Southeastern transaction cases, the SAAs contained language that excepted merger agreements, Bank Board letters, and resolutions from the integration document, implying that these documents stood on their own as independently enforceable agreements. *Id.* at 40 (citing *Winstar*, 64 F.3d at 1540; *Winstar*, 518 U.S. at ----, 116 S.Ct. at 2449). Based on the language cited and the conclusory nature of the government's argument, this court must conclude that contracts existed between CalFed and the government as to the Brentwood and Family transactions.[FN22]

> FN22. The documentary evidence for both the Brentwood and Family transactions demonstrates that purchase accounting and amortization of goodwill were essential terms of the negotiated transactions. In the Brentwood deal, CalFed specifically requested approval from the FHLBB to amortize goodwill created by the acquisition "under the purchase method of accounting using the straight line method over the

estimated useful life of 35 years...." CalFed Mot. Summ. J. at 10-11 (citing a September 2, 1982 Letter from Cal Fed to FHLBB). The Bank Board approved the acquisition on September 30, 1982, and on October 1, 1982, issued a forbearance letter stipulating that "[t]he resulting association may amortize any goodwill created under the purchase method of accounting using the straight line method over [ ] 35 years...." *Id.* at 12 (Ex. 11 to Wegge Decl. CalFed Mot. Summ. J.). The Family acquisition proceeded similarly, though the commitment regarding amortization of goodwill was contained in the Acquisition Agreement, Article 6.1(a): "The Resulting Association may amortize any goodwill created under the purchase method of accounting using the straight line method over the useful life of 40 years...." *Id.* at 16 (Ex. 18 to Wegge Decl.). This amortization was structured in the Agreement as a condition precedent to CalFed's obligations. *Id.* The merger application sent to the Bank Board included the Acquisition Agreement and an additional request to approve the 40 year amortization. *Id.* at 17. In two subsequent letters dated November 26, 1982 and January 5, 1983 (forbearance letter), the Bank Board confirmed CalFed's entitlement to "record the merger under the purchase method of accounting" and amortize resulting goodwill over 40 years. *Id.* at 17-18. There is no factual dispute concerning these documents, and these documents are exactly the type of evidence relied upon by the *Winstar* courts to establish the existence of thrifts' contracts with the government.

In *Landmark,* Defendant raises the instant argument as part of its attempt to show that no contract existed between it and Landmark with respect to Landmark's acquisition of St. Bernard S & L and the supervisory forbearances issued in connection therewith. Def. Cross-Mot. & Opp'n (Landmark) at 18-20. However, the *Landmark* record again belies Defendant's claims that *Winstar* should not apply.

In July, 1986, the Bank Board "suggested that Landmark again [it had acquired Dixie in 1982] acquire savings and loan associations that had negative net worth." Landmark Pl. Mot. Summ. J. at 7. Accordingly, "[t]he agreement between the Bank Board and Landmark was that St. Bernard Savings would be converted to a stock association and

acquired by Dixie Savings, and that Dixie Savings would contribute all its real estate and all of the stock in its service corporation Landmark Land Development Co., Inc., to St. Bernard Savings using purchase accounting...." *Id.* Resolution 86-693 was issued "to embody the terms of the agreement." *Id.* at 8; *see* FHLBB Resolution 86-693 at 5 ("Severe financial conditions exist which threaten the stability of St. Bernard, the accounts of which are insured by FSLIC;" "[t]he proposed acquisition would lessen the risk to FSLIC"); March 11, 1986 Letter from Dallas FHLBB to Washington D.C. Office of Examinations and Supervision ("St. Bernard is a severe supervisory case and its condition is continuing to deteriorate [;] we believe it is necessary to move on [Landmark-Dixie's] proposal as quickly as possible"). "The transaction with St. Bernard Savings was accounted for by 'purchase accounting' which was authorized 'for all purposes' by the Assistance Agreement dated September 30, 1982." *Id.* at 9. [FN23] Another *775 resolution, FHLBB Resolution 86-801, specifically requires that Landmark furnish an independent accountant's opinion that "describes the entries recording the push-down [purchase] accounting on the books of St. Bernard and [ ] substantiates the reasonableness of the anticipated amortization methods and periods for the intangible assets, discounts, and premiums." Resolution No. 86-801 at 2. In a July 16, 1986 letter to Landmark's president (Barton) from FHLBB, the Bank Board stated:

