## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **WINSTON & STRAWN LLP,** ) | |
| and ) | |
| **DON S WILLNER & ASSOCIATES, P.C.** ) | |
| and ) | |
| **BLACKWELL SANDERS PEPER MARTIN** ) | Civil Case No. 06-01120 (EGS) |
| and ) | |
| **ERNEST M. FLEISCHER** ) | [Consolidated with No. 06-01227 |
| Consolidated Plaintiffs, ) | (EGS) and No. 06-01273 (EGS)] |
| v. ) | |
| **FEDERAL DEPOSIT INSURANCE** ) | |
| **CORPORATION, AS RECEIVER FOR** ) | |
| **THE BENJ. FRANKLIN FS&LA,** ) | |
| **PORTLAND, OREGON** ) | |
| Defendant. ) | |

## PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

This lawsuit is one of three consolidated cases seeking an award of attorneys' fees pursuant to U.S.C. 1821(d)(6). Plaintiffs Blackwell Sanders Peper Martin, LLP ("Blackwell") and Ernest M. Fleischer ("Mr. Fleischer") move the Court to grant partial summary judgment on their claim that they are entitled as a matter of law to a reasonable percentage fee from the $44 million common fund which was preserved for the shareholders of The Benj. Franklin Savings and Loan Association ("Benj") after the settlement of the Internal Revenue Service ("IRS") its claim for $1.2 billion in federal income taxes and related interest and penalties. The percentage

and the dollar amount of the fee must await an evidentiary hearing. A memorandum in support of this motion is set out below.

## I.    BACKGROUND INFORMATION

In 1990, the Office of Thrift Supervision seized Benj and appointed the Defendant's predecessor, the Resolution Trust Corporation ("RTC"), first as the Benj Conservator and later the Benj Receiver. In 1990 counsel for the Benj shareholders, Don Willner ("Mr. Willner"), commenced claims against the United States on behalf of a large group of Benj shareholders ("Shareholder Claims"). In 1995, the court determined that the Shareholder Claims could be brought derivatively on behalf of Benj but not as individual stockholders. In the same year, as a result of a statutory enactment, the Federal Deposit Insurance Corporation ("FDIC") succeeded the RTC as the Benj Receiver. Under the liquidation statutes, the Benj shareholders would receive from the RTC the Benj receivership surplus, *i.e.*, the amount remaining after all prior claims against Benj, including tax claims, were paid.

In April 2002, the court determined that the Government was liable to Benj for $35 million of damages. (*See* C. Robert Seuss v. United States, Opinion April 1, 2002, No. 90-981C, U.S. Ct. of Fed. Claims.) On April 22, 2002 the Internal Revenue Service filed a proof of claim with the FDIC asserting that Benj owed approximately $1.2 billion in federal income tax. In early July 2002, Mr. Willner, who by that time has been designated by the court as lead counsel for the Benj shareholders, retained Mr. Fleischer, on a wholly contingent fee basis, to assist in defense against the IRS claim. On July 17, 2002, the IRS filed a Complaint in this Court seeking a determination that the tax and related interest and penalties were due and owing. The amount claimed by the IRS would have consumed the entire receivership surplus, including the amount recovered derivatively in the Shareholder Claims. Mr. Fleischer played an important role in

preventing payment of the receivership assets to the IRS and in subsequently negotiating a favorable settlement with the IRS, thus preserving tens of millions of dollars of the shareholders' assets.

Mr. Willner advised Mr. Fleischer that the lawyers working for the Benj shareholders would receive a reasonable fee at the end of the tax litigation if it ended successfully. Under FDIC procedures, Mr. Willner included a claim for Plaintiffs' fees in making his own claim for fees. These attorney fee claims were made pursuant to 12 U.S.C. § 1821(d)(5). In 2006, over four years after Mr. Fleischer was first retained, the FDIC agreed that he was entitled to a fee, but only in the amount of his customary hourly rates, rather than the contingency fee Mr. Fleischer agreed to and is entitled to under law. Plaintiffs then filed this action pursuant to 12 U.S.C. § 1821(d)(6) for *de novo* review of their claim for fees.

Plaintiffs seek and are entitled to summary judgment on their claim in that Plaintiffs are entitled to a reasonable percentage portion of the receivership estate that they skillfully and successfully preserved for the shareholders.

## II.    STATEMENT OF UNCONTROVERTED FACTS

### The Parties

Mr. Fleischer is an attorney at law and of counsel with Blackwell Sanders Peper Martin, LLP ("Blackwell"), in its Kansas City, Missouri office. (Declaration of Ernest M. Fleischer, Exhibit 1, hereafter "Fleischer Dec").

1.      Blackwell is a Missouri limited liability partnership. Pursuant to an agreement with Fleischer, Blackwell also has an interest in this litigation. Blackwell's claims and Fleischer's are one and the same. (Fleischer Dec ¶ 2.)

2.     The Federal Deposit Insurance Corporation ("FDIC") is an independent agency of the United States government with its principal office in Washington, D.C.  The FDIC is the Benj Receiver.

## The Underlying Case

3.     In 2002, the Internal Revenue Service ("IRS") filed a proof of claim ("IRS Claim") with the FDIC in the Benj Receivership in the approximate amount of $1.2 billion dollars for unpaid federal income tax, interest and penalties.  Subsequently, the IRS filed suit in this Court to adjudicate its claim.  (Def. Answer ¶ 8; United States v. FDIC, No. 1:02CV1427 (hereinafter referred to as "U.S. v. FDIC").

