## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WINSTON & STRAWN LLP,<br><br>and<br><br>DON S WILLNER & ASSOCIATES, P.C.<br><br>and<br><br>BLACKWELL SANDERS PEPER MARTIN<br>and<br>ERNEST M. FLEISCHER<br><br>          Consolidated Plaintiffs,<br><br>    v.<br><br>FEDERAL DEPOSIT INSURANCE<br>CORPORATION, AS RECEIVER FOR<br>THE BENJ. FRANKLIN FS&LA,<br>PORTLAND, OREGON<br><br>        Defendant. | Civil Case No. 06-01120 (EGS)<br><br>[Consolidated with No. 06-01227<br>(EGS) and No. 06-01273 (EGS)] |

## DECLARATION OF ERNEST M. FLEISCHER

Ernest M. Fleischer states:

    1.    I am an attorney at law and of counsel with Blackwell Sanders Peper Martin, LLP ("Blackwell"), in its Kansas City, Missouri office.

    2.    Blackwell is a Missouri limited liability partnership. Pursuant to our agreement, Blackwell also has an interest in this litigation. Therefore, our interests in this litigation are one and the same.

3.    The tax issues involved in the Internal Revenue Service ("IRS") Claim against Federal Deposit Insurance Corporation as receiver for the Benj Franklin Savings and Loan Association, Portland, Oregon ("Benj") were complex and highly specialized.

4.    After the IRS filed its claim and lawsuit seeking $1.2 billion, Donald Willner ("Mr. Willner"), the lawyer who had been appointed as lead counsel for the Benj shareholders in the United States Court of Federal Claims litigation against the government for breaching its contracts with Benj, the Trustee of the Benj Shareholders Litigation Fund and an attorney for many of the Benj shareholders, became concerned that the Defendant intended to pay all of the assets of the receivership to the IRS without litigating the IRS Claim.

5.    Mr. Willner obtained my name, and contacted me in early July 2002.

6.    I advised Mr. Willner in our initial conversation that it would be disastrous to allow FDIC to pay all of the assets to the IRS.

7.    Based on case law and statutory authority, it was necessary to pay the entire tax due with respect to any one year in order to prosecute a refund claim with the Internal Revenue Service.

8.    Shortly thereafter, I provided Mr. Willner with the case law and statutory authority upon which I based my advice that allowing all of the Estate's assets to be paid-over in partial payment of the IRS Claim would prevent the Shareholders or the Defendant from later pursuing a refund from the IRS.

9.    From early July 2002 through October 2002, only Mr. Willner and I worked together to research the law and develop the legal position opposing the IRS claim.

10.    In the summer of 2005 the Receivership and the IRS agreed to a settlement of the IRS claim in the amount of $50 million, leaving a Benj receivership surplus of $44 million.

11.    In my opinion, the major substantive issues involved in the IRS litigation were the following:

      a.    Whether the amount of accounting goodwill created from the acquisition by Benj pursuant to the contractual undertakings breached by the government had a tax basis equal to such amount.

      b.    Whether the Federal Financial Assistance ("FFA") provided to Benj were in fact and in law loans not taxable under the Internal Revenue Code ("IRC") and, moreover, not being income could not be subject to tax under the Sixteenth Amendment to the Constitution.

      c.    Whether the method of accounting used by the Defendant in preparing the Benj returns was the accrual method as required by the IRC.

      d.    Whether the interest owing to the government on the FFA loans was deductible in computing taxable income in each year as the interest liability was being incurred.

      e.    Whether penalties should be imposed on Benj under the IRC as a result of Defendant's conduct over which Benj had no control.

      f.    Whether Benj should be liable for interest at a rate higher than the rate being paid by the United States Treasury on the use of the funds belonging to Benj that were used in each year by the Treasury.

12.    The IRS tax claim in this instance involved a novel issue of law because the IRS based its claim on the assertion that FFA paid to the Benj receivership should be treated as taxable income and no reported decision or published scholarly article had ever addressed this issue.

13.    I believed that the procedural detriments in the case presented a greater likelihood of failure than the substantive case law.  Those procedural detriments were:

      a.    It seemed unlikely that Mr. Willner and the shareholders that he represented

would probably be granted "standing" to defend against the IRS claim, because under the

federal statutes the defendants had succeeded to all of the rights of shareholders except

for the rights that the shareholders had to residual receivership surplus. Moreover, the Defendant was the taxpayer--not the shareholders.

b.      The Federal statutes forbid any restraining order against actions proposed to be taken by the Defendant. Mr. Willner therefore did a remarkable job in obtaining the TRO and then persuading the Defendant to cooperate.

c.      The sole jurisdictional basis for recovery of damages against the Defendant is the Federal Torts Claims Act, for which there exists the discretionary function exemption. That exemption is overcome only if the government receiver fails to follow a specific statutory directive.

d.      The Federal Deposit Insurance Corporation ("FDIC") and the IRS had entered into an inter-agency agreement under which the FDIC promised not to oppose the IRS in tax litigation. That risk continued until after court approval of the settlement.

