# DON S. WILLNER & ASSOCIATES, PC

Don S. Willner
(Licensed in Oregon and Washington)

ATTORNEYS AT LAW
SUITE 1415 THE AMERICAN BANK BUILDING
621 S.W. MORRISON STREET
PORTLAND, OREGON 97205
TELEPHONE (503) 228-4000
FAX (503) 273-8842

March 17, 2003

Robert Clark
Senior Counsel
FDIC
550 17ᵗʰ St., NW
Washington DC 20429

**CONFIDENTIAL**
**FOR SETTLEMENT PURPOSES ONLY**
**SUBJECT TO FRE RULE 408**

Catherine Topping
Counsel
FDIC
550 17ᵗʰ St., NW
Washington DC 20429

Hugo Zia
Counsel
FDIC
550 17ᵗʰ St., NW
Washington DC 20429

Re:  ***United States v. Federal Deposit Insurance Corporation, et al.***
Civil Action No. 02 1427 (USDC D.DC)
***Suess et al. v. FDIC***
CV 02 807 HA (USDC D.OR)

Dear Bob, Catherine & Hugo:

In late January, I talked by telephone with Catherine and Hank Darmstadter.
I said that we would be preparing a further memorandum demonstrating that the amount of the
loans from the RTC to the Benj. Franklin receivership are not includible in the receivership's
taxable income.  A copy of that memorandum is enclosed.  For your convenience, I have
enclosed in the same binder copies of (i) our prior memorandum on this issue and (ii) our
memorandum on the tax treatment of the Benj. goodwill.

KC-1066579-1

Page 2
March 17, 2003

We believe it would be beneficial to see whether the Benj. shareholders and the FDIC can develop a common position on the tax treatment of the RTC advances. We therefore ask that you not share or discuss the enclosed memorandum with the Department of Justice or the Internal Revenue Service at this time. Instead, we would like to meet with you at your earliest convenience to obtain your reaction to the memorandum and discuss whether we can reach an agreed position on the tax treatment of the RTC advances. This meeting would be preparatory to a subsequent meeting among DOJ, IRS, FDIC and the Benj. shareholders to consider whether all the issues in the case can be settled.

At our meeting with you, we would propose to discuss three topics: (i) the tax treatment of the loans from the RTC, (ii) the tax treatment of the Benj. goodwill, and (iii) several outstanding factual issues, which are outlined below.

With regard to the goodwill issue, we thank Catherine for her letter of the 13th, which we have reviewed. We agree that the tax returns filed by Benj. from 1982 forward, as well as other documents prepared by Benj., consistently treated the Equitable acquisition as a non-taxable reorganization. However, for the reasons set out in our memorandum, we believe that position was incorrect as a matter of law in light of the Supreme Court's *Paulsen* decision in 1985. Moreover, the position taken by Benj. in those years does not control the treatment of the goodwill on the 1990 return. It is well settled that a mistake of law on a prior return does not prevent a taxpayer from applying the law correctly in a subsequent year.

In this regard, we have not been able to locate any explanation of the legal reasoning underlying Benj.'s assertion that the Equitable acquisition remained nontaxable even after the *Paulsen* decision. We would be interested to know whether in your review of the files you have found any indication why Benj.'s management and their advisers believed that the Supreme Court's holding in that case was not relevant to the Equitable acquisition. We also would be interested to discuss your views of the legal arguments that we raised in our December 6, 2002 submission and your views on the correct post-1985 treatment of the Equitable acquisition.

Catherine also raised in her letter the question of whether prior tax years of Benj. or of the selling Equitable shareholders should be reopened. We believe the statute of limitations prevents the reopening of any such years. We would agree, however, that the amount of the net operating loss carryover and any other carryovers into Benj.'s 1990 year would need to be redetermined to reflect the treatment of the Equitable transaction as taxable.

At our meeting, we would also like to discuss with you several factual issues which should be resolved before any meeting with DOJ and the IRS. These issues are as follows:

Page 3
March 17, 2003

1. We understand that Benj. incurred very substantial prepayment penalties when it repaid its FHLB advances in 1990. We believe these penalties would have been deductible for federal income tax purposes, but we have not been able to identify where, if at all, such a deduction was claimed on the 1990 return. We are interested in any information you have regarding the amount of the penalties and whether a deduction for these penalties was in fact claimed.

2. We would like to discuss further with your tax staff the amounts of, and rationale for, the adjustments on the 1990 return to put the Benj. receivership, an accrual basis taxpayer, on a cash basis.

3. We would like to discuss further with your tax staff the reconciliation of the gain on FHLB stock sold in 1990 with the amounts of FHLB stock dividends excluded from income in prior years. We understand from your last letter that you are satisfied that these amounts can be reconciled, but we have not been able to do so on the basis of the information available to us.

4. We would like to discuss further with your tax staff whether $113,095,275 or $139,026,176 is the applicable NOL from 1989 to be deducted in the 1990 Benj. Franklin return. If you believe the $139 million figure is the correct one, it would be useful to be able to review a reconciliation of that figure with the NOL reported on the 1989 return.

Once we have had the opportunity to meet with you and your staff, we think it would be useful to schedule a meeting with DOJ and IRS regarding the three main issues we have raised, namely (1) that there should be a deduction for the interest paid on the RTC advances; (2) that the Benj. goodwill should have had a taxable basis resulting in a loss when the institution was seized; and (3) that the RTC advances cannot appropriately be taxable income, as well as any other issues that need to be addressed at that time.

I will phone Catherine in the near future to schedule a time for a meeting.

Sincerely yours,

DON S. WILLNER & ASSOCIATES, PC

Don S. Willner

DSW:cva
Enclosures

March 17, 2003

**CONFIDENTIAL**
**FOR SETTLEMENT PURPOSES ONLY**
**SUBJECT TO FRE RULE 408**

**FEDERAL INCOME TAX TREATMENT OF RTC LOANS MADE TO THE BENJ. FRANKLIN CONSERVATORSHIP AND RECEIVERSHIP**

I.       Introduction and Overview

The Benj. Franklin Federal Savings and Loan Association ("Benj.") was, until its seizure by the government in 1990, a well regarded, long established thrift institution operating in Oregon. Prior to the enactment of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA") in August 1989, Benj. was in full compliance with all applicable regulatory capital requirements. However, as a result of the enactment of FIRREA, Benj. became subject both to new capital requirements and to a requirement that Benj. change the previously approved method of accounting for goodwill in determining its compliance with those requirements. The regulators determined that Benj. was not in compliance with the new requirements. As a result, Benj. was placed into conservatorship in February 1990 and into receivership in September 1990, with the Resolution Trust Corporation ("RTC") acting as conservator and receiver. The U.S. Court of Federal Claims has held that the statutory change in the approved treatment of goodwill and resulting seizure of Benj. constituted a breach of contract by the government for which the Benj. receivership has been awarded approximately $35 million in damages.

During 1990, the RTC, acting in its corporate capacity, advanced funds to the Benj. conservatorship and receivership to facilitate the resolution of that institution's outstanding obligations to its depositors and creditors. These advances were made subject to a requirement that they be repaid to the extent funds were available. In light of the relatively high priorities that the RTC claims were accorded in the receivership, and the strong financial position of the Benj. receivership, there was never any doubt that these claims would be repaid, and in fact they were repaid in full, along with the interest on those claims to which the RTC was entitled under the regulatory scheme for thrift receiverships.

At the present time, the Benj. receivership remains in existence. All claims against the receivership have been paid in full, with the exception of a claim for federal income taxes the amount of which is in dispute. Moreover, the receivership currently holds approximately $90 million in funds. To our knowledge, Benj. is one of the very few thrifts in receivership in the country to have paid all depositor and RTC claims in full with substantial funds left over.

The United States has filed suit to reduce the outstanding claim for federal income taxes to judgment. This claim is based in large part on the Internal Revenue Service's contention that

the amounts advanced by the RTC in 1990 constituted taxable income. The Benj. Shareholders have previously advised the IRS and the Department of Justice, in a statement dated November 4, 2002, that in this case the amounts advanced by the RTC cannot be treated as taxable income. This memorandum sets out the support for this position in greater detail.

The precise question to be resolved is whether the amounts advanced by the RTC in 1990 should be treated as taxable income of the Benj. conservatorship and receivership under the authority of section 597 of the Internal Revenue Code.[1]  For the reasons set forth in this memorandum, the answer is no. Under well developed and long standing case law standards, an advance of funds is a loan, not a capital contribution or income, for federal income tax purposes if it is made with the expectation of repayment and that expectation is reasonably likely to be fulfilled. We acknowledge that in the great majority of cases, RTC advances to thrifts in receivership will not meet this standard. However, in the particular circumstances of Benj.'s case, the RTC advances indisputably met this standard and therefore constituted loans for federal income tax purposes. Thus, considered apart from section 597, it is clear the RTC advances to Benj. would not constitute taxable income.

Moreover, neither section 597 nor the IRS guidance issued under that section can change this result. Nothing in section 597 itself requires advances such as those made to Benj. to be taxed, and a review of the legislative history and the relationship of section 597 to other provisions of the Code clearly indicates Congress did not intend such advances to be taxed. Thus, to the extent that the IRS guidance is interpreted as doing so, it is invalid on the ground that it is inconsistent with Congressional intent. Moreover, imposing an income tax on *bona fide* loan proceeds conflicts with Constitutionally imposed limits on taxation. This in itself is evidence that Congress did not intend section 597 to be so construed. However, if section 597 were construed to impose an income tax on such loan proceeds, it would be Constitutionally invalid.

II.    Factual Background

A.  Overview of the Thrift Resolution Process

During the 1970s and early 1980s, rising interest rates put substantial pressure on the earnings, and therefore continued viability, of many thrift institutions. During this period, federal regulators averted the failure of a substantial number of these thrift institutions by persuading other institutions with stronger capital positions to acquire them.  In these transactions, the federal regulators generally assured the acquirors that they would be able to treat the goodwill purchased in these acquisitions as capital for bank regulatory purposes (subject to a requirement that the goodwill be amortized over a specified period of years).

In August 1989, Congress adopted FIRREA, which imposed specific, increased capital requirements on thrifts and prohibited the treatment of goodwill as capital. As a result of the changes made by FIRREA, many of the thrift institutions that had carried out such government-sponsored acquisitions of weaker thrifts ceased to be in compliance with regulatory capital

---

[1]    Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986 (the "Code"), as in effect during the years at issue in this case, or to the Treasury regulations promulgated thereunder.

requirements. In many cases, these thrifts were taken over by the RTC and placed into conservatorship or receivership.

The RTC's most common method for resolving insolvent thrifts during this period was to arrange a "purchase and assumption" transaction in which a third-party institution would acquire the deposit liabilities and all or a substantial portion of the assets of the insolvent thrift. The RTC's usual procedure was to establish market values for the various categories of assets on the thrift institution's books. The RTC would then solicit bids to acquire the assets and deposit liabilities of the thrift institution. The RTC would offer to transfer to the acquiring institution cash equal to the amount, if any, by which the fair market value of thrift assets being acquired fell short of the amount of deposit liabilities being assumed by the acquiring institution. Thus, the acquiring institution would obtain assets with a value equal to the amount of liabilities being assumed. Prospective acquirors would bid for the assets and liabilities by offering to pay a premium, which generally reflected the perceived value to the acquiror of obtaining the thrift's deposit relationships.

In most purchase and assumption transactions, the fair market value of the assets being acquired fell substantially short of the amount of liabilities being assumed. Thus, the RTC was required to provide substantial assistance in order to enable the transaction to occur. The transactions were carried out on a "net wire" basis, that is, the RTC wired to the acquiror funds equal to the amount by which (i) the required financial assistance exceeded (ii) the premium being paid by the acquiror.