FN23. It is clear that the FSLIC needed a healthy institution to bail out St. Bernard. Landmark asserts that the negotiated 1986 transaction "was intended to provide a permanent solution to the severe financial condition of St. Bernard through which Landmark's or Dixie's real estate assets would be valued at fair market value as of the date of the St. Bernard acquisition on a permanent basis." Landmark Pl. Reply at 29 (citing Affidavit of Gerald Barton (1997) ¶ ¶ 41-43) ("The 1986 capital contribution to St. Bernard by Landmark and its subsidiaries included real estate or subsidiaries with a fair market value of approximately $713,000,000 as determined by written appraisal reports which were accepted by the FHLBB."); *see* FHLBB Internal Memo of August 4, 1986, at 3 ("appraisals were ultimately found to contain sufficient data to sustain the values ... [a] minor part of the total property to be contributed to this deal has a fair market

39 Fed.Cl. 753                                                      Page 22
39 Fed.Cl. 753
(Cite as: 39 Fed.Cl. 753)

value of about $32.25 million-far in excess of that required for St. Bernard to qualify as a viable institution") [Landmark Pl. Reply Ex. 12].

For the purposes of reporting to the Bank Board, with respect to the books and records of St. Bernard, push-down accounting shall be used to record the purchase of St. Bernard's capital stock, in accordance with generally accepted accounting principles and Office of Examinations and Supervision Memorandum # R 55a.

Landmark Pl. Reply Ex. 16, at 2. Defendant thus agreed to be bound to exercise such forbearance.[FN24] The requisite intent existed to form a contract.

> FN24. "FHLBB also agreed in the July 16, 1986 forbearance letter to exclude the property contributed by [Plaintiff] from any regulatory limitations on direct investments in subsidiaries for a period of five years and to continue the waiver for those assets for as long as they were held." FDIC-Intervenor Brief at 12.

Second, the Landmark documents show undisputedly that offer and acceptance were present in this transaction. A May 15, 1986 letter from Landmark counsel to FHLBB is evidence that an "Application for Voluntary Supervisory Conversion of St. Bernard Federal Savings & Loan Association" was delivered by hand to FHLBB offices in Washington, D.C. on that date. Landmark Pl. Reply Ex. 15. The previously referenced Resolutions, the July 16, 1986 Letter, and the Internal Memo of August 4, 1986 (noting approval of the Applications on 7/14/86) all demonstrate that Landmark's offer was accepted. *See* FDIC-Intervenor Brief at 22-23 (explaining the distinction between pure regulatory conduct and commercial, non-regulatory conduct by government agencies; "[i]n the St. Bernard transaction ... the resulting forbearance contract was in fact a necessary condition in order to relieve the FSLIC insurance find from having to make a payout.").

Third, consideration was exchanged. Landmark received the supervisory forbearances set forth in the Resolutions and the July 16, 1986 Letter. In summary, "supervisory goodwill created as a result of the recapitalization of St. Bernard could be counted in determining compliance with its minimum regulatory capital requirement." FDIC-Intervenor Brief at 12.[FN25] The government was given the benefit of being relieved of the obligation to liquidate

a failing bank. *See* FHLBB Resolution 86-693, at 5 ("St. Bernard is a failing institution"). There is thus ample record evidence that a contract existed between Plaintiff and the government concerning the supervisory forbearances expressed in the St. Bernard documents, despite the absence of an AA or SAA.

> FN25. The 1986 transaction, unlike the 1982 transaction, was unassisted, meaning that FSLIC made no capital contributions to the acquiring entity. "Rather than FSLIC assistance for the resolution of St. Bernard, Oak Tree and the FHLBB agreed that supervisory goodwill would be created and real estate assets that had been contributed to the Dixie subsidiary during 1983 would be marked to their fair value at the date of the St. Bernard acquisition. In addition, Dixie received the right to hold these real estate assets without regard to otherwise applicable regulatory restrictions." FDIC-Intervenor Brief at 19 (citing July 16, 1986 forbearance letter).