## Opposition to the IRS Claim

4.     The tax issues involved in the IRS Claim were complex and highly specialized. (Def. Answer ¶ 10; Fleischer Dec ¶ 3; U.S. v. FDIC.)

5.     After the IRS filed its claim and lawsuit seeking $1.2 billion, Donald Willner ("Mr. Willner"), the lawyer who had been appointed as lead counsel for the Benj shareholders in the United States Court of Federal Claims litigation against the government for breaching its contracts with Benj, the Trustee of the Benj Shareholders Litigation Fund and an attorney for many of the Benj shareholders, became concerned that the Defendant intended to pay all of the assets of the receivership to the IRS without litigating the IRS Claim.  (Deposition of Donald Willner ("Willner Depo."), Exhibit 2, p. 10, ll. 9-15; p. 11, ll 6-16; Fleischer Dec ¶ 4.).

6.     The IRS and FDIC had entered into an agreement whereby the FDIC agreed not to contest claims made by the IRS. (Interagency Agreement, Exhibit 3, Section V, p. 4.)

7.     Mr. Willner initially sought assurances from the FDIC that it would cooperate with the Shareholders to contest the IRS Claim.  He wrote several letters, upon which the FDIC

took no action and made little or no response. (Deposition of Bruce Taylor ("Taylor Depo."), Exhibit 4, p. 6, ll. 16-22, pp. 7-9, p. 10, ll. 1-6; and Taylor Depo. exs. 2, 3, 5, and 6.)

8.    Based on Mr. Taylor's response on behalf of the FDIC, Mr. Willner concluded that the FDIC would pay the IRS Claim. (Willner Depo., Ex. 2, p. 1, ll. 4-22; p. 12, ll. 1-8; Exhibit 5, Taylor Depo. ex. 7.)

9.    Mr. Willner is not a specialist in taxation, but he suspected that the assets could never be recovered if the IRS claim was paid. He decided to consult with a tax attorney who could advise him whether to oppose to possible payment to the IRS. (Willner Depo., Ex. 2, p. 21, ll. 13-22.)

10.    Mr. Willner made inquiry to determine the name of an attorney with expertise and experience in taxation of savings and loan associations. (Willner Depo., Ex. 2, p. 22, ll. 1-11.)

11.    Mr. Willner obtained the name of Mr. Fleischer, and contacted Mr. Fleischer in early July 2002. (Fleischer Dec, Ex. 1, ¶ 5.)

12.    Mr. Willner gave Mr. Fleischer the basic facts of the case. Mr. Willner advised Mr. Fleischer that there was no fund from which to pay attorney fees to Mr. Fleischer. He told Mr. Fleischer that Mr. Fleischer would have to work on a contingent basis, and that the amount of Mr. Fleischer's fee would be determined by a judge at the conclusion of the matter. Mr. Fleischer agreed to work on those terms. (Willner Depo., Ex. 2, p. 22, ll. 16-22; Fleischer Deposition ("Fleischer Depo."), Exhibit 6, p. 4, ll. 14-22, p. 5.)

13.    Mr. Fleischer advised Mr. Willner in the initial conversation that it would be disastrous to allow FDIC to pay all of the assets to the IRS. (Willner Depo., Ex. 2, p., 15, ll. 6-15; Fleischer Dec, Ex. 1, ¶ 6.)

14.    Fleischer advised that if payment occurred, case law and statutory authority required a payment of the entire tax with respect to any one year in order to prosecute a refund claim with the Internal Revenue Service. (Fleischer Dec, Ex. 1, ¶ 7.)

15.    Shortly thereafter, Mr. Fleischer provided Mr. Willner with the case law and statutory authority upon which Mr. Fleischer based his advice that allowing all of the Estate's assets to be paid-over in partial payment of the IRS Claim would prevent the Shareholders or the Defendant from later pursuing a refund from the IRS. (Willner Depo., Ex. 2, p. 41, ll. 12-19; Fleischer Dec, Ex. 1, ¶ 8.)

16.    Based on the advice and information from Mr. Fleischer, Mr. Willner filed suit against the FDIC in Oregon and obtained a temporary restraining order prohibiting payment of the receivership assets to the IRS. (Willner Depo., Ex. 2, p. 41, ll. 7-21.)

17.    The TRO was dissolved after the FDIC agreed during argument at the preliminary injunction hearing not to make a payment to the IRS without advising Mr.Willner.    (Willner Depo., Ex. 2, p. 42, ll. 7-21.)

18.    Mr. Willner and Mr. Fleischer then began to develop the issues and supporting legal authorities to contest the IRS claim. (Willner Depo., Ex. 2, p. 44, ll. 15-22.)

19.    From early July 2002 through October 2002, only Mr. Willner and Fleischer worked together to research the law and develop the legal position opposing the IRS claim. (Fleischer Dec, Ex. 1, ¶ 9.)

20.    In November 2002, the Winston & Strawn law firm ("Winston") began participating in the tax litigation.

21.    Mr. Willner continued to act as lead counsel.  He ultimately directed that Mr. Fleischer and the lead tax attorney for the Winston firm exchange views before deciding on a position or strategy.  (Willner Depo., Ex. 2, p. 44, ll. 2-14.)