14.     My work on the tax case consisted of the following:

a.      Legal research concerning:

1.      Requirement of total tax payment as requirement for refund litigation;
2.      Right to contest merits of tax assessment as part of tax collection litigation;
3.      Tax consequences of the acquisition of a stock thrift by a mutual thrift;
4.      Effect of mitigation provisions to statutory limitations on tax assessments;
5.      Application of duty of consistency where position change is caused by an intervening judicial decision;
6.      Goodwill as a depreciable asset;
7.      Tax consequences from sale of goodwill;
8.      Abandonment loss for unsold goodwill;
9.      Requirements for repayment potential in order for cash received to be a loan for tax purposes;
10.     Constitutional authority to tax a loan as income;
11.     Tax recognition of transaction substance if form of transaction differs from its substance;
12.     Accrual method requirement for thrifts;

13.    Applicability of tax penalties imposed by the government to seized entities over which only the government and not those who would bear the penalty had a role in the conduct resulting in the penalty; and

14.    Interest charges by the government from time to time at a rate on delinquent tax payments at a rate higher than the government paid on the taxpayer's funds used by the government during such times.

b.    Review of tax returns, financial reports and regulatory filings from 1982 through 2002.

c.    Preparation, review and revisions of memoranda, letters and spreadsheets concerning tax, interest and penalty deficiency claims; participation in discussing the merits and results of varying scenarios; and structuring, reviewing and discussing varying schedules of potential tax deficiency based on success on each or a combination of each of the issues in contention.

d.    Participation in telephone calls and conferences with respect to all matters being considered.

e.    Travel to and from and attendance at meetings in Washington, D.C.

15.    Because I was working on a contingency fee basis, I did not keep contemporaneous time records. I initially estimated that I had spent 240 hours working on the matter. Subsequently, I prepared as detailed a reconstruction of my time as possible, resulting in an estimated 253.6 hours.

16.    I received no payment for my services for over four years. I would have received nothing if no assets had been preserved for the shareholders.

17.    Neither I nor Blackwell Sanders would have undertaken a matter as complicated, demanding and risky as this IRS dispute if we had known at the outset that at the conclusion of the matter we would be paid only our ordinary and usual hourly fees at the time the services were performed, and not a contingency fee based on the results achieved.

18.    When I agreed to provide services to Benj and its shareholders, I did so with the understanding that our fee would be wholly contingent on a successful outcome for the

shareholders in the IRS dispute and that we would be paid a fair contingency fee if, and only if, a successful outcome was achieved.

19.    Blackwell and I exposed ourselves to substantial financial risk by agreeing to provide my services with only the possibility of recovering any fee if a successful outcome was achieved.

20.    The novel and complex nature of the procedural impediments and the substantive issues presented by the Benj dispute with the IRS increased the uncertainty of the outcome of the litigation.

21.    When Mr. Willner filed a proof of claim with the FDIC, he included our listing of the services performed on behalf of the Benj receivership and the shareholders by date and description computed, as directed by the FDIC, at our customary hourly fees.

22.    On March 3, 2006, at the request of Richard Gill of the FDIC, I sent Mr. Gill a facsimile message in which I set forth the factual background of the contingency fee arrangement, including therein my understanding that "a 'fair' contingent fee amount would be determined by a Federal judge".

23.    In a letter dated June 6, 2006, to me, Mr. Glinsmann stated "Your claim has been reviewed, and the Receiver has determined that is [sic] should be partially allowed. Enclosed you will find a check in the amount of $89,465.34."

24.    The payment letter contained no discussion of compensation for the risks inherent in the wholly contingent fee arrangement or the time delay for income receipt for the services which we provided.

25.    To date, we have not been compensated in any way for the risk assumed by representing the Benj receivership and the interests of the Benj shareholders on a contingency fee basis.

26.    My standard hourly rates were at all relevant times consistent with the prevailing non-contingent rates for attorneys offering services of a similar type and quality, as demonstrated by the Defendant's allowance of said fees.

27.    The Defendant spent six months reviewing our fee request and invoices before rendering its recent determination.

28.    The Defendant ultimately concluded that my standard hourly rates were acceptable and that the time expended benefited the Estate.

29.    Thus, the Defendant determined that the Benj receivership should compensate us for virtually all of my time.

30.    My educational background is as follows:

(a)    1954, Washington University, Bachelor of Arts (with areas of concentration in political science and economics).

(b)    1954, Washington University, Bachelor of Business Administration (with area of concentration in accounting).

(c)    1954, Washington University, Master of Business Administration (with area of concentration in finance).

(d)    1959, Harvard Law School, Juris Doctor *magna cum laude* (with area of concentration in taxation).

31.    I have been a tax lawyer since 1959.

32.    In 1977, I passed the Missouri State Board of Accountancy examination to become a Certified Public Accountant.

33.    I have been listed in The Best Lawyers in America since 1996.

34.    I have been of counsel in the firm of Blackwell Sanders Peper Martin, LLP since 1992.

35.    I was Chairman of the Board, and I and my family members owned a majority of the stock of the holding company that owned Franklin Savings Association, a savings and loan with assets of over $10 billion, during the 1980s.  Because I am a tax lawyer, I became very familiar with the taxation of thrifts.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

/s/ Ernest M. Fleischer
Ernest M. Fleischer

Dated:  February 2, 2007