Under the federal regulations governing most thrift receiverships (including the Benj. receivership), the RTC had a claim against the receivership for the amount of any funds advanced to the thrift or to the acquiror in a purchase and assumption transaction, as well as for any other funds expended by the RTC in the course of resolving the thrift. The RTC also was entitled to interest at specified rates based on U.S. Treasury yields on the amount of any such claims. The relative priorities of these and other unsecured claims against the thrift were set forth in the regulations, as follows:

Priority 1.    Administrative expenses of the receiver, including the costs, expenses and debts of the receiver;

Priority 2.    Certain administrative expenses of the thrift incurred within 30 days prior to the receivership;

Priority 3.    Wage and salary claims of certain thrift employees whose employment is continued by the receiver after the inception of the receivership;

Priority 4.    Wage and salary claims of certain thrift employees whose employment is not continued;

Priority 5.    Tax claims other than claims for federal income taxes;

Priority 6.    Claims of the depositors, including claims of the RTC as subrogee of the depositors, and all other unsubordinated claims that had accrued and become unconditionally fixed as of the date of default;

Priority 7.    All unsubordinated claims that had not accrued and become unconditionally fixed as of the date of default, including claims for interest on Priority 6 claims;

Priority 8.    Claims for federal income taxes;

Priority 9.    Claims that were, by their terms, subordinated to claims of general creditors; and

Priority 10.   Claims of shareholders.[2]

The RTC was considered to be subrogated to the claims of depositors to the extent of funds paid to an acquiror in a purchase and assumption transaction to induce the acquiror to assume the deposits. Thus, the RTC's claim for repayment of such funds was considered to be a Priority 6 claim.

A typical purchase and assumption transaction during this period left the thrift in receivership with far less in residual assets than the outstanding amount of RTC assistance. Thus, the prospect for repayment of these RTC advances, let alone interest thereon, by most thrift receiverships was slight to nonexistent.

B.   The Benj. Receivership

During the 1980s, Benj. acquired the assets and liabilities of two troubled thrifts, Equitable Savings and Loan and Western Heritage Savings and Loan, in reliance on promises that Benj. would be able to take the goodwill generated by these acquisitions into account in determining Benj.'s compliance with capital requirements. The enactment of FIRREA caused Benj. no longer to be in compliance with applicable capital requirements. As a result, Benj. was placed into conservatorship by the RTC in February 1990.

From the records provided to date by the FDIC (RTC's successor), it appears that the RTC, acting in its corporate capacity, advanced $503 million to the conservatorship. These funds were apparently used to aid in the resolution of Benj., although the FDIC has not been able to identify exactly how they were used. The RTC treated its claim for repayment of the $503 million (and interest thereon) as a Priority 1 claim. The $503 million was in fact repaid in full, along with $26.3 million in interest, by August 1991.

During the summer of 1990, the RTC sought bidders that would assume Benj.'s deposit liabilities and acquire its assets. The RTC successfully negotiated and closed a purchase and assumption transaction covering Benj.'s assets and liabilities with Bank of America on September 7, 1990. This transaction differed in important ways from the typical pattern described above.

First, Bank of America acquired assets with a value greater than the amount of deposit liabilities that it assumed. Pursuant to the transaction, Bank of America assumed approximately

---

[2]    12 C.F.R. § 360.3(a).

$2.65 billion in Benj. deposit liabilities and acquired assets valued at $2.735 billion. Bank of America paid the receivership $85 million to compensate the receivership for this net transfer of value to Bank of America. In addition, Bank of America paid a $162.3 million premium to acquire the Benj. deposit base. To our knowledge, this was one of the largest premiums, in terms of percentage of principal amount of deposits acquired, ever paid in a purchase and assumption transaction. Finally, following the resolution of a dispute under the purchase and assumption agreement, Bank of America paid the Benj. receivership an additional $14.7 million for Benj.'s mortgage servicing rights. Thus, rather than the RTC transferring any funds to Bank of America or to Benj. at the time of the purchase and assumption transaction, Bank of America transferred an aggregate amount of approximately $262 million to the receivership.

Immediately after the purchase and assumption transaction, the Benj. receivership had, according to the RTC's pro forma statements, $479,585,021 of assets (exclusive of the funds received from Bank of America) and $742,838,366 of liabilities (including the $503 million liability to the RTC). If the $262 million received from Bank of America in the purchase and assumption transaction is added to these amounts, it appears that the receivership had approximately $742 million of assets and $743 million of liabilities, i.e., that the receivership had assets and liabilities of approximately equal amounts. Importantly, however, the liabilities shown on the pro forma statements included approximately $132 million of "deferred income." It is not clear why the pro forma statements showed such a large amount of deferred income. However, it is clear that as an accounting matter, deferred income does not represent a financial liability to an outside party; rather, it represents the fact that cash received by a business is not yet ripe for inclusion in income (for example, because it consists of prepaid interest). Thus, according to the pro forma statements, the Benj. receivership had assets (including the funds paid by Bank of America) of $742 million and no more than $611 million of liabilities to outside parties. In other words, the pro forma statements showed that the Benj. receivership had approximately $131 million more in assets than would have been necessary at that point to pay off all its liabilities to outside parties, including the RTC.

As part of the September 7, 1990 purchase and assumption transaction, the RTC granted Bank of America a series of "put" rights to sell certain of the Benj. assets back to the receivership. The put rights had to be exercised within specified periods, generally 60 or 90 days. If a put was exercised, the assets covered by the put were sold back to the receivership at the same price at which they had been purchased on September 7, 1990. The exercise of its put rights did not entitle Bank of America to a refund of any part of the $162.3 million premium it paid in the acquisition.

Bank of America exercised certain of its put rights under the purchase and assumption agreement, returning certain of the assets it had acquired and receiving payment for those assets from the receivership on one or more dates in late 1990. We have not been able to identify the exact amount of assets that were put by Bank of America back to the Benj. receivership. However, it appears the total amount was approximately $1.4 billion. The repurchase of assets by the receivership was funded by an advance of an equal amount from the RTC. The RTC considered that it was subrogated to the claims of former Benj. depositors to the extent of the

amount so advanced. Accordingly, the RTC treated the approximately $1.4 billion of funds advanced as a Priority 6 claim.[3]

Importantly, the assets returned to the Benj. receivership by virtue of the put options had a value _greater_ than the price at which they were returned to the receivership. Thus, the exercise of the put options _increased_ the Benj. receivership's capacity to repay the RTC advances. James Murphy, Executive Vice President, Bank of America, who supervised that Bank's due diligence and the asset purchase, testified in the U.S. Court of Federal Claims case that the assets acquired from the Benj. receivership had a value significantly in excess of the "pass price" at which they were transferred to and sold back by Bank of America. Mr. Murphy based this view on both a Merrill Lynch valuation commissioned by the Bank of America and Mr. Murphy's own judgment as a senior bank officer who had handled over a dozen similar transactions. Mr. Murphy specifically stated that Bank of America would have made a profit on the loans that were put back to the receivership. Thus, Bank of America's exercise of its put options in no way represented an assessment that the acquired assets had a value less than the price at which they had been purchased by Bank of America. To the contrary, Mr. Murphy believed the exercise of the put option was attributable to the shortsighted unwillingness of some Bank of America officers to work with assets that were not documented in the same manner that other Bank of America assets were documented and to a general policy at Bank of America not to retain most assets in RTC acquisitions.[4]

As noted above, immediately after the close of the September 7, 1990 purchase and assumption transaction Benj.'s assets exceeded its liabilities to outside parties by $116 million. Moreover, the $1.4 billion advanced by the RTC was used to bring assets of an equal amount back into the receivership. Accordingly, after the put options were exercised the assets of the receivership continued to substantially exceed its liabilities to outside parties, including the RTC.

This assessment of the financial state of the receivership in 1990 is borne out by subsequent events. During the period 1990 through 1995, the Benj. receivership repaid to the RTC, not only all of the $503 million Priority 1 claim and the $26.3 million of related interest, but also all of the $1.4 billion Priority 6 claim, along with the RTC's Priority 7 claim for $258 million of related interest. Moreover, now that all claims through Priority 7 have been fully paid, the receivership has over $90 million in funds remaining.

III.    Analysis

A. Tax Treatment of Advances Apart From Section 597

1. Status of Advances as Debt

---

[3]    The RTC calculated the net amount of funds advanced to the Benj. receivership as of December 31, 1990 to be approximately $1.7 billion. This figure reflected the combined effect of (i) the $503 million advance, (ii) the repayment of a portion of that advance and interest thereon during 1990, (iii) the approximately $1.4 billion advance to fund the purchase of assets pursuant to Bank of America's exercise of its put options, and (iv) the results of receivership operations through December 31, 1990.

[4]    See the excerpts from Mr. Murphy's testimony attached as Exhibit A.

It is helpful to begin the analysis of the federal income tax treatment of the two RTC advances described above by considering how those advances would be treated in the absence of section 597 of the Code. In this regard, advances of funds to a corporation generally may be regarded for tax purposes as (i) a loan; or (ii) a contribution to capital. As explained below, the RTC advances were loans for tax purposes and, as a result, did not constitute taxable income to the Benj. receivership.

The RTC advances were treated as loans for accounting and regulatory purposes. They were described as liabilities on the financial statements for the receivership prepared by the RTC. Moreover, they were treated as debts of the receivership for purposes of assigning priorities to the RTC's claims for repayment of these advances, and were given priorities that were senior to, or on a par with, the claims of other persons who were clearly creditors of Benj. Finally, the RTC in fact asserted and enforced its right to repayment of these claims, along with interest, in accordance with the regulatory priorities to which those claims had been assigned.

Advances that are treated as loans for nontax purposes may, under certain circumstances, fail to constitute debt for tax purposes. However, the RTC advances in this case clearly met the requirements to be treated as debt for tax purposes as well. In this regard, there is no formal tax law definition of debt. Congress has authorized the Treasury Department to issue regulations distinguishing debt from stock for tax purposes, but no regulations under that section have ever become effective. The authorizing statute—section 385 of the Code—does, however, provide a list of five factors that are to be taken into account in distinguishing debt from stock. Those factors are:

    (1)    whether there is a written unconditional promise to pay on demand or on a specified date a sum certain in money in return for an adequate consideration in money or money's worth, and to pay a fixed rate of interest,

    (2)    whether there is subordination to or preference over any indebtedness of the corporation,

    (3)    the ratio of debt to equity of the corporation,

    (4)    whether there is convertibility into the stock of the corporation, and

    (5)    the relationship between holdings of stock in the corporation and holdings of the interest in question.

Each of these five factors supports the conclusion that the RTC advances to the Benj. receivership were debt for tax purposes.

First, the RTC advances were reflected in written entries on the books of the receivership that indicated the RTC was entitled to repayment of the stated sum. As noted above, the RTC's right to receive interest on this sum was also set forth in the regulations. The advances did not have a stated maturity date, but were in effect "demand" loans, in that the RTC had the power to, and did, control the timing of repayment of the advances as Benj. assets were liquidated.

-7-

The second factor—the priority of the claims in question relative to the claims of other creditors—also supports debt characterization. As noted above, the RTC's claim for repayment of the $503 million was a Priority 1 claim, which was preferred over all other claims of unsecured creditors. The RTC's claim for the $1.4 billion was a Priority 6 claim, which was on a par with claims of depositors and general unsecured creditors and had priority over (i) all unsubordinated claims that had not accrued and become unconditionally fixed as of the date of default, (ii) claims for federal income taxes, (iii) claims of subordinated debt holders and (iv) claims of shareholders.

The third factor set forth in section 385 is the ratio of debt to equity. This factor, which is directed to whether there is an equity "cushion" sufficient to assure repayment of the debt, also supports the treatment of the RTC advances as debt. As noted above, following the purchase and assumption transaction the Benj. receivership had assets that exceeded liabilities to outside parties by $116 million. Given the fact that Benj. had ceased to conduct business and was therefore no longer incurring operating expenses, this cushion was more than adequate to assure repayment of the RTC advances in full. In fact, these advances were fully repaid, with interest, a few years later, leaving $90 million in the receivership for payment of lower-priority claims.

The fourth and fifth factors set forth in section 385 also support debt characterization. The fourth factor asks whether the debt in question was convertible into equity, i.e., whether it gave the debt holder an opportunity to participate in future growth of the corporation. The RTC advances provided no such opportunity to the RTC. The fifth factor goes to the extent to which the debt in question is held by persons who are also shareholders of the corporation. The RTC was not a shareholder in Benj. and had no interest in the Benj. assets beyond the amount of its claims and the prescribed interest thereon.