Finally, in *Suess,* the government asserts that "[t]he existence of these express, written contracts executed by both the FSLIC and the acquiring thrifts was the Federal Circuit's basis for concluding that the parties *776 had intended to form a contract." Def. Cross-Mot. & Opp'n (Suess) at 22 (citing *Winstar,* 64 F.3d at 1537-38). This is without merit The Federal Circuit specifically stated that, in each of the three transactions at issue (*Glendale, Statesman,* and *Winstar* ), Supervisory Action Agreements and/or Assistance Agreements were not *sine qua non* to the existence of contracts, but merely "part" of the transactions. 64 F.3d at 1537-38, 1540; ("Glendale's contract not limited to the SAA itself, but also included the contemporaneous resolutions and letters issued by the FSLIC and the Bank Board"). Further, the court concluded, "based on all of the contemporaneous documents," and "supported by other evidence and by the circumstances surrounding the transaction," that mutual intent to contract existed, and that a contract concerning the use of supervisory goodwill for regulatory capital purposes was formed. *Id.* at 1541-42. The government also relies on language from *Charter Federal Sav. Bank v. Office of Thrift Supervision,* 976 F.2d 203 (4th Cir.1992), to establish that an FHLBB resolution cannot constitute a contract, but merely operates as approval of a merger agreement between two private parties. Def. Cross-Mot. & Opp'n (Suess) at 22-23. As Plaintiffs point out, this reasoning "has [ ] been

39 Fed.Cl. 753
39 Fed.Cl. 753
(Cite as: 39 Fed.Cl. 753)

explicitly rejected by this Court, the Federal Circuit, and the Supreme Court." Suess Pl. Reply at 14 & n. 7.[FN26]

> FN26. Impervious to the clear language of the *Winstar* decisions, Defendant's Reply brief in Suess again articulates the argument that because there was no assistance agreement executed in connection with the BF-Equitable merger, there was no *Winstar*-type contract between BF and the government. Def. Reply (Suess) at 17.

The relevant transaction (to this Common Issue) in *Suess*, BF's acquisition of Equitable, is less explicitly documented than those in either *CalFed* or *Landmark*. However, *Suess* Plaintiffs adequately demonstrate that the intent existed to form a contract concerning the amortization of goodwill. Suess Pl. Mot. Summ. J. at 8-12 (citing letters, the Merger Application, independent accountants' opinions, the FHLBB-Seattle's internal "merger digest," and deposition and affidavit testimony of government and BF negotiators).

In sum, the facts of these three cases and the law that controls them all mandate that Defendant's contentions on Common Issue # 9 be rejected.

ISSUE No. 10

Relevant to: *Suess*

*Statement of Issue:* Where a capital contract was made between a thrift acquiror and a FHLBB Principal Supervisory Agent ("PSA") located at a regional Federal Home Loan Bank rather than with a Bank Board official geographically located at the Federal Home Loan Bank Board in Washington, no contract can exist *per se* because no Principal Supervisory Agent had authority to make such a contract with a thrift acquiror.

* * *

Defendant argues that the regional Bank Board officials, the PSAs, lacked authority "to bind the Government to assume, for [the relevant amortization period], the risk of future changes in Federal laws and regulations." Def. Cross-Mot. & Opp'n (Suess) at 59. Defendant thus questions "only the authority of the [PSAs] to approve mergers that contain a goodwill term." FDIC Brief, CI # 10, at 2.

[6] Defendant's claim is difficult to understand, given that "the Bank Board expressly delegated to its [PSAs] in the field the authority to approve unassisted mergers in which goodwill was included in net assets and regulatory capital." FDIC Brief, CI # 10, at 3 (citing 47 Fed.Reg. 8152, 8153 (1982) [effective Feb. 23, 1982] );[FN27] *see* Pls. Cmte. Brief, CI # 10, at 8-9. In addition, the Supreme Court's decision addressed the issue of delegated authority, and resolved it in favor of plaintiff thrifts.