22.    In the summer of 2005, the Receivership and the IRS agreed to a settlement of the IRS claim in the amount of $50 million, leaving a Benj receivership surplus of $44 million. (Fleischer Dec, Ex. 1, ¶ 10.)

23.    Because the attorneys, acting on behalf of the Benj shareholders, contested the IRS claim, a fund of $44 million was preserved for the shareholders.

24.    If upheld, the IRS Claim would have exhausted the assets of the Benj receivership estate, depriving the shareholders of any recovery of any amount then in the receivership estate, because the receivership estate at that time was less than 10% of the IRS Claim.  (Def. Answer ¶ 9; U.S. v. FDIC.)

25.    The shareholders would have had no recourse against the FDIC for paying the amount to the IRS nor would the shareholders have been able to obtain a refund.  (Def. Answer ¶ 10; U.S. v. FDIC.)

### The Issues Involved in the Tax Litigation

26.    The major substantive issues involved in the IRS litigation were the following:

a.    Whether the amount of accounting goodwill created from the acquisitions that were made pursuant to the contractual undertakings breached by the government had a tax basis equal to such amount.

b.    Whether the Federal Financial Assistance ("FFA") provided to Benj were in fact and in law loans not taxable under the Internal Revenue Code ("IRC").

      c.      Whether the loans could be taxable as income under the Sixteenth Amendment to the Constitution.

      d.      Whether the method of accounting used by the Defendant in preparing the Benj returns was the accrual method as required by the IRC.

      e.      Whether the interest owing to the government on the FFA loans was deductible in computing taxable income in each year as the interest liability was being incurred.

      f.      Whether penalties should be imposed on Benj under the IRC as a result of Defendant's conduct over which Benj had no control.

      g.      Whether Benj should be liable for interest at a rate higher than the rate being paid by the Government on its concurrent use of the Benj receivership funds.

(Fleischer Dec, Ex. 1, ¶ 11.)

    27.    The IRS tax claim in this instance involved a novel issue of law because the IRS based its claim on the assertion that FFA paid to the Benj receivership should be treated as taxable income and no reported decision or published scholarly article had ever addressed this issue. (Id. at 12.)

    28.    Mr. Fleischer believed that the procedural detriments in the case presented a greater likelihood of failure than the substantive case law. Those procedural detriments were:

      a.      It seemed unlikely that Mr. Willner and the shareholders that he represented would be granted "standing" to defend against the IRS claim, because under the federal statutes the defendants had succeeded to all of the rights of shareholders except for the rights that the shareholders had to residual receivership surplus. Moreover, the Defendant was the taxpayer--not the shareholders.

b.     The Federal statutes forbid any restraining order against actions proposed to be taken by the Defendant.  Mr. Willner therefore did a remarkable job in obtaining the TRO and then persuading the Defendant to cooperate.

c.     The sole jurisdictional basis for recovery of damages against the Defendant is the Federal Torts Claims Act, for which there exists the discretionary function exemption.  That exemption is overcome only if the government receiver fails to follow a specific statutory directive.

d.     The Federal Deposit Insurance Corporation ("FDIC") and the IRS had entered into an inter-agency agreement under which the FDIC promised not to oppose the IRS in tax litigation.  That risk continued until after court approval of the settlement.

(Id. at 13.)

29.     Mr. Fleischer's work on the tax case consisted of the following:

a.     Legal research concerning:

1.     Requirement of total tax payment as requirement for refund litigation;

2.     Right to contest merits of tax assessment as part of tax collection litigation;

3.     Tax consequences of the acquisition of a stock thrift by a mutual thrift;

4.     Effect of mitigation provisions to statutory limitations on tax assessments;

5.     Application of duty of consistency where position change is caused by an intervening judicial decision;

6.     Goodwill as a depreciable asset;

7.    Tax consequences from sale of goodwill;

8.    Abandonment loss for unsold goodwill;

9.    Requirements for repayment potential in order for cash received to be a loan for tax purposes;

10.    Constitutional authority to tax a loan as income;

11.    Tax recognition of transaction substance if form of transaction differs from its substance;

12.    Accrual method requirement for thrifts;

13.    Applicability of tax penalties imposed by the government to seized entities over which only the government and not those who would bear the penalty had a role in the conduct resulting in the penalty; and

14.    Interest charges by the government from time to time at a rate on delinquent tax payments at a rate higher than the government paid on the taxpayer's funds used by the government during such times.

b.    Review of tax returns, financial reports and regulatory filings from 1982 through 2002.

c.    Preparation, review and revisions of memoranda, letters and spreadsheets concerning tax, interest and penalty deficiency claims; participation in discussing the merits and results of varying scenarios; and structuring, reviewing and discussing varying schedules of potential tax deficiency based on success on each or a combination of each of the issues in contention.

d.    Participation in telephone calls and conferences with respect to matters being considered.

      e.     Travel to and from and attendance at meetings in Washington, D.C.

(Id. at 14.)

30.     Because he was working on a contingency basis, Mr. Fleischer did not keep contemporaneous time records.  He initially estimated that he had spent 240 hours working on the matter.  Subsequently, he prepared as detailed a reconstruction of his time as possible, resulting in an estimated 253.6 hours.  (Id. at 15.)