In addition to section 385, there exists a substantial body of case law bearing on the distinction between debt and equity for tax purposes. These cases have their genesis in the fact that it is generally preferable from a tax standpoint for a corporation to issue debt, rather than stock, because interest payments on debt are deductible by the corporation, whereas dividend payments on stock are not. Thus, corporations have an incentive to raise capital by issuing instruments that are denominated as debt. The Internal Revenue Service has responded to possible abuses in this area by taking the position that instruments that, on their face, are debt should nevertheless be treated as stock for tax purposes if the terms of the instrument, the financial position of the corporation, and any collateral understandings between the investor and the corporation are such that the economic position of the purported creditor more nearly resembles that of a shareholder, i.e., one who has risked his invested funds on the success of the business.

The cases in this area have cited a wide range of criteria in characterizing advances to a corporation as debt or equity. However, it is generally recognized that an advance will be respected as debt for tax purposes if the creditor had "the genuine intention to collect the

purported debt and a reasonable expectation of realizing that intention."[5]  The RTC advances to the Benj. receivership clearly satisfied both of these criteria.

Courts have generally found taxpayers to have violated the first criterion noted above where they have behaved more like shareholders than like creditors.  For example, a person with the formal rights of a creditor may be treated as a shareholder if he has not enforced those rights (perhaps in order to protect a separate investment in the corporation in the form of stock).[6]  In contrast, the RTC clearly behaved like a creditor:  it carried out the disposition of Benj.'s assets with a view to ensuring the repayment of its claims, as well as the claims of other creditors.  Moreover, it repaid the amounts of its advances to itself out of the assets of the receivership, along with interest, in accordance with the regulatory scheme of claim priorities.  As noted above, under this scheme the RTC's claim for the $503 million and related interest was senior to the claims of depositors.  The RTC's claim for the $1.4 billion and related interest was *pari passu* with claims of depositors and other unsecured creditors and senior to (i) claims that were not fixed as of the inception of the receivership, (ii) claims for federal income taxes, (iii) claims of subordinated creditors and (iv) claims of shareholders.

Courts have also recharacterized transactions that are, in form, loans as investments in stock for tax purposes in situations in which the purported loan "is so risky that it can properly be regarded only as venture capital."[7]  Thus, the second debt criterion applied in the case law has been whether, at the time an advance was made, it was reasonable to expect that the advance would be repaid.  Both of the RTC advances satisfied this criterion.  First, at the time the $503 million advance was made, the assets of Benj. far exceeded the amount necessary to repay it.  The amount of depositor claims was irrelevant to the expectation that the $503 million would be repaid, because the $503 million claim ranked senior to any depositor claims.  Thus, there was never any doubt that the $503 million would be repaid, and in fact it was repaid in full with interest by August 1991.  Second, as noted above the assets of the Benj. receivership significantly exceeded its liabilities to outside parties, both at the time of the purchase and assumption transaction and at the time Bank of America exercised its put options and the RTC advanced the $1.4 billion to repurchase the put assets.  Accordingly, it was also clear at all relevant times that the $1.4 billion would be repaid.  In fact, as noted above, within only a few years the $1.4 billion was repaid in full with interest.

2.  Consequences of Classification of RTC Advances as Loans

Taxpayers are generally subject to federal income tax on gross income, less allowable deductions.  For this purpose, "gross income" is generally defined in section 61 as "all income from whatever source derived."  This definition is very broad and has been interpreted as

---

[5]    William T. Plumb, Jr., The Federal Income Tax Significance of Corporate Debt: A Critical Analysis and a Proposal, 26 Tax L. Rev. 369, 509 (1971) (a seminal article summarizing and classifying the factors that courts have cited in distinguishing debt from equity).

[6]    See, e.g., Gooding Amusement Co. v. Comm'r, 236 F.2d 159 (6th cir. 1956), cert. denied, 352 U.S. 1031 (1957).

[7]    Gilbert v. Comm'r, 248 F.2d 399, 407 (2d Cir. 1957).

representing Congress's intent to "use the full measure of its taxing power" under the Constitution.[8] Nevertheless, it is a well established principle, enunciated in a long string of Supreme Court cases, that "receipt of a loan is not income to the borrower" and therefore is not taxable under section 61.[9] The implication is that the subjection of loan proceeds to an income tax would exceed Congress's power of taxation under the Constitution.

This implication is borne out by an analysis of the history of the development of Congress's Constitutional taxing power. The basic Constitutional provision setting forth the taxing power is Article I, Section 8, Clause 1, which provides that "the Congress shall have the Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States." Two other Constitutional provisions limit this taxing power, however, by stating that "direct" taxes must be apportioned among the states according to population.[10] The purpose of this limitation was to assure the states that their contributions to the government, in terms of direct taxes, would be proportional to their representation in that government.

Taxpayers relied on these Constitutional provisions to challenge an income tax enacted by Congress in 1894. In Pollock v. Farmers' Loan and Trust Co., 157 U.S. 429 (1895), the Supreme Court decided that the income tax was in part a "direct tax." Because the tax was imposed by reference to each taxpayer's income, it obviously was not apportioned among the states according to population, and therefore was Constitutionally invalid.

In order to ensure that Congress would have the power to impose an income tax without apportionment, the Sixteenth Amendment to the Constitution was adopted and ratified in 1913. That Amendment provides that "the Congress shall have power to lay and collect taxes on income, from whatever source derived, without apportionment among the several States, and without regard to any census or enumeration."

Thus, the state of affairs following Pollock and the Sixteenth Amendment is that Congress may impose any tax on income, or any "indirect tax," without the need for apportionment. However, a "direct tax" that is not a tax on income cannot be imposed by the federal government unless it is apportioned among the several states according to population. Because such an apportionment is impractical, the rule amounts to a ban on federal direct taxes that are not taxes on income.

The Pollock decision indicates that the distinction between direct taxes and indirect taxes was considered to be that direct taxes are imposed by reason of the mere ownership of property,

---

[8]    Helvering v. Clifford, 309 U.S. 331, 334 (1940).

[9]    Commissioner v. Indianapolis Power & Light Co., 493 U.S. 203, 207 (1990); Commissioner v. Tufts, 461 U.S. 300, 307 (1983); James v. United States, 366 U.S. 213, 219 (1961); Commissioner v. Wilcox, 327 U.S. 404, 408 (1946).

[10]    Article I, Section 2, Clause 3 ("Representatives and direct taxes shall be apportioned among the several States ..."); Article I, Section 9, Clause 4 ("No capitation, or other direct, tax shall be laid, unless in proportion to the census or enumeration hereinbefore directed to be taken.")

whereas indirect taxes are those that are imposed by reason of the taxpayer carrying out, or having the privilege to carry out, some activity or business.  Subsequent Supreme Court cases have embraced this distinction.[11]  By this standard, a tax imposed on the mere receipt of loan proceeds is a direct tax and, not being a tax on income, cannot be sustained under the Constitution.

### B.  Analysis of Section 597

#### 1.  History of Section 597

Section 597 was originally enacted in 1981 in an effort to facilitate the restructuring of the thrift industry in light of "recent economic conditions, including high interest rates."[12]  At that time, the Federal Savings and Loan Insurance Corporation ("FSLIC") had contributed funds to a number of thrifts in order to enable them to remain in business.  The legislative history of section 597 noted that "the repayment of these contributions may be contingent on subsequent profitability of the institution."[13]  In other cases, FSLIC contributed funds to a stronger institution in order to induce it to acquire a failing thrift.

Then, as now, there was little likelihood in the vast majority of cases that FSLIC contributions would be repaid by a failed or failing thrift.  Thus, the 1981 legislation did not discuss the possible treatment of such contributions as loans.[14]  Congress noted, however, that under the law in effect at the time a FSLIC contribution could be treated as a "nonshareholder contribution to capital," which was nontaxable under section 118 but required the recipient thrift to reduce the tax basis of other property owned by the thrift by the amount of funds received.  Section 597 was enacted to confirm that FSLIC contributions would not be taxable to failed or failing thrifts, and to change the law so that no basis reduction would be required upon the receipt of such contributions.[15]  Nothing in section 597 or its legislative history was inconsistent with the possibility that in an appropriate case a FSLIC contribution could be treated as a loan, in which case the protections of section 597 would not be required.

---

[11]    See Eisner v. Macomber, 252 U.S. 189, 217 (1920) ("taxation of property because of ownership … require[s] apportionment under the provisions of the Constitution"); Flint v. Stone Tracy Co., 220 U.S. 107, 150 (1911) (upholding a tax on the privilege of doing business as an excise tax because it did "not impose direct taxation upon property solely because of its ownership").

[12]    Joint Committee on Taxation, General Explanation of the Economic Recovery Tax Act of 1981 (December 29, 1981) at 151.

[13]    Id.

[14]    Section 597, as enacted in 1981, provided that FSLIC assistance was nontaxable regardless of whether the federal agency received a debt or equity instrument in exchange for the assistance.  Taken in context, the intent of this language was obviously to make clear that FSLIC assistance was nontaxable even if the FSLIC received nothing in exchange for its contributions.

[15]    Section 597 was amended in 1988 to include FDIC assistance within its protections.  The 1988 Act also added a rule requiring thrifts receiving financial assistance to reduce certain tax attributes by an amount equal to 50% of the assistance.

Congress substantially amended section 597 as part of the enactment of FIRREA in 1989. As amended, section 597 did not specify how federal financial assistance should be treated. Instead, the statute authorized the Treasury to issue regulations prescribing such treatment.

The FIRREA legislative history described the changes to section 597 as a "repeal" of "the special tax rules applicable to financially troubled institutions," and gave as the reason for the change its belief that "the tax subsidy provided to financially troubled financial institutions through more favorable tax rules than those applicable to other taxpayers is an inefficient way to provide assistance to such institutions."[16]  The clear implication of this language is that pre-existing principles of tax law that existed wholly outside section 597 would be unaffected by the Act.

The legislative history indicates that in repealing prior-law section 597, Congress was specifically concerned to prevent thrifts from using federal financial assistance to obtain "double benefits."  In a typical example, a thrift with, say, $1 billion of deposit liabilities and assets with a face amount of $1 billion but a fair market value of only $800 million might receive $200 million of financial assistance in order to facilitate an acquisition of the thrift's assets and liabilities by a stronger institution.  Under the prior-law version of section 597, the thrift would recognize a $200 million tax loss on the sale of its assets, but would not be required to take the offsetting $200 million of financial assistance into income.  The resulting net loss could be carried back to obtain refunds of taxes or used to offset taxes of a corporate parent or affiliate that was not necessarily subject to FSLIC or FDIC jurisdiction.  To prevent such outcomes, the legislative history stated that in implementing section 597, "the Treasury Department is not authorized to issue regulations that would permit the utilization of any deduction (or other tax benefit) which is, in effect, reimbursed by Federal financial assistance that is not includible in income."[17]

Congress clearly did not intend, however, for Federal financial assistance to result in the creation of tax liability for a thrift.  The FIRREA legislative history set forth "interim rules" to be applied pending the issuance of Treasury guidance.  The FIRREA conference report summarized those rules as follows:

> "[F]inancial assistance received by, or paid with respect to, financially troubled financial institutions is generally treated as taxable.  Such assistance is deemed to be received by the financially troubled financial institution at the time the assets of such institution are sold or transferred.  As a result, the financial assistance generally will be offset by the net operating losses and built-in losses of the financially troubled financial institution.  Thus, an acquired financially troubled financial institution will

---

[16]    H.R. Rep. No. 54, 101st Cong., 1st Sess. 25 (Report of the Committee on Ways and Means on the Financial Institutions Reform, Recovery and Enforcement Act of 1989) (May 22, 1989).

[17]    Id.

generally have no net tax liability resulting from the receipt (or deemed receipt) of financial assistance."[18]

Thus, Congress contemplated that the effect of the repeal of prior-law section 597 would be to prevent thrifts from obtaining <u>double</u> tax benefits, but not to increase the tax burden on thrifts beyond the extent necessary to achieve that goal. While Congress gave Treasury the power to write its own rules in this area, it must be presumed that Congress intended these rules to reflect its overall intent regarding the effect of new section 597.