> FN27. In 1983, the Bank Board gave PSAs authority to approve "certain assisted mergers and to authorize the expenditure of FSLIC funds." Pls. Cmte. Brief, CI # 10, at 10 n. 14 (citing 48 Fed.Reg. 27394 (1983)).

First, the Court stated that the cases before it did not involve "contracts to surrender the Government's sovereign power to regulate." *Winstar*, 518 U.S. at ----, 116 S.Ct. at 2462. Similarly, *Suess* Plaintiffs are not *777 asserting that the Seattle Bank's PSA (Mr. Faulstich) purported to bind the Federal government not to regulate away the agreed upon treatment of goodwill. Further, after reviewing the statutory grounds for the Bank Board's "specific powers in the context of supervisory mergers," the Court concluded that "[t]here is no serious question that FSLIC (and the Bank Board acting through it) was authorized to make the contracts in issue." 518 U.S. at ---- - ----, 116 S.Ct. at 2462-63. The regulations in effect between 1982 and FIRREA's enactment and the *Winstar* decision itself confirm that "the ability to bind the government to compensate the acquiring thrifts in the event of a change in the accounting treatment of supervisory goodwill was indisputably necessary to effectuate [the relevant] mergers [;] the power to approve mergers in which supervisory goodwill was included in assets for regulatory net worth purposes would have been all but meaningless without the power to contract...." Pls. Cmte. Brief, CI # 10, at 13. Even without any illuminating arguments from Plaintiffs,[FN28] Defendant's basic claim is doomed to failure.

> FN28. Plaintiffs do argue persuasively that, either by express grant of authority (the regulations), implied actual authority (based on the integral duties of PSAs and the national policies of the Bank Board and FSLIC, recognized by the *Winstar* courts), or ratification (given the FHLBB's necessary approval and/or constructive knowledge of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

39 Fed.Cl. 753                                                                                    Page 24
39 Fed.Cl. 753
**(Cite as: 39 Fed.Cl. 753)**

the transactions), the actions of PSAs resulted in legally binding contracts. Pls. Cmte. Brief, CI # 10, at 6-10, 11-14, and 15-17, respectively.

Defendant's particular argument on this issue in *Suess* can be disposed of quickly. Defendant argues that Mr. Faulstich, the president of the regional (Seattle) Bank Board, "lacked authority to enter into a binding agreement with Franklin respecting the future regulatory treatment of the Equitable goodwill." Def. Cross-Mot. & Opp'n (Suess) at 61.[FN29] Faulstich "neither sought, nor received, a legal opinion that he had authority to guarantee Franklin against changes in the regulatory treatment of goodwill...." *Id.* at 62. Of course, no federal employee has such authority. The question is whether he had the authority to enter into a contract, and whether he did in fact do so with respect to BF's merger with Equitable. *See* 64 F.3d at 1548 ("[T]he Bank Board and the FSLIC, as the principal regulators of the thrift industry, were fully empowered to enter into the contracts at issue here."). This issue is settled in favor of Plaintiffs' position. *See* FDIC Supp. Brief, CI # 10, at 3-4 ("Specifically, the Bank Board gave 'delegated authority to allow the Principal Supervisory Agent to approve merger applications in which goodwill is included in assets.' ") (quoting 47 Fed.Reg. 8152 (1982)); Def.App. (Suess) at 133 (Faulstich's September 8, 1982 letter approving the merger is stamped "BOARD ACTION UNDER DELEGATED AUTHORITY").

> FN29. In its Reply brief, Defendant presses its point: "Authority to approve a merger pursuant to existing regulations does not, however, constitute authority to enter into contracts binding the Government's future regulatory [sic] for 40 years." Def. Reply (Suess) at 23. Continuous recycling of an argument that is directly at odds with the regulations in place at the relevant times and the statement of the Supreme Court that there is no question that the Bank Board possessed authority to enter the type of contract at issue in *Suess* (admittedly, minus an AA or SAA) does not improve the strength or quality of the government's arguments.