31.     Mr. Fleischer received no payment for his services for over four years.  He would have received nothing if no assets had been preserved for the shareholders.  (Id. at 16.)

32.     Plaintiffs would not have undertaken a matter as complicated, demanding and risky as the IRS dispute had he known at the outset that at the conclusion of the matter he would be paid only his ordinary and usual hourly fees at the time the services were performed and not a contingency fee based on the results achieved.  (Id. at 17.)

### Plaintiffs' Undertook a Significant Risk by Agreeing to Represent the Shareholders on a Contingency Basis

33.     When Mr. Fleischer agreed to provide services to Benj and its shareholders, he did so with the understanding that Plaintiffs' fee would be wholly contingent on a successful outcome for the shareholders in the IRS dispute, that Plaintiffs would be paid a fair contingency fee if, and only if, a successful outcome was achieved, and and that he would be required to participate in litigation to determine the amount of his fee.  (Id. at 18.)

34.     Plaintiffs exposed themselves to substantial financial risk by agreeing to provide Mr. Fleischer's services with only the possibility of recovering any fee if a successful outcome was achieved.  (Id. at 19.)

35.     The novel and complex nature of the procedural impediments and the substantive issues presented by the Benj dispute with the IRS increased the uncertainty of the outcome of the litigation. (Id. at 20.)

## The FDIC Has Paid Mr. Fleischer a Portion of His Fees

36.     When Mr. Willner filed a proof of claim with the FDIC, he included Mr. Fleischer's listing of the services performed on behalf of the Benj receivership and the shareholders by date and description computed, as directed by the FDIC, at Plaintiffs' customary hourly fees. (Id. at 21.)

37.     On March 3, 2006, at the request of Richard Gill ("Mr. Gill") of the FDIC, Mr. Fleischer sent Mr. Gill a facsimile message in which Mr. Fleischer set forth the factual background of the contingency fee arrangement, including therein his understanding that "a 'fair' contingent fee amount would be determined by a Federal judge". (Fleischer Dec, Ex. 1, ¶ 22.)

38.     In a letter dated May 19, 2006 ("denial letter"), Glenn Glinsmann ("Mr. Glinsmann") of the FDIC Claims Department stated that it "has allowed the claim of Ernest Fleischer in the amount of $89,465.34, that includes $1,408.34 in expenses".    (Deposition of Glenn Glinsmann ("Glinsmann Depo."), Exhibit 7, Glinsmann Depo. ex. 1.)

39.     The amount of fees allowed was at Plaintiffs' standard hourly rates in effect at the time the services were performed. (Deposition of  Richard Gill ("Gill Depo."), (Ex. 8, p. 24, ll. 4-19.)

40.     In its denial letter to Mr. Willner for a fee enhancement, the FDIC advised that "an appropriate enhancement is not appropriate in this case because this would not constitute reasonable attorney's fees". (Ex. 7.)

41.    That denial letter contains no discussion of compensation for the risks inherent or the time delay of income receipt in the contingent fee arrangement for the services provided. (Id.)

42.    In a letter dated June 6, 2006 ("payment letter"), to Mr. Fleischer, Mr. Glinsmann stated "Your claim has been reviewed, and the Receiver has determined that is [sic] should be partially allowed.  Enclosed you will find a check in the amount of $89,465.34."  (Fleischer Dec, Ex. 1, ¶ 23.)

43.    The payment letter contained no discussion of compensation for the risks inherent in the wholly contingent fee arrangement or the time delay for income receipt for the services which we provided.  (Fleischer Dec, Ex. 1, ¶ 24.)

44.    To date, Plaintiffs have not been compensated in any way for the risk assumed by representing the Benj receivership and the interests of the Benj shareholders on a contingency fee basis.  (Fleischer Dec, Ex. 1, ¶ 25.)

45.    Mr. Fleischer's standard hourly rates were at all relevant times consistent with the prevailing non-contingent rates for attorneys offering services of a similar type and quality, as demonstrated by the Defendant's allowance of said fees.  (Fleischer Dec, Ex. 1, ¶ 26.)

46.    The Defendant spent six months reviewing Plaintiffs' fee request and invoices before rendering its recent determination.  (Fleischer Dec, Ex. 1, ¶ 27.)

47.    The Defendant ultimately concluded that Mr. Fleischer's standard hourly rates were acceptable and that the time expended benefited the estate.  (Fleischer Dec, Ex. 1, ¶ 28.)

48.    Thus, the Defendant determined that the Benj receivership should compensate Plaintiffs for virtually all of Mr. Fleischer's time.  (Fleischer Dec, Ex. 1, ¶ 29).

### Mr. Fleischer's Qualifications

49.    Mr. Fleischer's educational background is as follows:

a.    1954, Washington University, Bachelor of Arts (with areas of concentration in political science and economics).

b.    1954, Washington University, Bachelor of Business Administration (with area of concentration in accounting).

c.    1954, Washington University, Master of Business Administration (with area of concentration in finance).

d.    1959, Harvard Law School, Juris Doctor *magna cum laude* (with area of concentration in taxation).

(Fleischer Dec, Ex. 1, ¶ 30.)

50.    He has been a tax lawyer since 1959.  (Fleischer Dec, Ex. 1, ¶ 31.)

51.    In 1977 he passed the Missouri State Board of Accountancy examination to become a Certified Public Accountant.  (Fleischer Dec, Ex. 1, ¶ 32.)