## 2.  Application of Section 597 to Benj. Receivership

Nothing in the language or history of section 597 indicates that the treatment of the RTC advances to the Benj. receivership as nontaxable loan proceeds should be changed. As noted above, Congress conceived of its changes to section 597 as a "repeal" of the special benefits thrifts had been granted in 1981. There is no reason to suppose that Congress had any intention of changing a rule as well established and longstanding as the proposition that loan proceeds are not taxable. Any change of such magnitude surely would have been explicitly addressed by Congress if it had been intended. Moreover, Congress should not be presumed to have intended a change that would be Constitutionally invalid. To the contrary, the only reasonable interpretation of the statute and its legislative history is that Congress gave no thought to the treatment of Federal financial assistance that might constitute a *bona fide* loan. Nor did Congress have reason to do so, given that few thrift receiverships had ever generated sufficient funds to repay the federal advances they had received.

Importantly, treating the RTC advances to the Benj. receivership as nontaxable loan proceeds would not conflict with Congress's expressed purpose to prevent double tax benefits. As noted above, the FDIC has not been able to identify the exact use to which the $503 million advance was put, but the magnitude of the amount suggests that it was used to meet deposit runoffs or enable Benj. to pay other substantial debt obligations. These uses of the $503 million would not have generated tax losses for the thrift; rather, they simply would have represented the substitution of the RTC for other creditors of Benj. Thus, treating the $503 million advance as nontaxable loan proceeds would not create the possibility of a double tax benefit.

Similarly, the receipt of the $1.4 billion RTC advance did not create a tax benefit for the Benj. receivership. Rather than being used to cover deductible losses on the sale of thrift assets, the $1.4 billion was used to repurchase assets from Bank of America. Under the general approach to Federal financial assistance laid out in the 1989 legislative history, such an advance would have been taken into account, if at all, in subsequent years in which the repurchased assets were finally sold.

In sum, section 597 cannot reasonably be construed as directing that RTC advances under the circumstances present in Benj.'s case be included in taxable income. To the contrary, such treatment would manifestly be contrary to Congressional intent.

---

[18]     H.R. Rep. No. 222, 101st Cong., 1st Sess. 463-4 (Conference Report to Accompany H.R. 1278, the Financial Institutions Reform, Recovery and Enforcement Act of 1989) (August 4, 1989).

### 3.  Analysis of Guidance under Section 597

Not long after the enactment of FIRREA, the Internal Revenue Service issued Notice 89-102, which was designed to provide guidance to taxpayers regarding the application of section 597 as revised by FIRREA.  That Notice states that it is based on "the general principle that, in the absence of the exclusion provided by prior law section 597, Federal financial assistance is gross income properly taken into account by the Financially Troubled Institution."  Included in Federal financial assistance for this purpose is "any money or property" provided to a troubled institution, regardless of the form in which it is provided.

As explained above, however, absent section 597 it would not necessarily be the case that all Federal financial assistance would be regarded as income.  Thus, the "general principle" referred to in the Notice must be understood as one that would apply in most cases, but not universally.  Otherwise the Notice would be in conflict with the Congressional history and Constitutional principles described above.  The Notice's use of the adjective "general" reflects a recognition that at least one exception to the stated principle may apply.  Because excluding a *bona fide* loan would make the Notice consistent with the Code and the Constitution, the Notice must be read as providing this exception to the stated principle.

In 1992, Treasury issued proposed regulations under section 597.  The regulations were finalized, substantially in the form in which they were proposed, in 1995.  The regulations allow the inclusion of Federal financial assistance to be deferred pending the recognition of related tax losses.  Treasury's preamble to the regulations states that this rule is based on a "principle[] derived from the legislative history of FIRREA ... [that] the timing of the inclusion of FFA should, where feasible, match the recognition of the Institution's losses."  The Treasury preamble, in basing this rule on a "principle" of the legislative history, strongly suggests that Notice 89-102, unless it is interpreted in the manner set out above, would be inconsistent with the legislative history.[19]

### IV.  Conclusion

The RTC advances to the Benj. receivership were indisputably loans for federal income tax purposes.  Accordingly, these advances cannot validly be treated as taxable income under the Code or the Constitution.

In light of its legislative history and the background against which it was enacted, section 597 cannot reasonably be understood to require a contrary result.  Although the IRS guidance's treatment of Federal financial assistance as income will be unobjectionable in almost every case, that does not justify the imposition of income treatment in those rare cases, such as the Benj. receivership, in which it is apparent that the advances would be respected as loans under longstanding federal income tax principles.

---

[19]  We understand the Internal Revenue Service has taken the position that the section 597 regulations are not applicable to Benj.'s 1990 tax year because the time within which to make an election to apply the regulations to Benj.'s 1990 tax year had expired by the time the regulations were finalized.  In any event, the section 597 regulations would themselves be inconsistent with the Code and Constitution unless they were similarly interpreted to include an exception for a *bona fide* loan.

In this regard, the only IRS guidance applicable to the Benj. 1990 taxable year is Notice 89-102. If that guidance were interpreted as treating an advance from a regulator as income regardless of the circumstances under which it was provided, including situations in which the advance constituted a *bona fide* loan, it would be contrary to Constitutional principles and inconsistent with Congressional intent. However, the description of the taxation of Federal financial assistance as a "general" principle in that Notice allows the Notice to be construed to exclude a bona fide loan from inclusion in taxable income. The IRS guidance must be so construed in order to avoid a conflict with the Code and Constitutional principles described above.

295305.1

Winston & Strawn    3/17/03 2:42  PAGE  2/10    RightFAX

1426

1   IN THE UNITED STATES COURT OF FEDERAL CLAIMS

2   C. ROBERT SUESS,

3                    Plaintiff,                )
                                               )
4   v.                                         )     No.:  90-981C
                                               )
5   THE UNITED STATES,                         )
                                               )
6                    Defendant.                )

7

8                              Courtroom 13B
                               Mark O. Hatfield Federal Building
                               1000 SW Third Avenue
9                              Portland, Oregon

10                             Wednesday,
                               February 10, 1999
11

12          The parties met, pursuant to the notice of the
13   Judge, at 10:20 a.m.

14          BEFORE:  HON. LOREN A. SMITH
15                   Chief Judge

16   APPEARANCES:

17   For the Plaintiff:

18   DON S. WILLNER, Esq.
     Willner, Keaney, Mata & U'Ren, LLP
19   111 SW Front Avenue
     Suite 303
20   Portland, Oregon 97204-3500
     (503) 228-4000

21   THOMAS M. BUCHANAN, Esq.
     Winston & Strawn
22   1400 L Street, N.W.
     Washington, D.C. 20005-3502
23   (202) 371-5950

24

25

Winston & Strawn       3/17/03 2:42   PAGE   3/10    RightFAX

1427

```
 1        APPEARANCES:  (Cont'd.)

 2        For the Defendant:

 3        JONATHAN S. LAWLOR, Esq.
          Commercial Litigation Branch
 4        U.S. Department of Justice
          1100 L Street, N.W.
 5        Washington, D.C. 20530
          (202) 307-0361

 6

          MELISA B. ROGERS, Esq.
 7        Civil Division
          U.S. Department of Justice
 8        1100 L Street, N.W.
          Washington, D.C. 20530
 9        (202) 307-1011

10        G. MICHAEL HARVEY, Esq.
          U.S. Department of Justice
11        1100 L Street, N.W.
          Washington, D.C. 20530
12        (202) 307-0282

13        CARL TAYLOR, JR., Esq.
          U.S. Department of Justice
14        1100 L Street, N.W.
          Washington, D.C. 20530
15        (202) 307-0282

16

17

18

19

20

21

22

23

24

25
```

Heritage Reporting Corporation
(202) 628-4888

MURPHY - DIRECT

1498

1    A    Yes, it did.

2    Q    And could you explain that, please?

3    A    In all of the RTC acquisitions that BankAmerica

4    did, we put back significant amounts of assets that if we had

5    held, and if we had worked appropriately, would have yielded

6    significant value to Bank of America.  And we made a decision

7    to put those assets back to the RTC, because they were --

8    they weren't done -- they weren't originated our way.  The

9    appraisals weren't done to a standard that we accepted, or

10    some part of the documentation, while it may have been

11    adequate, was not done to Bank of America's standards.  It

12    may have been done to capital market's standards but not to

13    Bank of America's standards.

14        And our loan portfolio, our line officers in those

15    product areas, put back substantial assets across the board

16    in all of our RTC acquisitions, far in excess of what I

17    believed, at the time, the management of the company believed

18    was appropriate.

19    Q    Do you recall the amount of loans, in terms of

20    dollar amounts, that were put back by Bank of America to the

21    RTC receiver, with regard to Ben Franklin?

22    A    Actually, I don't recall the number that were put

23    back, no.

24    Q    Based on your testimony just now concerning the

25    value of those assets to Bank of America, had they been held,

Heritage Reporting Corporation
(202) 628-4888

MURPHY - DIRECT                                    1499

1    do you believe, based on your knowledge of the deal, that

2    Bank of America would have been better off holding on to the

3    assets it put back, with regard to the Benj. Franklin deal,

4    as opposed to --

5              MR. TAYLOR:  Objection.  Calls for speculation.

6              THE COURT:  It seems to me it's within the range of

7    a lay witness.  They're -- given this witness's function as

8    an evaluator of a newly-acquired acquisition, in making that

9    decision, it seems to me these are the kinds of judgments

10   that he makes in the normal course of his duties.  So I'll

11   allow it.

12             THE WITNESS:  Yes.  I believe B of A would have

13   made money if we held the assets.

14             BY MR. BUCHANAN:

15        Q    And instead, the bank exercised a put option that

16   was contained in the purchase assumption agreement to retain

17   certain assets to the receiver.

18        A    Yes, we did.

19        Q    Did you ever put a specific value on that put

20   option, at the time?

21        A    No, I did not.

22        Q    Could you turn to Exhibit 199-3, which is, I think,

23   another document down into the book.

24        A    Yes.

25        Q    This a Merrill Lynch document.

Heritage Reporting Corporation
(202) 628-4888

MURPHY - DIRECT

1500

1       A    Yes, it is.

2       Q    And was this document prepared on behalf of

3  BankAmerica by Merrill Lynch?

4       A    Yes, it was.

5       Q    Could you briefly describe what this document is?

6       A    This is Merrill Lynch's valuation, based upon the

7  due diligence that they performed, of the current value or

8  value on August 17 of the commercial real estate and

9  multi-family loan portfolio owned by the Benjamin Franklin.

10      Q    And what did Merrill Lynch determine, with regard

11  to the commercial loan portfolio of Benj. Franklin?

12      A    Well, their analysis indicated that all commercial

13  loans have a value greater than the value that we would

14  receive them from the RTC.

15      Q    Okay.  And did you agree with that analysis?

16      A    In our review, we discounted a little bit of the

17  value here but we -- in 199-8 you see we intended to keep a

18  major portion of the loan portfolio, yes.

19      Q    Does a put option have any value where you

20  determine the loans that you're acquiring to be of greater

21  value than the purchase price?

22      A    No, it would not.

23      Q    Were there also some auto loans and installment

24  loans that were acquired?

25      A    Yes, there were.

Heritage Reporting Corporation
(202) 628-4888

MURPHY - DIRECT                              1501

1      Q    Do you recall the view of yourself and Bank of
2    America, with regard to those loans and their value, in terms
3    of retaining them?

4      A    Yes.  It was our view that these were again worth
5    more than we would have to pay the RTC for them.

6      Q    So would your testimony be consistent there, as
7    well, that is to those loans, in terms of the value of a put
8    option?

9      A    Yes.

10     Q    Could you look at Exhibit 199-6, please, which is
11   the next document.

12     A    Yes.

13     Q    There's a cover sheet.  It appears to be from the
14   managing director of Merrill Lynch to yourself, dated
15   August 21, 1990.

16     A    Yes.

17     Q    Do you see that?  What is this cover letter in this
18   document?

19     A    This was a valuation that we had Merrill Lynch
20   prepare, working in conjunction with our residential real
21   estate folks, as to the value of the residential real estate
22   loan portfolio owned by the Benjamin Franklin.