### ISSUE No. 12

Relevant to: *Suess*
*Statement of Issue:* "Successor regulation" language in an assistance agreement, net worth maintenance

agreement, or in other agreements *per se* placed the risk of change in the law on the acquiring thrift.
* * *

This argument is a formalized version of the government's *Winstar* contention that the commitments regarding goodwill amortization contained in the agreements between the acquiring thrifts and the government merely reflected then-current statements of regulatory policy. The *Winstar* Court found this contention meritless. Defendant clearly lost this argument; Justice Scalia's concurrence labels it as a losing argument and explains why: "If, as the dissent believes, the Government committed only 'to provide [certain] treatment unless and until there is subsequent action' ... then the Government in effect said 'we promise to regulate in this *778 fashion for as long as we choose to regulate in this fashion'-which is an absolutely classic description of an illusory promise." *Winstar,* 518 U.S. at ----, 116 S.Ct. at 2477 (Scalia, J., concurring).

Winstar's Assistance Agreement provided for amortization of goodwill over 35 years, and stated that "the governing regulations and the accounting principles shall be those in effect on the Effective Date or as subsequently clarified, interpreted, or amended by the Bank Board or the Financial Accounting Standards Board ("FASB"), respectively, or any successor organization to either." *Winstar,* 518 U.S. at ----, 116 S.Ct. at 2450. The government argued that this language "barr[ed] any inference that the Government assumed the risk of regulatory change." *Id.* The Court found that this argument "ignore[d] the preceding sentence providing that the Bank Board's resolutions and actions in connection with the merger must prevail over contrary regulations." *Id.* With respect to Statesman, the Court construed similar language which required Statesman to comply with "all applicable statutes, regulations, orders of, and restrictions imposed by the United States" to mean only "that Statesman was required to observe FIRREA's new capital requirements once they were promulgated." *Id.* at ----, 116 S.Ct. at 2451. The Court went on to state that such language was "hardly necessary to oblige Statesman to obey the law, and nothing in [that language] barred Statesman from asserting that passage of that law required the Government to take action itself or be in breach of its contract." *Id.* The Court then emphasized that "[n]othing in the documentation or the circumstances of these transactions purported to bar the Government from

changing the way in which it regulated the thrift industry." *Id.* at ----, 116 S.Ct. at 2452.

As part of its argument that there was no contract between BF and the government with respect to the Western Heritage transaction, Defendant asserts that FHLBB Resolution 85-618 allocated the risk of regulatory change to BF. In particular, Defendant points to the following language:
RESOLVED FURTHER, That in accounting for the Merger, Benj. Franklin shall use generally accepted accounting principles prevailing in the savings and loan industry, as accepted, modified, or clarified by applicable regulations of the Bank Board and the FSLIC.

Res. 85-618, at 4; Suess Pl.App. at 291.    According to Defendant, because this provision contemplated "that the governing legal and accounting principles were subject to change," the change occasioned by FIRREA did not breach any promises.

The Western Heritage Assistance Agreement contains language identical to the language the Supreme Court interpreted in *Winstar* with respect to the Winstar transaction.    See Suess Pl.App. at 279; Western Heritage AA § 10. [FN30] However, this section does not specify the goodwill amortization period, as the corresponding Winstar AA did. *See supra.* BF's goodwill from the Western Heritage acquisition is governed by Resolution 85-618, which states in relevant part:

> FN30. Section 10 states:
> Accounting Principles: Except as otherwise provided, any computations made for purposes of this Agreement shall be governed by generally accepted accounting principles as applied in the savings and loan industry, except that where such principles conflict with the terms of the Agreement, applicable regulations of the Bank Board or [FSLIC], or any resolution or action of the Bank Board approving or relating to the Merger or to this Agreement, then this Agreement, such regulations, or such resolution or action shall govern. [ ]. If there is conflict between such regulations and the Bank Board's resolution or action relating to the Merger or to this Agreement, the Bank Board's resolution or action shall govern.
> Suess Pl.App. at 279.