52.    He has been listed in The Best Lawyers in America since 1996.  (Fleischer Dec, Ex. 1, ¶ 33.)

53.    He has been of counsel in the firm of Blackwell Sanders Peper Martin, LLP since 1992.  (Fleischer Dec, Ex. 1, ¶ 34.)

54.    Mr. Fleischer was Chairman of the Board and he and his family members owned a majority of the stock of the holding company that owned Franklin Savings Association, a savings and loan with assets of over $10 billion, during the 1980s.  Because he is a tax lawyer, he became very familiar with the taxation of thrifts.  (Fleischer Dec, Ex. 1, ¶ 35.)

### III.    PERCENTAGE FEE CLAIMED

55.     Although an award of a percentage or specific sum as reasonable attorney fees is probably not possible without an evidentiary hearing, the Court should be aware of Plaintiffs' position as to the amount of fees to be awarded.  Plaintiffs believe that under the law of the District of Columbia Circuit, as set out below, the attorneys who represented the shareholders' interests in the tax litigation are entitled to a percentage of the funds which they have preserved for the shareholders.

56.     The attorneys in this case have preserved a common fund of $44 million for the Benj shareholders before deduction of the related expenses.  In addition, with that preservation the Benj shareholders also have the potential in sharing in the $52 million judgment in the Shareholder Claims litigation which, without the success in defending against the IRS claim, would not have been available to them.  Already $31 million has been distributed among the Benj shareholders from that common fund.  Plaintiffs believe that a reasonable attorneys' fee in the circumstances of this case would be ten percent of the amount of the common fund preserved in the tax litigation and propose total fees less than that amount.  Plaintiffs suggest that because he was lead counsel, because of his insight in recognizing the danger of payment of the assets to the IRS and because he prevented such payment, Mr. Willner should be awarded 3.5% of the fund in the amount of $1.5 million, that Plaintiffs should receive 3.0% in the amount of $1.3 million, and that Winston should be awarded the amount it has requested, 2.7%, in the amount of $1,188,000.  In making their recommendations, Plaintiffs have taken into account that the services provided by Mr. Willner and Winston were only on the basis of a partial contingency arrangement and with a client with whom they have a continuing relationship, whereas the services provided by Plaintiffs were on a wholly contingency arrangement with Plaintiffs' engagement limited to their expertise in the unique area of the law involved.  For those reasons,

Plaintiffs believe that their suggested total attorneys' fees and the division of that total among the attorneys providing the services are demonstrably fair both to the Benj shareholders and the other attorneys providing services.

## III.    ARGUMENTS AND AUTHORITIES

### A.    SUMMARY JUDGMENT STANDARD

Plaintiffs seek partial summary judgment to the effect that they are entitled as a matter of law to a percentage fee of assets of the Benj receivership estate, and that the reasonableness of this fee should be determined according to the factors relied upon in common fund fee award cases under District of Columbia authority.

Summary judgment for Plaintiffs is appropriate in this case because the pleadings, depositions, declarations, and other evidence in the record demonstrate that there is no genuine issue as to any material fact and thus, the Plaintiffs are entitled to judgment as a matter of law. FED.R.CIV.P. 56(c); American Federation of Gov't Employees v. Nicholson, No. 05-5365 (January 16, 2007, D.C. Cir.). Plaintiffs bear the initial responsibility of demonstrating the absence of a genuine dispute of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, (U.S. 1986). Plaintiffs in this instance can successfully support their Motion because they have, by way of this Memorandum, informed this Court of the basis for their motion, and identified those portions of the record which they believe demonstrate the absence of a genuine issue of material fact. FED. R. CIV. P. 56(c); Celotex , 477 U.S. at 323; Edmonds Institute v. U.S. Dept. of Interior, 460 F.Supp. 2d 63, 68 (D. D.C. 2006).

Plaintiffs are entitled to summary judgment because pursuant to District of Columbia law and authority, the proper measure of attorney fees in cases wherein a fund is preserved for the benefit of its owners is a reasonable percentage of that fund.  Defendant cannot refute that

established authority or create a genuine issue of material fact, and thus, Plaintiffs are entitled to judgment as a matter of law.  FED.R.CIV.P. 56(c); American Federation, No. 05-5365; Gipson v. Wells Fargo, 460 F.Supp. 2d 15, 22 (D. D.C. 2006).

**B.    AS A MATTER OF LAW, PLAINTIFFS ARE ENTITLED TO A PERCENTAGE OF THE PRESERVED COMMON FUND**

     **1.    The FDIC agrees that Plaintiffs are entitled to attorney fees.**

Plaintiffs' entitlement to attorney fees has already been established and conceded by the FDIC.  (Statement of Uncontroverted Facts ("Facts") at ¶ 42).  The FDIC spent several months reviewing Mr. Fleischer's claim for fees and ultimately concluded that the time he expended benefited the estate.  The FDIC granted a fee award based on Plaintiffs' acceptable hourly rates. (Facts at ¶ 47).  The FDIC compensated Mr. Fleischer for virtually all of his time and paid him fees based on his standard hourly rates.  (Facts at ¶ 42).  Because the FDIC has already acknowledged Plaintiffs' entitlement to attorney fees, the only issue in this case is the computation of those fees.  The crux of Plaintiffs' claim is that the FDIC employed the wrong analysis in the computation of Plaintiffs' fees and wrongly refused to award fees pursuant to the "common fund doctrine."   As demonstrated below, Plaintiffs are entitled to a reasonable percentage of the receivership estate that they preserved for the shareholders as a matter of law.