23     Q    Could you turn to the third page of this document.
24   Down on the right-hand corner, there's a Bates stamp number
25   of 0006869.

Heritage Reporting Corporation
(202) 628-4888

MURPHY - DIRECT                                        1502

1        A    Yes.

2        Q    And there's a chart there, and it states Portfolio

3   Valuation Summary.  And under the column ML Project 70 and

4   the row that says total, there is a 100.81 number.  And over

5   on the far-hand side, there's a past price of 97.63.

6        A    Yes.

7        Q    And then there's another row titled Loans Accepted

8   in Millions.  And it has $916 million under Merrill Lynch

9   Project 70.

10            Could you explain those numbers to the Court, what

11   they mean?

12            MR. TAYLOR:  Your Honor, we object.  Mr. Murphy nor

13   Bank of America had anything to do with the preparation of

14   this document.  This was, in fact, prepared by Merrill Lynch.

15            THE COURT:  Okay.  Mr. Buchanan?

16            MR. BUCHANAN:  That's correct, Your Honor.  And

17   they retained Merrill Lynch to prepare this.  They received

18   it.  They reviewed it.  According to Mr. Murphy, they relied

19   on it to a certain extent in making their bid.  And I think,

20   based on the Court's prior rulings, that this would be

21   admissible.

22            THE COURT:  This particular document, you're

23   familiar and used this document, Mr. Murphy?

24            THE WITNESS:  Yes.

25            MR. BUCHANAN:  So I'd move this document into

Heritage Reporting Corporation
(202) 628-4888

MURPHY - DIRECT

1503

1    admission.  That's 199-6, as well as the prior Merrill Lynch

2    document, 199-3, with the exception of the handwriting on the

3    first sheet.

4              THE COURT:  Okay.  The handwriting is not an

5    admission.  Based on my prior rulings, I'll admit this.

6              MR. TAYLOR:  Your Honor, just to note, we have our

7    standing objections and the same objection I just made, with

8    regard to the prior document, as well.

9              THE COURT:  Right.

10             BY MR. BUCHANAN:

11       Q    Could you explain those figures to the Court in

12    that chart, generally?

13       A    What this essentially says is that with regard to

14    $916 million dollars of the loan portfolio, the Merrill Lynch

15    valuation was 100.81 percent of face value.  And the RTC past

16    price, according to the documents in the RTC bid package,

17    would be 97.63 percent of face value.  The difference between

18    100.81 and 97.63 is essentially profit that BankAmerica could

19    realize, if it sold those loans in the capital markets

20    immediately after acquisition, based upon the price that they

21    would pay to the RTC on a volume of $916 million, and there

22    were $916 million dollars of loans that aggregated to that

23    amount.

24       Q    So in this case the -- as well as the other cases

25    you testified about -- the put option would have no value,

Heritage Reporting Corporation
(202) 628-4888

MURPHY - DIRECT                    1504

1    since the loans were of greater value to Bank of America than

2    the Government.  Or actually, the price you were paying for

3    them was less than the value of the market.

4         A    If -- I mean -- yes.

5              THE COURT:  Mr. Buchanan, where are we on time?

6              MR. BUCHANAN:  I'm almost done, Your Honor.  I

7    think maybe ten minutes or less.

8              THE COURT:  Okay.  We'll wait to take a break until

9    then.

10             BY MR. BUCHANAN:

11        Q    Would you look at the next exhibit, which is 199-7.

12        A    Yes.

13        Q    And I don't need you to go through this, but if you

14   could just identify this document.

15        A    This is a document that I had Merrill Lynch prepare

16   for me that did two things.  It looked at Merrill Lynch's

17   view of the value of the Benjamin Franklin to Bank of

18   America.  And I also asked them to do an analysis as to what

19   their point of view was as to how much Security Pacific

20   Corporation would pay for the Benjamin Franklin, since I

21   believed that Security Pacific was my major competitor in

22   this acquisition opportunity.

23             MR. BUCHANAN:  I'd move Exhibit 199-7 into

24   evidence, Your Honor.

25             MR. TAYLOR:  Your Honor, we have the same objection

Heritage Reporting Corporation
(202) 628-4888

# STATEMENT
# OF
# BENJ. FRANKLIN SHAREHOLDERS

# PROPOSED INTERVENORS-
# DEFENDANTS

# NOVEMBER 4, 2002

## STATEMENT OF BENJ. SHAREHOLDERS
## PROPOSED INTERVENORS-DEFENDANTS
### (November 4, 2002)

In September 1990, these proposed Intervenors-Defendants sued the government in the U.S. Court of Federal Claims on behalf of 6,500 shareholders for breach of the goodwill contracts between the government and Benj. Franklin, the largest savings and loan in the Pacific Northwest. The breach of contract occurred when Congress, in the 1989 FIRREA legislation, retroactively eliminated the long-term inclusion of goodwill in regulatory capital that was earlier given to Benj. Franklin by the government as the inducement to acquire two failing thrifts, whose depositors would otherwise have been paid by the FSLIC fund. Unfortunately for Benj. Franklin and its shareholders, this breach of contract also caused the government to place the institution in federal conservatorship months after the enactment of FIRREA. The suit in the Claims Court followed promptly in September 1990. Then, in 1995, the Claims Court granted shareholder derivative standing. In 1997 there was a summary judgment for liability and, in April 2002, a damage judgment for about $35 million. Both sides have filed Motions for Reconsideration which are pending, and an appeal to the Federal Circuit is probable.

Benj. Franklin was seized in February 1990, and was so highly regarded locally that it was profitable even during the conservatorship. (Ex. A) In September 1990, Bank of America paid one of the highest premiums ever received by RTC for the deposits, and also purchased other assets with a put option. Thereafter, $1.7 billion in assets were returned to the receivership, which came into existence at the time of the Bank of America sale. James Murphy, Executive Vice President, Bank of America, who supervised its due diligence study and purchase, testified in the Claims Court trial that

-1-

Bank of America would have made money on the assets that were put back to RTC and that it put those assets back solely because procedures used by Bank of America had not been followed when the assets had been acquired by Benj. Franklin. He further testified that the Bank of America's policy was not to retain most assets in RTC acquisitions, being more interested in the deposit base (Ex. B).

In fact, the RTC-Receiver made a profit on the $1.7 billion of assets that were put back, and repaid the RTC loan plus approximately $259 million of interest. There is now about $90 million in the Benj. Franklin receivership, and all bills have been paid. Clearly, it is time to distribute those funds to the shareholders who have waited 12 years for the Benj. Franklin receivership to distribute the funds rightly belonging to them.

In its Complaint filed July 17, 2002, the United States on behalf of the Internal Revenue Service ("IRS") alleges that the Federal Deposit Insurance Corporation ("FDIC") in its corporate capacity and in its capacity as receiver for The Benjamin Franklin Savings & Loan Association ("Benj.") owes tax, penalty and interest for the taxable periods ended (i) December 31, 1990, of $94,099,423, $210,206,531 and $772,952,045; (ii) December 31, 1994, of $16,780, $70,991 and $140,874; (iii) December 31, 1999. of $110,140, $48,462 and $30,569; and (iv) December 31, 2000, of $79,711, $6,377 and $6,558.

For the reasons set forth below (i) no amounts of tax, penalty and interest are owing for 1990; (ii) interest on taxes owing for 1994, 1999 and 2000 should be recalculated at the lower of the interest rates set forth in the Internal Revenue Code ("IRC") or the interest rate which the Benj. receivership earned on its funds held by the FDIC; and (iii) no penalties should be imposed for 1994, 1999 and 2000.

## 1990 TAXABLE INCOME

For 1990 Benj. should not have shown any taxable income on line 28 (Taxable income before net operating loss deduction and special deductions) of its original 1990 Form 1120 ("1990 Line 28"). The amount shown on that line was $2,690,604,742. That amount resulted from the erroneous inclusion as income of $2,699,397,061 (Statement 4; 1990 Form 1120), described as RTC TAXABLE ASSISTANCE. By eliminating that $2,699,397,061 from income, 1990 Line 28 shows a loss ("1990 Line 28 Loss") of $8,792,319 ($2,699,397,061 minus $2,690,604,742).

No amount in 1990 advanced to Benj. by the FDIC or by its predecessor the Resolution Trust Corporation ("RTC") was taxable. All amounts advanced in 1990 were loans and were repaid with interest. Congress has no Constitutional power to impose an income tax on a transaction that is in fact and in law "a loan." At the time that the loan was made by the government to Benj., the RTC--an entity under government control--had control over, and a preferential claim on, assets whose value exceeded the amount of that loan. That the loan here was repaid with interest and that the receivership estate has a large surplus present powerful presumptions that no taxable assistance occurred and that the transaction was in fact, and in law, a loan.

Moreover, at the time that the loan was made several facts then known evidenced that the loan would in fact be repaid and that the receivership would have a large surplus. Those facts included that: (i) the loan was made for a payment to Bank of America for assets returned by it to the receivership simply because of the nature of the assets and not because of any value issue with those assets; (ii) Bank of America had paid one of the largest premiums ever received by a receivership for a thrift's goodwill represented

primarily by its deposit base; (iii) the RTC's operation of the Benj. conservatorship had been profitable; (iv) Benj. shareholders had a lawsuit pending against the United States for breach of contract before the exercise by Bank of America of its put option; and (v) most important, that the loan at all times was fully secured by assets whose value exceeded the amount of the loan. All such facts provided additional evidence of the high likelihood of what in fact did happen: the loan was repaid with interest. Finally, in the regulations implementing IRC Section 597, which deals with taxable regulatory assistance, the IRS recognized Congressional intent not to impose an income tax on the amount of such repaid assistance through complex computations explained in Regulations § 1.597-2 for "FFA that is not currently included in income."

The 1990 Line 28 Loss of $8,792,319 understates the actual loss sustained in 1990 by Benj. because of the failure to include in the tax basis of assets sold that year an amount equal to the sum of each of the following assets: (i) the tax basis of the $6,809,000 goodwill acquired in 1985 by Benj., when, as a mutual thrift, Benj. acquired Western Heritage Federal Savings and Loan Association, a stock thrift, and (ii) the tax basis of the $342,535,000 goodwill acquired in 1982 by Benj. when, as a mutual thrift, Benj. acquired Equitable Savings & Loan Association, a stock thrift. Neither of those transactions qualified as a non-taxable transaction under the 1985 United States Supreme Court decision in the case of Paulsen v. Commissioner of Internal Revenue, 469 U.S. 131, which held that the acquisition of a stock thrift by a mutual thrift was taxable. Benj. has never deducted such goodwill in the computation of its taxable income. All such goodwill is properly deductible in 1990 when the Benj. receiver sold its operations to Bank of America. Those goodwill amounts apparently escaped the RTC's consideration

amount. The government had control of and the use of Benj. cash. Cash is fungible. Thus, there is no justification for the IRS, a part of the Treasury Department of the United States, to charge the Benj. receivership a rate of interest higher than the rate that was paid by the Treasury Department to the Benj. receivership on the funds held in the United States Treasury on behalf of the Benj. receivership by another Federal entity, the FDIC. The interest rate charged the Benj. receivership on any unpaid tax should therefore be the lower of the interest rate on unpaid taxes authorized by the IRC or the interest rate earned by the FDIC on the Benj. receivership funds which it had on deposit with the United States Treasury.

Accordingly, the amount of taxes for 1994, 1999 and 2000 of $16,780, $110,140 and $79,711, together with interest calculated as explained in the preceding paragraph that is applicable to the amounts of 1994, 1999 and 2000 taxes, should be paid by the FDIC as receiver to the IRS.

## PENALTIES

Penalties are intended to punish wrongdoers and deter others from committing similar acts. They serve no purpose when imposed on a receivership, as explained in the decision of the United States District Court for the Western District of Oklahoma in the 1983 case of Professional Asset Management, Inc. v. Penn Square Bank, N.A.., 563 F. Supp. 134. Funds now held by the FDIC in the Benj. receivership are for the benefit of the Benj. shareholders, who had no role in not paying timely amounts properly due and owing to the IRS. Thus, no penalties should be imposed.