[T]he cash contribution by the FSLIC to Benj. Franklin with respect to Western Heritage pursuant to the Assistance Agreement shall be deemed a contribution to net worth;   [ ] the value of any intangible assets acquired as a result of the Merger may be amortized by Benj. Franklin over a period of forty (40) years by the straight line method.
Suess Pl.App. at 292; Res. 85-618 at 5.   By letter of August 12, 1985, the Bank Board confirmed this treatment of goodwill and the forty year amortization period, using identical**779** language.    Suess Pl.App. at 297-98.    Section 16 of the Assistance Agreement contained an integration clause that clarifies that the AA's provisions do not supersede Bank Board resolutions or letters issued in connection with the transaction;   accordingly, the resolutions and letters are part of the contract.   Suess Pl.App. at 283; *Winstar,* 518 U.S. at ---- - ----, 116 S.Ct. at 2471-72 (affirming that Bank Board resolutions and letters were part of the contractual undertakings by the government with respect to supervisory goodwill).    Given the language of the Western Heritage Assistance Agreement, Resolution 85-618, and the August 12, 1985 letter, there is no way to distinguish BF's case from Winstar's.    The court is required to follow the Supreme Court and reject Defendant's argument that "successor regulation" language shifted the risk from the government to BF.    *See Winstar,* 518 U.S. at ----, 116 S.Ct. at 2449 (holding that the government's interpretation of the Glendale documents as reflecting then-current regulatory policy rather than contractual undertakings was "fundamentally implausible");   Pls. Cmte. Brief, CI # 12, at 15-18;  FDIC Brief, CI # 12, at 4-6.[FN31]

> FN31. Plaintiffs and FDIC discuss two other versions of this argument in their briefs: (1) language suggesting that the regulations setting forth the level of capital required may change "effectively shifted to the acquiror the risk of a change in the law with respect to the government's promise to count certain intangible assets as capital;" (2) "language with regard to regulations setting the level of capital that a thrift must maintain 'allocated any risk of regulatory change to' the plaintiffs with respect to the government's agreement to count various intangible assets as part of the thrift's regulatory capital."  Pls. Cmte. Brief, CI # 12, at 5-6 (citing various government briefs). Defendant's arguments on both points are unsupportable,   absent   specific   factual

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

39 Fed.Cl. 753                                                                                    Page 26
39 Fed.Cl. 753
**(Cite as: 39 Fed.Cl. 753)**

showings that agreements in individual cases differed significantly from the language construed in *Winstar*. *See Winstar*, 64 F.3d at 1544 ("This stipulation by Winstar to maintain its regulatory net worth at whatever level the regulators set does not, however, eclipse the government's own promise that Winstar could count supervisory goodwill in meeting the regulatory requirements with which it had promised to comply."); Pls. Cmte. Brief, CI # 12, at 13-14 ("[A] general provision setting forth the parties obligation to obey the law-which is implied in any event, whether express or not-does not authorize the government to abrogate its contractual commitments without liability by changing the law.") (citing *Lynch v. United States*, 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434 (1934)).

### CONCLUSION

Defendant's arguments on the eleven Common Issues Nos. 1-10 and 12 range from the rejected to the implausible. This is especially so since the arguments are heavily legal, and the government persists in ignoring or misrepresenting the law while failing to distinguish the cases factually. Summary judgment on these Common Issues is thus appropriately granted to Plaintiffs.

### THE COURT THUS ORDERS THE FOLLOWING:

In all *Winstar*-related cases where there are pending summary judgment motions or cross-motions filed by the plaintiffs, the United States shall show cause, within 60 days, why those motions should not be granted, and liability found on all *Winstar* contract issues based upon the instant decision. In all cases where the government has a pending summary judgment motion or cross-motion the government shall show cause within 60 days, why those motions should not be denied, for the same reasons.

Following the submission of any summary judgment motion on liability in any *Winstar*-related case the United States shall have 90 days to show cause why that motion should not be granted on the same basis.

The government in responding to this order shall not raise issues that have been resolved by opinions in the original *Winstar* cases as clarified in this decision.

Irrespective of ultimate attorneys fee issues in these cases, failure to follow this order will require the government to reimburse the plaintiffs for attorneys fees spent litigating issues that have already been resolved by this court, the Federal Circuit or the Supreme Court.