     **2.    The FDIC should have used the common fund doctrine for determining attorneys' fees rather than the lodestar method.**

It is uncontroverted that District of Columbia law applies to this case.  It is well established in the District of Columbia[1] that the proper measure of attorney fees in actions

---

[1] A number of other jurisdictions, notably the United States Supreme Court, and the Third Circuit, among others, and various district courts, have embraced the trend of "percentage-of-the-fee" awards in common fund cases.  See Boeing Co. v. Van Gemert, 444 U.S. 472 (U.S. 1980); Third Circuit Task Force, *Court Awarded Attorney Fees: Report of the Third Circuit Task Force*, 108 F.R.D. 237 (1985); In re Warner Communications Sec. Litig., 618 F. Supp. 735 (S.D.N.Y. 1985), aff'd 798 F.2d 35 (2d Cir. 1986).

resulting in the creation, preservation, or increase of a common fund is a "percentage-of-the-fund", as opposed to the lodestar analysis. Consolidated Edison Co. of New York, Inc. v. Bodman, 445 F.3d 438, 451 (D.C. Cir. 2006); Swedish Hospital Corp. v. Shalala, 1 F.3d 1261, 1271 (D.C. Cir. 1993); Fresh Kist Produce, L.L.C. v. Choi Corp., 362 F.Supp. 2d 118, 127 (D. D.C. 2005); In re Baan Co. Securities Litigation, 288 F.Supp. 2d 14, 17 (D. D.C. 2003); In re First Databank Antitrust Litigation, 209 F. Supp. 2d 96, 98 (D. D.C. 2002); see also Boeing Co. v. Van Gemert, 444 U.S. 472, 478 (U.S. 1980) (discussing that the equity of the "common fund" doctrine was established by the U.S. Supreme Court over a century ago).

The "common fund doctrine" allows a party who creates, preserves, or increases the value of a common fund to be reimbursed from that fund for litigation expenses incurred, including counsel fees. Swedish Hospital, 1 F.3d at 1272; Fresh Kist, 362 F.Supp. 2d at 126; In re Baan, 288 F.Supp. 2d at 16; In re First Databank, 209 F.Supp. 2d at 98. In this case, the shareholders have an ownership interest in the assets of the receivership estate and thus, those assets are part of a "common fund". See e.g., Swedish Hospital, 1 F.3d at 1272. To the end of preserving that common fund against the IRS claim, Plaintiffs rendered knowledgeable and skillful legal services and successfully preserved tens of millions of dollars of the shareholders' assets. (Facts at ¶ 22).

Without Plaintiffs' services towards preservation of the receivership estate, the IRS would have wiped out the assets in the receivership estate. (Facts at ¶ 24). To the extent that Plaintiffs secured assets that would have otherwise been taken by the IRS, Plaintiffs are entitled to payment for their legal services because Plaintiffs preserved a common fund for the benefit of the shareholders. See Consolidated Edison, 445 F.3d at 453 (to the extent that the litigation secured sums for the beneficiaries that otherwise would have flowed to other parties or would

have been retained by the government, a common fund fee would be in order) (citing U.S. v. American Society of Composers, Authors and Publishers, 466 F.2d 917 (2d Cir. 1972)).

For the benefit of the shareholders, and on their behalf, Plaintiffs agreed to undertake the risk of nonpayment for years of work. As a result of this risk, and through the application of their expertise and diligent efforts, Plaintiffs preserved a common fund of $44 million dollars for the benefit of the shareholders. Therefore, as a matter of law, Plaintiffs are entitled to their fees according to the common fund analysis and calculation. See e.g., In re Baan 228 F.Supp. 2d at 16-17.

## C.    AS A MATTER OF LAW, PLAINTIFFS ARE ENTITLED TO A REASONABLE PERCENTAGE OF THE COMMON FUND

Because Plaintiffs are entitled to an award of attorney fees under the "percentage-of-the-fund" computation rather than the lodestar method, Plaintiffs are entitled as a matter of law to a reasonable percentage of the common fund that they worked to preserve for the shareholders.

This Court has considerable discretion on the issue of reasonableness and has looked to the following factors in that assessment: (1) size of the fund created, preserved, or increased and the number of persons benefited; (2) presence or absence of substantial objections by members of the class to settlement terms and/or fees requested; (3) skill and efficiency of the attorneys involved; (4) complexity and duration of the litigation; (5) risk of nonpayment; (6) amount of time devoted to the case by plaintiff's counsel; and (7) awards in similar cases. In re Baan, 288 F. Supp. 2d at 17; see also Fresh Kist, 362 F.Supp. 2d at 128. Applying these factors, the Court is to ensure that Plaintiffs' claims are reasonable. Swedish Hospital, 1 F.3d at 1265; Fresh Kist, 362 F.Supp. 2d at 127. Consequently, common fund fee awards typically fall between twenty and thirty percent. See In re Baan, 288 F. Supp. 2d at 16-17; citing Swedish Hospital, 1 F.3d at

1265, 1272.  Plaintiffs, however, are seeking a fee that is a mere fraction of the twenty to thirty

percent benchmark set by the Court; Plaintiffs are seeking a reasonable fee of 3%.