## CONCLUSION

Proposed Intervenors-Defendants appreciate the willingness of the Department of Justice to take a fresh look at this claimed tax liability.

The 1990 tax assessment should be abated. In place of the large gain reported on the original 1990 tax return, Benj. in that year actually sustained a large loss for two reasons. First, the alleged FFA never occurred since in 1990 the funds received by Benj. from the government was in fact and in law a fully secured loan that was repaid in full with interest. Thus, the entire FFA must be deleted from income. When that deletion is made, Benj. will show a loss for 1990. Second, in 1990 Benj. received a very large premium when Bank of America acquired the Benj. goodwill represented by the then Benj. deposit base. The amount of that premium was included as part of the taxable income reported by Benj. in 1990. No deduction, however, was taken for the tax basis of that portion of the goodwill represented by the deposit base and other rights that Benj. had acquired in taxable transactions in 1982 and 1985 from stock thrifts. The rights represented by that acquired goodwill were either (i) sold in 1990 to Bank of America or (ii) became worthless that year when Benj. went into receivership and its business terminated. Recognizing that deduction for the tax basis in 1990 of the 1982 and 1985 acquired goodwill results in a very large 1990 Benj. tax loss for that year.

The taxes owing for 1994, 1999 and 2000 and related interest on those tax amounts, calculated as explained above, should be far less than $500,000. Those amounts should be paid by the FDIC to the IRS.

The balance of the funds then remaining in the Benj. receivership, approximately $90 million, should then promptly be made available to and for the benefit of the Benj. shareholders.

RUSH - DIRECT

5528

1    WALTER W. RUSH,

2    having been first duly sworn, was called as a witness herein

3    and was examined and testified as follows:

4              THE COURT:  Please be seated at the witness

5    stand.  There's a pitcher and a clean glass.  Help yourself.

6              THE WITNESS:  Thank you.

7              THE COURT:  Ms. Romero, you can proceed.

8              DIRECT EXAMINATION

9              BY MS. ROMERO:  Good morning.

10        Q    Can you please state your name, for the record.

11        A    Yes.  My name is Walter Kenneth Rush, the III.

12        Q    And where do you live, Mr. Rush?

13        A    I live at 422 William Street, Denver, Colorado.

14        Q    Mr. Rush, I'd like to direct your attention to

15   the binder that's in front of you, the tab that's marked

16   DX 13014.

17        A    Yes.

18        Q    It's a document labeled on goodwill accounting

19   for the Benjamin Franklin Federal Savings and Loan

20   Association.  If you would, turn to the last few pages of

21   that DX.

22        A    Yes.

23        Q    There's a document there that's about four pages

24   long.  Is this your resume, Mr. Rush?

25        A    Yes, it is.

EXHIBIT___A 1 of 2

DIRECT - RUSH                                    5770

1    that the same business as a going concern would also show

2    profit?

3         A    I don't see that there's a linkage there at all.

4              THE COURT:  Let me ask you, Ms. Romero, if this is

5    a point we can take a break?  We've been going about an hour.

6              MS. ROMERO:  Oh, a point for a break, you mean?

7              THE COURT:  Yes.

8              MS. ROMERO:  I think I'm almost done with this line

9    of questioning, Your Honor.

10             THE COURT:  Okay.

11             BY MS. ROMERO:

12        Q    Do you know what the status of the conservatorship

13   was at inception?

14        A    The conservatorship received essentially the -- the

15   conservatorship took over from Benjamin Franklin Savings and

16   Loan.  So maybe the easiest way to think about it is if you

17   look at the December 31, 1989, financial statements of Ben

18   Franklin, that's largely what the receiver inherited --

19   pardon me -- the conservator inherited.

20        Q    Was the conservatorship profitable?

21        A    Modestly.  If you'll turn to my report on the

22   conservatorship which is under --

23        Q    13,066.

24        A    Thank you.  If you'll turn to Page 4 of my report

25   in the conservatorship, you'll see in the middle of the page

A 7 17

MURPHY - DIRECT                           1433

1    the clerk's stand, the clerk has the Bible, and he'll swear

2    you in, if you'll place your left hand on the bible and raise

3    your right hand.

4    Whereupon,

                        JAMES D. MURPHY

5

6    having been first duly sworn, was called as a witness herein

7    and was examined and testified as follows:

8                   THE COURT:  If you'll please be seated.  There's

9    water and a cup.  Please feel free to help yourself.

10                  We have a new court reporter with us today.

11                  MS. EVANS:  Good morning.

12                  THE COURT:  Good morning.  And your name is?

13                  MS. EVANS:  My name is Andrea Evans.

14                  THE COURT:  Good to have you with us, Andrea.

15                  All right.  Mr. Buchanan, please proceed.

16                       DIRECT EXAMINATION

17                  BY MR. BUCHANAN:

18       Q    We'll let Mr. Murphy get himself some water before

19    we begin.

20                  Mr. Murphy, could you state your full name for the

21    record and spell your last name, please.

22       A    James Dennis Murphy, M-U-R-P-H-Y.

23       Q    And where do you reside, sir?

24       A    310 El Cerrito Avenue, Piedmont, California 94611.

25       Q    And how long have you lived there?

EXHIBIT B 1 of 12

MURPHY - DIRECT                                    1438

1       A    Yes, I did.

2       Q    While you were in corporate development, in fact in

3   charge of that unit, did you, on behalf of the Bank of

4   America, acquire any thrift institutions?

5       A    Yes.  I acquired a number of thrift institutions.

6       Q    About approximately how many did you bid on?

7       A    Well, we bid on about 20 institutions through the

8   RTC process and two or three other institutions that were

9   outside the RTC process that were thrift institutions.

10      Q    And how many did you actually acquire on behalf of

11  Bank of America?

12      A    I think 13 RTC transactions and one or two thrifts

13  that were non-RTC.

14      Q    Was one of the thrift institutions that Bank of

15  America acquired Benjamin Franklin of Portland, Oregon?

16      A    Well, it was the receiver for Benjamin Franklin,

17  yes.

18      Q    And when did that transaction occur, if you recall?

19      A    In 1990.

20      Q    Would that be September of 1990?

21      A    Yes, I believe so.

22      Q    And did you acquire Benjamin Franklin from the RTC

23  as receiver for Benj. Franklin?

24      A    Yes.

25      Q    Do you recall when Benj. Franklin was seized by the

Heritage Reporting Corporation
(202) 628-4888

EXHIBIT B 4.12

MURPHY - DIRECT                                    1442

1    appropriately utilized to do a valuation of the institution,

2    as to what we could afford to pay for it.

3           I would make a presentation to the managing

4    committee of Bank of America, as to what we could afford to

5    pay and whether or not it was an appropriate strategic

6    acquisition for us.

7           I would handle all of the negotiations with the RTC

8    and the closing process, if we were the successful bidder.

9           And then I would hand the implementation, if we

10   were successful, over to line management for the actual

11   operations, if we were the successful bidder.

12       Q    How many members of Bank of America were involved

13   in the due diligence process, in analyzing Benj. Franklin?

14       A    My estimate is approximately 30 to 50.

15       Q    And how long did the process of due diligence by

16   Bank of America last?

17       A    I can't recall exactly, but I think approximately a

18   month.  Generally, you had a four-to-six-week process between

19   when the bid package was delivered and the institution was

20   open and available for due diligence, until your bid was due

21   with the RTC.

22       Q    Did Bank of America retain any outside experts or

23   financial advisers to assist them in the due diligence

24   process?

25       A    Yes.  We retained Merrill Lynch to assist us.  And

EXHIBIT B 50/12

MURPHY - DIRECT                                                    1443

1    I also had a consultant working for me at the time named

2    Doyle Arnold, who later became an employee of Bank of

3    America.

4         Q    And was Merrill Lynch a recognized expert in

5    financial analysis of thrift acquisitions, at this point in

6    time?

7         A    Yes.

8         Q    How many employees or staff did Merrill Lynch

9    contribute to the effort of due diligence?

10         A    Well, there were three or four senior Merrill Lynch

11    representatives and then a number of people I really don't

12    know.  Lots of them would have been in their New York office,

13    but quite a few.

14         Q    Could you look at the second exhibit in your binder

15    in front of you, which has been marked for identification

16    purposes as Plaintiff's Exhibit 199-11.  It would be the

17    second exhibit in your binder.

18         A    Yes.

19         Q    It's titled Joint Meeting of the Executive

20    Committees of the Board of Directors of Bank of America

21    Corporation.  It's dated September 7, 1990.

22              Have you seen this document before?

23         A    Yes, I have.

24         Q    Does this appear to be typical meeting minutes for

25    the Board of -- or the meeting of the Executive Committee of

EXHIBIT B 6 1

1    case.  In addition, we would also make a hearsay objection to

2    the minutes being offered.

3            THE COURT:  Mr. Buchanan, with respect to the

4    hearsay -- the other one I have already ruled upon so --

5            MR. BUCHANAN:  Your Honor, I think it's a business

6    document of Bank of America.  I mean, if there's any document

7    that an institution like Bank of America records in the

8    regular course of business and maintains in the regular

9    course of business, it's the meeting of the Board of

10   Directors and the executive committee.  So that is the

11   exception to the hearsay rule on which basis I would move its

12   admission.

13           THE COURT:  I'll allow it.  It seems the corporate

14   minutes are close to the border line, but I'll allow it as a

15   business record.

16           BY MR. BUCHANAN:

17      Q    Mr. Murphy, you testified that Bank of America

18   ultimately acquired Benj. Franklin from RTC receiver.

19           What was the purchase price of the institution that

20   Bank of America paid?

21      A    Well, the bid that we submitted was a premium of

22   $162.3 million dollars.

23      Q    Now, in terms of bids that Bank of America had made

24   for thrift institutions at that time, particularly with

25   regard to premiums for a deposit base of the institution

EXHIBIT $B$ 7 1 12

1    loan area and missing significant opportunities is both a

2    weakness and an opportunity, because our guys are saying --

3    or we're saying that we saw opportunities to go in and sell

4    additional product that currently wasn't being sold through

5    the distribution system, but that with our operations and

6    systems, we'd be able to do; and that there had been some

7    questionable decisions regarding the location and processing

8    for teller and ATM systems.

9          You know, again, comments like this, with regard to

10   decisions that are made on operational issues like this are

11   very common in due diligence reports for any institution.

12   There is a real not-invented-here syndrome that all of these

13   due diligence teams had.  The way B of A did it was always

14   the best way.  And I generally -- you know, I would list

15   these.  I would point them out to management, because they

16   were part of the due diligence report, and it's my

17   responsibility to convey to senior management, you know, an

18   accurate representation of what was said.  But they were not

19   large dark clouds that would have affected our valuation

20   here.

21        Q    The comments you made about not-invented-here, I am

22   referring to due diligence personnel with Bank of America,

23   did that carry over at all, that philosophy or attitude, with

24   regard to putting back assets that had been acquired from

25   Bank of America?

EXHIBIT B 90/12

MURPHY - DIRECT                                          1498

1      A    Yes, it did.

2      Q    And could you explain that, please?

3      A    In all of the RTC acquisitions that BankAmerica

4  did, we put back significant amounts of assets that if we had

5  held, and if we had worked appropriately, would have yielded

6  significant value to Bank of America.  And we made a decision

7  to put those assets back to the RTC, because they were --

8  they weren't done -- they weren't originated our way.  The

9  appraisals weren't done to a standard that we accepted, or

10  some part of the documentation, while it may have been

11  adequate, was not done to Bank of America's standards.  It

12  may have been done to capital market's standards but not to

13  Bank of America's standards.

14          And our loan portfolio, our line officers in those

15  product areas, put back substantial assets across the board

16  in all of our RTC acquisitions, far in excess of what I

17  believed, at the time, the management of the company believed

18  was appropriate.

19      Q    Do you recall the amount of loans, in terms of

20  dollar amounts, that were put back by Bank of America to the

21  RTC receiver, with regard to Ben Franklin?

22      A    Actually, I don't recall the number that were put

23  back, no.