**IT IS SO ORDERED.**

Fed.Cl.,1997.
California Federal Bank v. U.S.
39 Fed.Cl. 753

Briefs and Other Related Documents (Back to top)

• 2004 WL 3832438 () (Transcript) (Apr. 13, 2004) Original Image of this Document (PDF)
• 2004 WL 3832437 () (Transcript) (Apr. 12, 2004) Original Image of this Document (PDF)
• 2004 WL 3832454 () Report of Professor Christopher James (Apr. 1, 2004) Original Image of this Document (PDF)
• 2003 WL 24595075 () Report of Grant M. Clowery (Dec. 12, 2003) Original Image of this Document (PDF)
• 2003 WL 24595076 () Expert Report of W. Barefoot Bankhead (Dec. 12, 2003) Original Image of this Document (PDF)
• 2003 WL 24841920 () (Transcript) (Dec. 12, 2003) Original Image of this Document (PDF)
• 2003 WL 24841927 () (Partial Testimony) (Dec. 12, 2003) Original Image of this Document (PDF)
• 2002 WL 33770629 () (Partial Testimony) (Sep. 12, 2002) Original Image of this Document (PDF)
• 1999 WL 34573121 () (Report or Affidavit) (Feb. 26, 1999) Original Image of this Document (PDF)
• 1999 WL 34680030 () (Partial Testimony) (Feb. 19, 1999) Original Image of this Document (PDF)
• 1999 WL 34590510 () (Transcript) (Feb. 9, 1999) Original Image of this Document (PDF)
• 1999 WL 34590511 () (Transcript) (Feb. 8, 1999) Original Image of this Document (PDF)
• 1999 WL 34590509 () (Transcript) (Feb. 4, 1999) Original Image of this Document (PDF)
• 1999 WL 34590508 () (Transcript) (Feb. 1, 1999) Original Image of this Document (PDF)
• 1999 WL 34590507 () (Transcript) (Jan. 28, 1999) Original Image of this Document (PDF)
• 1999 WL 34680020 () (Transcript) (Jan. 26, 1999) Original Image of this Document (PDF)
• 1999 WL 34590506 () (Partial Testimony) (Jan. 22, 1999) Original Image of this Document (PDF)
• 1999 WL 34590491 () Update to Expert Witness Report Net Impact of California Federal Bank's Investment in Institutions Acquired with Supervisory

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

39 Fed.Cl. 753
39 Fed.Cl. 753
**(Cite as: 39 Fed.Cl. 753)**

Goodwill (Jan. 13, 1999) Original Image of this Document (PDF)
• 1999 WL 34594145 () Supplement to Expert Witness Report Net Impact of California Federal Bank's Investment in Institutions Acquired with Supervisory Goodwill (Jan. 5, 1999) Original Image of this Document (PDF)
• 1998 WL 35022487 () Joint Report of Merton H. Miller and David J. Ross (Nov. 16, 1998) Original Image of this Document (PDF)
• 1998 WL 35022486 () Expert Report of Christopher M. James, Ph.D. William H. Dial/Sunbank Eminent Scholar In Finance University of Florida (Sep. 22, 1998) Original Image of this Document with Appendix (PDF)
• 1998 WL 35022488 () United States Court of Federal Claims (Sep. 22, 1998) Original Image of this Document (PDF)
• 1998 WL 35031601 () Expert Report and Declaration of Paul Pfleiderer (Sep. 14, 1998) Original Image of this Document (PDF)
• 1998 WL 35031602 () Expert Report of Ronald J. Gilson (Sep. 4, 1998) Original Image of this Document (PDF)
• 1998 WL 35031603 () Notice of Filing of Expert Report (Aug. 25, 1998) Original Image of this Document (PDF)
• 1:95cv00502 (Docket) (Aug. 04, 1995)
• 1:92cv00652 (Docket) (Sep. 21, 1992)
• 1:92cv00138 (Docket) (Feb. 28, 1992)
• 1992 WL 12536010 () Expert Report by Mr. John C. ""Hans" Morris Salomon Smith Barney (1992) Original Image of this Document (PDF)
• 1:90cv00981 (Docket) (Sep. 14, 1990)


END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.