> **1.      Mr. Fleischer helped preserve over $44 million dollars for distribution to many thousand shareholders before deduction for expenses incurred to preserve that fund.  Without the expertise and efforts of Mr. Fleischer and others, these dollars would have been paid to the IRS and never recovered.**

The preservation of more than $44 million dollars (before deduction of related expenses)

represents a substantial victory for the shareholders.  The IRS claim asserted federal income tax

liability of approximately $1.2 billion dollars.  The receivership estate was worth approximately

$92 million dollars at the time the IRS asserted its claim.  If upheld, the IRS claim would have

completely exhausted the receivership estate and any ultimate award in the Shareholder Claims

litigation.  (Facts at ¶ 24).  Because of arguments developed and advanced by Mr. Fleischer and

others, the IRS reduced its tax claim from $1.2 billion dollars to $50 million dollars — a

reduction of $1,150,000,000.00  Thus, Mr. Fleischer and others helped preserve a fund which

now exceeds $44 million dollars, of which the FDIC has distributed $31 million to the Benj

shareholders and is retaining the balance for expenses and contingencies, with whatever remains

after such expenses and contingencies to be distributed by the FDIC among those shareholders in

addition to the amount recovered in the Shareholder Claims litigation.  Without the work of Mr.

Fleischer and others, neither the initial $31 million distribution among the shareholders nor any

subsequent potential distribution would have occurred.

> **2.      On behalf of the shareholders, the Benj lead counsel hired Plaintiffs on a purely contingent fee arrangement.**

Mr. Fleischer entered into the fee agreement with the understanding he would be paid a

fair and reasonable fee contingent on a successful outcome for the shareholders.  (Facts at ¶ 33.)

It is Plaintiffs' understanding that over one-third of the shareholders have approved the award of a success fee. It is unknown at this time whether any of the shareholders have substantial objections to a percentage fee award, or what they might agree to as a reasonable percentage fee. Notwithstanding, it is the exercise of this Court's inherent equitable power to assess fees against those who stand to benefit from the fund. See Democratic Cent. Comm. v. Washington Metro. Area Transit Comm'n, 38 F.3d 603, 605-606 (D.C. Cir. 1994). In this instance, Mr. Fleischer would have never undertaken such a daunting task with such uncertain results if offered only his usual and customary hourly rates. Highly skilled and expert attorneys such as Mr. Fleischer would be deterred from undertaking such complex litigation if their ability to represent large groups of beneficiaries on a contingent fee basis was undermined by an imposition of a lodestar-type computation of fees.

### 3. Mr. Fleischer was eminently qualified to provide advice on complex issues of taxation.

Mr. Fleischer has a reputation in the legal community as one of the nation's top lawyers in tax matters. (Facts at ¶¶ 49-52.) Mr. Fleischer was hired by lead counsel for his expertise and abilities. Mr. Fleischer not only possesses expertise in tax analysis, but also expert skill in negotiation and was invaluable in formulating the arguments used negotiation discussions with the IRS. In particular, he was especially essential to the creation and the development of defenses against the IRS claim. (Facts at ¶¶ 26-28.)

### 4. The issues involved in challenging the IRS claim were highly complex and specialized.

The IRS based its tax claim on the assertion that FFA provided to the Benj receivership should be treated as taxable income. Because the value of the assets of very few FDIC

receiverships have ever exceeded the amount of their liabilities both before and after receiving FFA, as the Benj receivership had and did, the application of a federal income tax to FFA in the Benj receivership created a novel issue of law. In fact, no reported decision or published scholarly article had ever addressed this issue. (Facts at ¶ 26.) Mr. Fleischer was one of a handful of lawyers who had dealt with, and continues to deal with, the taxation of FFA in another case.

The FDIC, as the Benj Receiver, was proposing to pay the funds in the receivership estate to the IRS in partial satisfaction of the IRS Claim. If the FDIC had made such payment, the FDIC in all likelihood could not have successfully pursued a refund claim under well-establishd case law because all of the tax claimed by the IRS would not have been paid for any year. The Benj shareholders might not have standing to prosecute a refund claim because the FDIC as the Receiver and not the Benj shareholders was the "taxpayer". Any claim by the Benj shareholders against the FDIC for paying the amount to the IRS would probably also fail because the FDIC's paying such amount would probably fall within the "discretionary function" exception to government liability under the Federal Torts Claims Act. Finally, an income tax refund suit would have probably been unsuccessful pursuant to precedent in the United States Supreme Court holding that full payment of the tax assessment made with respect to a year is required before an income tax refund suit can be maintained. IRS CODE § 1346(a)(1); Flora v. U.S., 362 U.S. 145 (U.S. 1960).