24      Q    Based on your testimony just now concerning the

25  value of those assets to Bank of America, had they been held,

MURPHY - DIRECT                                          1499

1     do you believe, based on your knowledge of the deal, that

2     Bank of America would have been better off holding on to the

3     assets it put back, with regard to the Benj. Franklin deal,

4     as opposed to --

5                    MR. TAYLOR:  Objection.  Calls for speculation.

6                    THE COURT:  It seems to me it's within the range of

7     a lay witness.  They're -- given this witness's function as

8     an evaluator of a newly-acquired acquisition, in making that

9     decision, it seems to me these are the kinds of judgments

10    that he makes in the normal course of his duties.  So I'll

11    allow it.

12                   THE WITNESS:  Yes.  I believe B of A would have

13    made money if we held the assets.

14                   BY MR. BUCHANAN:

15        Q     And instead, the bank exercised a put option that

16    was contained in the purchase assumption agreement to retain

17    certain assets to the receiver.

18        A     Yes, we did.

19        Q     Did you ever put a specific value on that put

20    option, at the time?

21        A     No, I did not.

22        Q     Could you turn to Exhibit 199-3, which is, I think,

23    another document down into the book.

24        A     Yes.

25        Q.    This a Merrill Lynch document.

Heritage Reporting Corporation
(202) 628-4888

EXHIBIT B 11 ol

MURPHY - DIRECT                                          1500

1      A    Yes, it is.

2      Q    And was this document prepared on behalf of

3  BankAmerica by Merrill Lynch?

4      A    Yes, it was.

5      Q    Could you briefly describe what this document is?

6      A    This is Merrill Lynch's valuation, based upon the

7  due diligence that they performed, of the current value or

8  value on August 17 of the commercial real estate and

9  multi-family loan portfolio owned by the Benjamin Franklin.

10     Q    And what did Merrill Lynch determine, with regard

11 to the commercial loan portfolio of Benj. Franklin?

12     A    Well, their analysis indicated that all commercial

13 loans have a value greater than the value that we would

14 receive them from the RTC.

15     Q    Okay.  And did you agree with that analysis?

16     A    In our review, we discounted a little bit of the

17 value here but we -- in 199-8 you see we intended to keep a

18 major portion of the loan portfolio, yes.

19     Q    Does a put option have any value where you

20 determine the loans that you're acquiring to be of greater

21 value than the purchase price?

22     A    No, it would not.

23     Q    Were there also some auto loans and installment

24 loans that were acquired?

25     A    Yes, there were.

Heritage Reporting Corporation
(202) 628-4888

EXHIBIT B12412

SUPPLEMENTAL STATEMENT OF BENJ. SHAREHOLDERS
PROPOSED INTERVENORS-DEFENDANTS
DECEMBER 6, 2002

This statement supplements the November 4, 2002, statement of the Benj. Shareholders. That statement, in which we explained why the Benj. receivership had no 1990 taxable income, was used for purposes of the discussion at the meeting on November 19, 2002 (the "Meeting") among representatives of the FDIC, the Benj. Shareholders, the Department of Justice and the IRS to discuss the tax, interest and penalties that the IRS has alleged to be due from the Benj. receivership with respect to 1990. This statement and the November 4, 2002 statement are privileged settlement communications within the meaning of Rule 408 of the Federal Rules of Evidence.

At the meeting, (i) representatives of the FDIC explained that the Benj. receivership had failed to claim, in 1990 and in subsequent years, a deduction for the interest that had accrued and was ultimately paid on indebtedness owing from the Benj. receivership to the RTC and (ii) representatives of the Benj. Shareholders explained that in determining the tax consequences of the sale of the Benj. business to Bank of America in 1990, the Benj. receivership had failed to take into account the tax basis of goodwill that Benj. had acquired in connection with its 1982 acquisition of the Equitable Savings and Loan Association.

As requested by the IRS representatives at the Meeting, this Supplemental Statement explains the factual and legal basis for the 1990 goodwill deduction. This Supplemental Statement also explains why the inclusion in 1990 taxable income of an amount of $69,306,035, which was described as "Income Recognized On Conversion to Cash Method – RTC LAS Adjustment," was improper and should be reversed.

Where, as here, the government has sought collection of a tax in court, the taxpayer has the right to contest the merits of that tax as part of the litigation that the government has commenced. *See, e.g., United States v. O'Connor*, 291 F. 2d 520 (2d Cir. 1961). However, we are optimistic that this matter can be resolved without further litigation. In that regard, we sincerely appreciate the willingness of the FDIC and the IRS to meet informally with us to achieve the mutual goal of reaching a settlement. We would appreciate the opportunity to respond if, after review of this Supplemental Statement, any issues remain with respect to whether any tax is due for 1990 from the Benj. receivership.

I.    Goodwill

A.    Goodwill Defined.

At the outset, we think it will be helpful to distinguish the goodwill discussed in this supplemental statement from what has frequently been referred to as "supervisory goodwill." Supervisory goodwill arises when a thrift acquires another institution in a transaction that is treated, for purposes of generally accepted accounting principles ("GAAP"), as a "purchase"

rather than a "pooling of interests." In a transaction accounted for as a "purchase," the assets of the acquired thrift are put on the books of the acquiring thrift at values that reflect the price paid by the acquiring thrift--generally, the sum of the consideration paid and the liabilities assumed. If this purchase price exceeds the values of all of the identifiable assets of the acquired thrift, the excess is carried on the books as "goodwill." Under GAAP, goodwill must generally be amortized over a period of years.

Supervisory goodwill refers to the fact that prior to FIRREA, the thrift regulators, in order to induce healthier thrifts to acquire thrifts that were close to failure, allowed the acquiring thrifts to take the goodwill generated in purchase-accounting transactions into account in determining whether they satisfied regulatory capital standards. FIRREA, enacted in 1989, required thrifts to eliminate goodwill in determining their capital ratios for regulatory purposes, in many cases causing thrifts to fail to meet those ratios overnight. The elimination of supervisory goodwill by FIRREA is the basis for the claims brought against the government in the *Winstar* cases.

A number of taxpayers have taken the position that supervisory goodwill, i.e. the contract right of a thrift to count goodwill as capital, was a valuable asset in which the thrift had a tax basis, and that this basis should have been depreciable or deductible as an abandonment loss following the enactment of FIRREA. The Benj. Shareholders have not advanced this claim and are not doing so here.

The Benj. Shareholders' claim is with respect to the goodwill that is recognized for tax purposes when thrift assets are acquired in a transaction in which the amount paid to the seller, plus the seller's liabilities assumed by the acquirer, exceed the fair market value of all of the acquired assets (other than goodwill). Under well established tax principles, if the transaction is one in which the acquiror obtains a cost basis, rather than a carryover basis, in the thrift assets, the acquiror will be regarded as having acquired goodwill with a tax basis equal to the excess purchase price. This tax basis will generate a tax deduction if the goodwill is depreciated, abandoned or sold. This will be the case regardless of how the transaction is reported under GAAP or whether or not the regulators may have allowed the goodwill to be counted as capital.

B.    In the 1982 Transaction with Equitable, Benj. Acquired by Purchased Goodwill Having a Tax Basis of $346,439,160.

Benj. acquired the assets of Equitable on September 30, 1982. At that time, Benj. was a federally-chartered mutual association, i.e., an association without shareholders or capital stock. Equitable was a state-chartered stock association. The acquisition of the Equitable assets by Benj. involved three steps, none of which would have occurred unless all three were to occur: (i) the shareholders of Equitable exchanged their shares in Equitable for savings deposits in Benj. with an aggregate principal amount of $10 million; (ii) Equitable surrendered its Oregon state stock charter, adopted a new charter as a federal mutual association, and renamed itself the Benj. Franklin Federal Savings and Loan Association ("New Benj."); and (iii) the pre-existing Benj. was merged into New Benj., with deposit holders of the pre-existing Benj. receiving deposits in

2

New Benj. The net effect of those steps was the creation of a new federal mutual association, New Benj., which had acquired the Equitable and Old Benj. assets.

At the time of the transaction, the IRS position was that savings deposits in a mutual institution were not the equivalent of equity stock, and that therefore a transaction in which shareholders exchanged stock for savings deposits could not satisfy the continuity of interest requirement. *See* Rev. Rul. 69-6, 1969-1 CB 104. Many tax practitioners and some courts disagreed with that IRS conclusion on the ground that the deposit accounts represented the sole equity ownership of a mutual thrift. The acquisition of Equitable by Benj. was reported by both parties on their 1982 returns as a tax-free reorganization. As a result, the assets of Equitable were carried on the tax balance sheet of the new institution at the same tax basis that they had in the hands of Equitable immediately prior to the acquisition.[1] In particular, the goodwill of Equitable was treated as having a zero tax basis, the same tax basis that it had in the hands of Equitable.

The issue of whether transactions like the acquisition of Equitable by Benj. qualified as tax-free reorganizations was definitively resolved by the Supreme Court in 1985 in *Paulsen v. Commissioner*, 469 U.S. 131 (1985). In that decision the Supreme Court considered the merger of a stock thrift into a mutual thrift and held that the stockholders of the stock thrift could not treat their receipt of deposit accounts in the mutual thrift as equity stock because those deposit accounts did not represent the same type of proprietary interest as equity stock. Thus the receipt of such deposit accounts did not qualify for tax deferral under section 368. As explained below, the effect of *Paulsen* is that the assets of Equitable should have been assigned a new cost basis in the hands of the new institution resulting from the acquisition. In particular, the goodwill of Equitable should have been assigned a tax basis equal to its fair market value of $346,439,160.

Following *Paulsen*, it is clear that the acquisition of the Equitable assets by New Benj. for savings accounts in Benj. and the assumption of Equitable's liabilities did not qualify as a tax-free transaction.[2] That transaction did not satisfy the *Paulsen* continuity-of-interest requirement. Accordingly, New Benj. acquired the Equitable assets at their fair market value, which was their cost to New Benj., and did not succeed to Equitable's cost in those assets.

Under this analysis, the tax basis of the Equitable assets in the hands of New Benj. was equal to the sum of (i) the fair market value of the $10 million principal amount of savings deposits paid for the Equitable stock and (ii) the fair market value of the liabilities of Equitable assumed in the transaction, reduced by the fair market value of all of the assets other than goodwill. Ben. and its accountants, Peat Marwick Mitchell & Co., determined in 1982 that this purchase price exceeded the fair market value of Equitable's tangible assets by $342,535,160. This additional purchase price was assigned to goodwill. In this regard, a letter dated April 22,

---

[1] *See* section 362(b) (basis of property acquired by a corporation in connection with a tax-free reorganization is generally the same as the basis of that property in the hands of the transferor).

[2] Section 368 was amended in 1981 to provide that the continuity of interest requirement would, in effect, be waived in the case of an acquisition of a thrift if the Federal Home Loan Bank Board certified that circumstances justifying the appointment of a receiver existed or would exist in the near future in the absence of action by the FHLBB. *See* Section 368(a)(3)(D)(ii)(III). No such FHLBB certification was sought or received in connection with the acquisition of Equitable.

3

1983, from Ian D. G. McKechnie, Chief Financial Officer of Benj. to Donald W. Mochel, Vice President -- Supervisory Agent of the Federal Home Loan Bank of Seattle, noted that Benj. "has recorded as goodwill on its balance sheet, at September 30, 1982, $342 million representing the difference between the fair value of the liabilities assumed and the assets acquired." That Letter further described that goodwill as "an array of intangible assets such as market share, customer base, experienced employees, new market entry, technology and licenses to operate on an inter-state basis. We believe, for instance, that the right to operate in three other states, a right denied most other financial institutions in this country, has a significant value for the operations of the Benj. Franklin for the foreseeable future. . . ."

In 1983, the goodwill calculation was adjusted to take into account approximately $3,904,000 of preacquisition Equitable liabilities assumed in the transaction that had been subject to contingencies at the time of the transaction and therefore had not originally been included in the goodwill calculation.[3] This adjustment increased the amount by which the purchase price exceeded the fair market value of Equitable's assets other than goodwill, as of the acquisition date, from $342,535,160 to $346,439,160.[4] Thus, the tax basis of the Equitable goodwill was at least $346,439,160.[5]

C.    <u>Benj.'s 1990 Taxable Income Should Have been Reduced By the $346 Million Tax Basis in the Goodwill Acquired in 1982.</u>

Benj.'s taxable income should have been reduced in 1990 by the entire $346 million tax basis in the Equitable goodwill for one or more of the following reasons: (i) the goodwill became depreciable once it became clear, following the enactment of FIRREA and the placement of Benj. into conservatorship, that the goodwill had a finite useful life: (ii) any goodwill not claimed as a depreciation deduction should have been included in the cost basis of the assets sold to Bank of America.