5.    **Plaintiffs undertook a significant risk when they agreed to represent the shareholders on a contingency fee basis.**

Plaintiffs exposed themselves to substantial financial risk by agreeing to provide extensive legal services with the possibility of recovering any fee only if a successful outcome

was achieved. The novel and complex nature of the issues presented by Benj's dispute with the IRS increased the uncertainty of the outcome of the litigation. Plaintiffs would not have undertaken a matter as complicated, demanding, and risky as this IRS dispute if Plaintiffs could only receive its ordinary and usual hourly rates, and this only if it achieved a successful outcome. Moreover Plaintiffs knew that the determination of their fee would incur the additional expense of a court hearing. Plaintiffs bore a considerable risk on behalf of the shareholders, and they are entitled to the benefit of the fair contingent fee which they understood would be awarded. (Facts at ¶¶ 33-35.)

### 6.    Plaintiffs devoted a significant amount of time to preserving the shareholders assets in the receivership estate.

Plaintiffs devoted a substantial amount of time and effort to this case over a three-year period. Mr. Fleischer, based on a detailed reconstruction of his time, estimated that he worked 253.6 hours on this case. Mr. Fleischer researched and analyzed complex tax issues, including but not limited to, the possibility of a refund or repayment of any funds paid to the IRS, the merits of the IRS claim, the tax consequences, including penalties and interest, on any and all actions taken on behalf of the Benj shareholders. Further, Mr. Fleischer drafted and prepared various memoranda, letters, and spreadsheets documenting his research and analysis and advising and recommending on various courses of action. Mr. Fleischer was instrumental in discussions and negotiations, creating and analyzing various hypothesis and scenarios that could arise in this matter, prepared to implement a solution in any event. Lastly, Mr. Fleischer spent many hours traveling back and forth to Washington, D.C. (Facts at ¶ 29.)

7.    **Plaintiffs are requesting a fee much lower than the percentages of fund normally awarded in the District of Columbia.**

The IRS claim to this receivership presented a novel question of law (Facts at ¶ 27) and as such, comparable attorney fee awards in other similar successful cases are not available for analysis. However, this Court has consistently awarded attorney fees in a variety of common fund cases between twenty and thirty percent, leaving itself discretion to award fees either above or below that benchmark depending on the reasonableness factors described above. See e.g., Swedish Hospital, 1 F.3d at 1265; In re Baan 228 F.Supp. 2d at 16-17; Fresh Kist, 362 F.Supp. 2d at 127-128. Here, Plaintiffs' seek only 3% of the common fund.

The common fund in this matter is $44 million dollars. Plaintiffs seek 3%, or $1,320,000.00. The amount of the full payment of the sum of the amounts which Plaintiffs recommend for all attorneys plus the amounts of all other related expenses and claims, would leave the 6500 shareholders with over $34,000,000.00 or over $4.40 per share, of which $4.02, or about $31 million, has been distributed among the shareholders. Moreover, the successful defense of the IRS tax claim has preserved for the shareholders the potential to share, after related expenses, the $52 million judgment in the Shareholder Claims litigation. This may well explain why no shareholders have objected to payment of this fee. This Court has seen fit to award far greater percentages of common funds in matters requiring much less expertise, much less risk, and much less effort on the part of counsel. See e.g., In re First Databank, 209 F. Supp. 2d at 100-101 (where Court awarded counsel 30% of an $8 million dollar settlement even though the case "did not require the same heavy lifting demanded" of counsel in other cases). Thus, Plaintiffs' requested fee of 3% is more than reasonable.

As a matter of law, Plaintiffs are entitled to a reasonable percentage, 3%, of the $44 million dollar common fund that it preserved for distribution, after related expenses, to the Benj

shareholders. The FDIC can offer no evidence of the propriety of the use of the lodestar method in computing Plaintiffs' attorney fees, to which the FDIC has admitted Plaintiffs are entitled. The purpose of the "common fund" doctrine is to "conserve valuable legal talents and resources for the vindication of important substantive rights, rather than the determination of appropriate fees," Russ M. Herman and Stephen J. Herman, *Percentage-of-Benefit Fee Awards in Common Fund Cases*, 74 Tul. L. Rev. 2033, 2045 (1999-2000) and thus, the lodestar method is not an appropriate computation of Plaintiffs' fees. Rather, Plaintiffs are entitled to a reasonable percentage of the common fund. Plaintiffs request a fee – 3% - that is well below the benchmark of reasonable fees set by this Court – twenty to thirty percent. Together with the complexity of the underlying litigation and Plaintiffs' critical role in the successful outcome of the litigation, a 3% award of the common fund preserved is a reasonable fee.

## IV.    CONCLUSION

Plaintiffs are entitled to summary judgment as a matter of law on the method of computing the fee, and the amount thereof will await the evidentiary hearing.

Dated February 2, 2007                    Respectfully submitted,


                                          /s/ William F. Demarest, Jr.
                                          William F. Demarest, Jr. (D.C. Bar No. 266312)
                                          Blackwell Sanders Peper Martin LLP
                                          750 17th Street NW, Suite 1000
                                          Washington, D.C. 20006-3901
                                          (202) 378-2300

                                          and

                                          James Borthwick      MO #19722
                                          Nancy S. Jochens     MO #49022
                                          Blackwell Sanders Peper Martin LLP
                                          4801 Main Street, Suite 1000
                                          Kansas City, Missouri  64112
                                          (816) 983-8000
                                          (816) 983-8080 (Facsimile)

                                          *Attorneys for Plaintiffs*


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the above and foregoing document was filed electronically with the above-captioned Court, with notice of case activity generated and sent electronically by the Clerk of the Court to those requesting notice.


                                          /s/ William F. Demarest, Jr.