1.    <u>Depreciation Deduction.</u>

To be depreciable an asset must have a finite life. When acquired by Benj. from Equitable in 1982 and concurrently combined with the Benj. business, the goodwill purchased from Equitable was not deductible for tax purposes because that goodwill – being related to the Equitable business acquired by Benj. – had the same indefinite life as the combined Equitable-Benj. business. Even though that combined business in fact had an indefinite life, for purposes of generally accepted accounting principles ("GAAP"), which was followed for regulatory accounting principles ("RAP"), the amount of goodwill could not be included as an asset for an infinite period. The maximum period was 40 years, which was the time period over which Benj.

---

[3] This was confirmed in the February 27, 1984 opinion letter from Peat, Marwick, Mitchell & Co. to the Benj. Board of Directors and the accompanying audited financials for the year ended December 31, 1983.

[4] Treas. Reg. § 1.338-7(e) *Example 1* provides an example of a situation in which the amount of tax basis allocated to goodwill is increased as a result of a liability that is contingent at the time of the acquisition but later matures.

[5] It may be that similar increases in assumed liabilities were identified in years after 1983. We have not yet reviewed Benj.'s audited financials for 1984 and later years to determine whether this is the case.

was required to amortize its purchased goodwill for GAAP and RAP purposes. Thus, while no portion of the purchased goodwill – even if it had a tax basis – could be deducted in 1982 for tax purposes because the goodwill in fact had an indefinite life, for purposes of GAAP and RAP, the goodwill was given a hypothetical 40 year life over which the amount of the purchased goodwill was to be deducted from income computed under GAAP and RAP.

Unfortunately, a regulatory decision was made in 1990 to terminate the combined business of Equitable, Western and Benj. that had resulted from the acquisitions. That decision to terminate the business – i.e., by placing Benj. into a federal conservatorship, followed by a federal receivership – caused the goodwill to have a limited life and become subject to depreciation under IRC Section 167.

Income Tax Regulations Section 1.167(a)-1(b) provides in part that "For the purpose of section 167 the estimated useful life of an asset is not necessarily the useful life inherent in the asset but is the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business. . . ." Income Tax Regulations Section 1.167(a)(9) provides that obsolescence can be caused by many factors, including "regulatory action," and "In any case in which the taxpayer shows that the estimated useful life previously used should be shortened by reason of obsolescence greater than had been assumed in computing such estimated useful life, a change to a new and shorter estimated useful life computed in accordance with such showing will be permitted." Accordingly, the goodwill tax basis became eligible in 1990 for depreciation under IRC Section 167 for the period from the time that a regulatory decision was made to terminate the business to which that goodwill related until the time of its termination by the sale of the Benj. customer base to Bank of America later in 1990.

2.    Loss on Sale.

In September 1990, the Resolution Trust Corporation, as conservator of Benj., sold a substantial amount of Benj.'s assets and liabilities to the Bank of America. As a result of this transaction, all of the goodwill inhering in Benj.'s business was transferred to the Bank of America. In this regard, the Bank of America acquired all of Benj.'s deposits, and thus Benj.'s ongoing business relationships with its depositors. Following the Bank of America transaction, Benj. ceased to conduct any business. Within a few days, Benj. was placed in receivership and its activities thereafter were essentially limited to holding and liquidating its remaining loans and securities.

The 1990 tax returns filed by the Benj. receivership reflected this transaction by (i) calculating gain or loss on the sale of the assets without regard to the tax basis in the Equitable goodwill and (ii) separately reporting as taxable income the premium received from Bank of America. This treatment was erroneous because (i) the goodwill should have been taken into account as one of the assets sold by the Benj. receivership and (ii) the premium should simply have been treated as part of the purchase price paid by Bank of America and included in the overall gain or loss calculation, not taken into account as a separate line item of taxable income.

In light of these facts, Benj. should have reported a loss equal to the amount by which its tax basis in the transferred assets, including the $346 million tax basis in the goodwill, exceeded

5

the sum of (i) the premium paid by Bank of America and (ii) the liabilities assumed by Bank of America. In particular, the amount by which the $346 million basis in the goodwill exceeded the portion of Bank of America's purchase price allocable to the goodwill should have been recognized as a loss in 1990 under section 1231(a)(2) on property "held for more than 1 year" used in "the trade or business" as defined under IRC Section 1231(b) – "property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 167."

D.    Other Issues Relating to the Equitable Acquisition.

    1.    NOL Carryover to 1990.

The tax returns filed by the Benj. receivership claimed the benefit of a $139 million net operating loss carryforward from pre-1990 years. We have been unable to determine from information available to us how, if at all, that net operating loss carryforward would be affected by accounting for the Equitable acquisition as a taxable, rather than a tax-free, transaction. However, even if the net operating loss were eliminated, the effect of taking into account Benj.'s tax basis in the Equitable goodwill would be more than sufficient to offset the net income on which the IRS's assessment is based. Because the amount of the net operating loss carryforward appears to be irrelevant in determining any of the amounts at issue in the Complaint, we believe that determining that correct amount will not be necessary.

    2.    Other Adjustments from Carryover Basis to Cost Basis.

As noted above, in 1990 most of the Benj. assets were sold to Bank of America, which also assumed nearly all of the Benj. liabilities, including the entire customer deposit base. We have not yet been able to determine from information available to us how, if at all, the tax treatment of this transaction would be affected if the Equitable transaction were accounted for as a taxable, rather than a tax-free transaction. It should be possible to calculate the effect of using cost rather than carryover basis for the Equitable assets by reference to the Benj. records held by the FDIC. However, based on our understanding that the great majority of the Equitable assets had matured or been sold by 1990, we would not expect the difference to be large enough to cause Benj. to owe tax for 1990.

E.    IRS Published Guidance.

We have studied the IRS published guidance listed on the attached Schedule, which was referred to us by both FDIC and Justice Department representatives. None is relevant to the issues discussed above for the reasons stated on that Schedule.

II.    Income Recognized on Conversion to Cash Basis

A Schedule attached to the 1990 Benj. original federal tax return lists as an item included on "Line 10: Other Income" the amount of $69,308,035 described as "Income Recognized On Conversion to Cash Basis – RTC LAS Adjustment." The source of this adjustment is not clear.

It appears to be related to accounting adjustments that would have been made by the RTC at the inception of the receivership. There is some indication in the record in *Suess v. United States* that the adjustment reflects a restatement of assets and liabilities to remove illiquid items.[6]  If so, such adjustments would have been irrelevant to the determination of Benj.'s taxable income. The adjustment is equally inappropriate if it reflects the consequences of converting Benj. from an accrual to a cash basis method of accounting.  As a corporation, Benj. was not permitted to use the cash basis method of accounting for tax purposes, regardless of whether such a method might have been used by the RTC for receivership purposes.  *See* section 448.  Accordingly, this income inclusion should be reversed.

III.    <u>Spreadsheets</u>

We will provide you early next week with the spreadsheets requested by the Justice Department representatives at the November 19, 2002 Meeting.

---

[6]  Walter Rush, a witness for the United States, testified that "the receivership uses what they call a modified cash method of accounting. ... [B]asically what it does is it removes from the financial statements those items that are not currently convertible into cash or will not currently require the use of cash. ... And that netted to approximately $61 million dollars." Testimony of Walter K. Rush, April 22, 1999, Tr. 5775:15-23.

**SCHEDULE**

**IRS PUBLISHED GUIDANCE**

1.      IRS FSA 200013006, dated December 29, 1999, issued March 31, 2000, holds that supervisory goodwill—the right granted by the regulators to amortize goodwill acquired in a transaction under IRC Section 368 in which gain or loss is not recognized for tax purposes but is treated for GAAP and RAP purposes as a purchase so that solely for those purposes goodwill has a basis – is not money or other intangible property within the meaning of IRC Section 597. Further, because no tax basis exists, no amount is deductible as a loss under IRC Section 165. These facts are distinguishable from the Benj. goodwill because Benj. had a tax basis in its goodwill and is seeking to deduct that tax basis. The litigation in the Claims Court concerns the Benj. supervisory goodwill, for which no tax deduction has been or is now being claimed.

2.      IRS FSA 200028001, dated March 22, 2000, issued July 14, 2000, holds that in a tax-free transaction under IRC Section 368 the transferee corporation takes the tax basis of the transferor corporation in supervisory goodwill, which under the facts was zero. These facts are distinguishable from the Benj. goodwill because Benj. had a tax basis in its goodwill and is seeking to deduct that tax basis.

3.      IRS FSA 200050001, dated July 9, 2000, issued December 15, 2000, holds that supervisory goodwill granted in a tax-free acquisition under IRC Section 368 is not money or other property within the meaning of IRC Section 597 and that because no tax basis exists no amount is deductible as a loss under IRC Section 165. These facts are distinguishable from the Benj. goodwill because Benj. had a tax basis in its goodwill and is seeking to deduct that tax basis.

4.      TAM 200119007, dated January 17, 2001, issued May 11, 2001, holds that supervisory goodwill granted in a tax-free acquisition under IRC Section 368 is not money or other property within the meaning of IRC Section 597 and that because no tax basis exists no amount is deductible as a loss under IRC Section 165 or as depreciation under IRC Section 167. These facts are distinguishable from the Benj. goodwill because Benj. had a tax basis in its goodwill and is seeking to deduct that tax basis.

5.      IRS CCA 200206014, dated November 2, 2001, issued February 8, 2002, holds that supervisory goodwill acquired in a tax-free transaction under IRC Section 368 is not money or other property within the meaning of IRC Section 597 and that because no tax basis exists no amount is deductible for supervisory goodwill, for the right to use supervisory goodwill or for depreciation of supervisory goodwill. These facts are distinguishable from the Benj. goodwill because Benj. had a tax basis in its goodwill and is seeking to deduct that tax basis.

6.      IRS CCA 200208002, dated November 27, 2001, issued February 22, 2002, holds that supervisory goodwill acquired in a tax-free transaction under IRC Section 368 is not money or other property within the meaning of IRC Section 597 and that because no tax basis exists in the goodwill or the right to use goodwill no amount of goodwill is deductible as depreciation under

IRC Section 167. These facts are distinguishable from the Benj. goodwill because Benj. had a tax basis in its goodwill and is seeking to deduct that tax basis.

7.    IRS CCA 200210053, dated December 11, 2001, issued March 8, 2002, holds that supervisory goodwill acquired in a tax-free transaction under IRC Section 368 is not money or other property within the meaning of IRC Section 597 and that because no tax basis exists in goodwill or the right to use goodwill no amount of goodwill is deductible as depreciation under IRC Section 167. These facts are distinguishable from the Benj. goodwill because Benj. had a tax basis in its goodwill and is seeking to deduct that tax basis.

8.    IRS CCA 200216016, dated January 18, 2002, issued April 19, 2002, holds that supervisory goodwill acquired in a transaction under IRC Section 368 is not money or other property within the meaning of IRC Section 597 and that because no tax basis exists in goodwill or the right to use goodwill no amount of goodwill is deductible as depreciation under IRC Section 167. These facts are distinguishable from the Benj. goodwill because Benj. had a tax basis in its goodwill and is seeking to deduct that tax basis.

9.    IRS CCA 200216018, dated January 18, 2002, issued April 19, 2002, holds that supervisory goodwill acquired in a transaction under IRC Section 368 is not money or other property within the meaning of IRC Section 597 and that because no tax basis exists in goodwill or the right to use goodwill no amount of goodwill is deductible as depreciation under IRC Section 167. These facts are distinguishable from the Benj. goodwill because Benj. had a tax basis in its goodwill and is seeking to deduct that tax basis.

SH_DC1 235889v1